# Exhibit "B"

Kerry V. Nelson - April 22, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JESSICA PEREZ, INDIVIDUALLY AND )
AS NEXT FRIEND OF KEEGAN          )
HILLSMAN AND MORGAN HILLSMAN,     )
MINOR CHILDREN                    )
                                  )
     vs.                          ) No. 5:19-CV-00375
                                  )
ALVIN BOECKEN AND JIM BALLARD     )
D/B/A CAB TRANSPORT               )
_____ )

VIDEOTAPED DEPOSITION OF KERRY V. NELSON

Payson, Arizona

April 22, 2020

Prepared By:
Karen L. Locker, RPR
Certified Reporter #50821

**Coash & Coash, Inc.**
602-258-1440          www.coashandcoash.com

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 3 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

Page 2

```
 1                    I N D E X
 2   WITNESS                                      PAGE
 3   KERRY V. NELSON
 4        Examination by Mr. Finley              5
         Examination by Mr. Fischel            120
 5        Further Examination by Mr. Finley    123
 6
 7
 8                  EXHIBITS MARKED
 9   EXHIBITS       DESCRIPTION                  PAGE
10
     Exhibit 1      CV of Kerry V. Nelson          9
11
     Exhibit 2      12/23/19 Invoice from Commercial
12                  Vehicle Forensics, LLC        31
13   Exhibit 3      Notice of Deposition for
                    Kerry Nelson                  35
14
     Exhibit 4      Flash Drive containing Mr.
15                  Nelson's file                 36
                    (Marked upon receipt from witness)
16
     Exhibit 5      November 11, 2019 letter from
17                  Robert Fischel to Mr. Nelson  39
18   Exhibit 6      Contract for Services         92
19   Exhibit 7      Plaintiff's Designation of
                    Experts                       55
20
     Exhibit 8      Rule 26 Deposition and Trial
21                  List                          58
22   Exhibit 9      Kerry Nelson's Notes          91
23   Exhibit 10     Report of Kerry V. Nelson     93
24
25
```

Page 3

```
 1       VIDEOTAPED DEPOSITION OF KERRY V. NELSON
 2   was taken on April 22, 2020, commencing at 8:37 a.m., at
 3   180 East Ezell Lane, Payson, Arizona, before Karen L.
 4   Locker, a Certified Reporter in the State of Arizona,
 5   reported via videoconference
 6
 7
 8                  *   *   *
 9   APPEARANCES:
10
     For the Plaintiff:
11
         DAVIS LAW FIRM
12       By:  Mr. Robert O. Fischel
         10500 Heritage Boulevard, #102
13       San Antonio, Texas 78216
         210-444-4444
14       Robertf@davislaw.com
         (Via videoconference)
15
16   For the Defendants:
17       THORNTON, BIECHLIN, REYNOLDS & GUERRA, L.C.
         By:  Mr. Jeffrey K. Finley
18       100 N.E. Loop 410, Suite 500
         San Antonio, Texas 78216
19       210-342-5555
         jfinley@thorntonfirm.com
20       (Via videoconference)
21
22
23   Also present:
24       Jerry Coash, Videographer (via videoconference)
25
```

08:36:48-08:38:10

Page 4

1    THE VIDEOGRAPHER: We are on the record. The
2 time is 8:37 a.m. Here begins Volume 1, Media Unit No. 1
3 in the deposition of Kerry Nelson in the matter of Jessica
4 Perez v. Alvin Boecken and Jim Ballard in the United
5 States District Court for the Western District of Texas,
6 San Antonio Division, Case No. 5:19-CV-00375.
7    Today's date is April 22nd, 2020.
8    Our court reporter is Karen Locker.
9    My name is Jerry Coash, Jr., certified legal
10 videographer, representing Coash and Coash.
11    This video deposition is taking place at 180
12 East Ezell Lane, Payson, Arizona.
13    Counsel, please identify yourselves and state
14 whom you represent.
15    MR. FISCHEL: Robert Fischel for the plaintiff,
16 Jessica Perez.
17    MR. FINLEY: Jeff Finley for the defendants,
18 Alvin Boecken and Jim Ballard d/b/a CAB Transport.
19    THE VIDEOGRAPHER: Before we proceed I will ask
20 counsel to agree on the record that because of the Corona
21 virus pandemic and social distancing there is no objection
22 to the deposition officer administering a binding oath to
23 the witness remotely.
24    Please state your agreement on the record.
25    MR. FISCHEL: No. Objection --

08:38:11-08:39:06

Page 5

1    MR. FINLEY: Counsel for defendant -- sorry --
2 counsel for defendants agrees.
3    MR. FISCHEL: Counsel for the plaintiff also
4 agrees.
5    THE VIDEOGRAPHER: Will the court reporter
6 please swear in the witness.
7
8    KERRY V. NELSON,
9 a witness herein, having been first duly sworn by the
10 Certified Reporter to speak the truth and nothing but the
11 truth, was examined and testified as follows:
12
13    EXAMINATION
14    BY MR. FINLEY:
15 Q. Good morning, Mr. Nelson. How are you?
16 A. Good morning, Mr. Finley. I'm doing fairly
17 well.
18    MR. FINLEY: Before we get started.
19    Robert, we had discussed this off the record
20 before we went on, but do you want to enter into an
21 agreement with respect to objections.
22    MR. FISCHEL: Yeah. We had talked about
23 handling objections pursuant to the State rules, and I
24 think it's what we have done in all the other depositions,
25 so...

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

08:39:07-08:40:21                                    Page 6

1    MR. FINLEY: I agree to the same.
2    MR. FISCHEL: Okay.
3    BY MR. FINLEY:
4  Q.  Mr. Nelson, please state your full name for the
5  record.
6  A.  Kerry V. Nelson.
7  Q.  Mr. Nelson, I believe, and correct me if I'm
8  wrong, you've given a deposition before.
9  A.  Yes.
10 Q.  Okay.  I know this is not your first time to do
11 a deposition.  It may be one of your first times to do one
12 in a Zoom setting such as we're in today, and doing it
13 completely remotely, but I know you've given a deposition
14 before.  Because of that I won't take as much time as I
15 typically would with the witness to go through a bunch of
16 different ground rules that I'd like for you and I to have
17 an understanding on here today, but I will remind you that
18 you are under oath giving sworn testimony in this lawsuit
19 here today, and you understand that what you testify to
20 can and may be read back to the jury at the time of trial
21 as well as the video of your deposition.
22 A.  I understand.
23 Q.  Okay.  You understand that I, I represent the
24 defendants, Alvin Boecken and Jim Ballard, in this
25 lawsuit?

08:40:21-08:41:24                                    Page 7

1  A.  Yes.
2  Q.  Okay.  As we go along here today please let me
3  know, especially in light of the circumstances and the
4  fact that we're taking this deposition remotely, if you do
5  not hear or understand any of the questions that I ask
6  you.
7  A.  I'll do that.
8  Q.  If there is anything that you simply do not
9  understand because I spoke too softly, we had a
10 disconnection, you know, with our remote circumstances, or
11 the phrasing was confusing please ask me to repeat it.
12 I'll be glad to do so.  Otherwise, I will assume that you
13 understood the question as asked and take the answer as
14 given.
15 A.  Okay.
16 Q.  If you need to take a break today for any reason
17 please let me know and I'm glad to take a break and to be
18 able to get through this in a timely fashion here today.
19 A.  Okay.
20 Q.  The only thing I ask in return is if there's a
21 question on the table is to please answer that before we
22 take a break.
23 A.  All right.
24 Q.  Mr. Nelson, where do you currently reside?
25 A.  I reside in Payson, Arizona.

08:41:31-08:42:48                                    Page 8

1    Would you like the address?
2  Q.  Please.  Please.
3  A.  180 East Ezell, E-Z, as in zebra, E-L-L, Lane,
4  Payson, Arizona, 85541.
5  Q.  Was that mason or -- was that with an M?
6  A.  No.  P-A-Y -- P as in Paul, A-Y-S-O-N.
7  Q.  Got you.
8    And you have your own business.  Is that
9  correct?
10 A.  That's correct.
11 Q.  What's the name of that business.
12 A.  Commercial Vehicle Forensics.
13 Q.  And where is the, what is the principal place of
14 business for you, the business location?
15 A.  At that address I just gave you.
16 Q.  Okay.  Mr. Nelson, how old are you today?
17 A.  Oh, let's see.  75.
18 Q.  Okay.  Your date of birth?
19 A.  11/17/45.
20 Q.  Mr. Nelson, are you a registered professional
21 engineer in any state?
22 A.  I am not.
23 Q.  Have you ever been?
24 A.  No, sir.
25 Q.  Mr. Nelson, did you attend high school?

08:42:59-08:44:45                                    Page 9

1  A.  I did.
2  Q.  Where did you attend?
3  A.  In a place called Camelback High School in
4  Phoenix, Arizona.
5  Q.  And did you graduate from there?
6  A.  I did.
7  Q.  And what year did you graduate?
8  A.  1963.
9  Q.  Did you attend any type of secondary education
10 after that?
11 A.  Two years of college.
12 Q.  And where was that at?
13 A.  One year at Northern Arizona University and one
14 year at Phoenix College.
15 Q.  And why don't we go ahead, then, and just attach
16 right now as an exhibit to your deposition your CV.  That
17 will be Exhibit No. 1.
18    (Exhibit 1 was marked for identification.)
19    MR. FINLEY: And then is the, if we can -- can
20 the CV be displayed?
21    THE VIDEOGRAPHER: Yes, sir.  Just a moment.
22    MR. FINLEY: Sure.
23    BY MR. FINLEY:
24 Q.  Mr. Nelson, can you see a copy of your CV on the
25 screen in front of you?

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

1  A.  Yes, sir.
2  Q.  Okay.  You may have a hard copy there in front
3  of you as well.  I don't know, but I'm looking at your CV
4  right now.  We're talking about education, and you said
5  you had one year of undergraduate work at Northern
6  Arizona, and then you said one year at Phoenix College,
7  correct?
8  A.  Yes, sir.
9  Q.  Now, I'm looking at your CV, and that one year
10  at Northern Arizona you write on there, you identify there
11  that your curriculum was mechanical engineering.
12      Was that a major that you had at that time?
13  A.  Yes.
14  Q.  All right.  And then, again, at Phoenix College
15  you identify the curriculum again as mechanical
16  engineering.
17      Was that your major at Phoenix College?
18  A.  Yes, sir.
19  Q.  All right.  Did you obtain any type of a degree
20  from Northern Arizona University?
21  A.  I did not.
22  Q.  Did you obtain a degree of any kind from Phoenix
23  College?
24  A.  I did not.
25  Q.  All right.  Your education section of your CV

1  shows two years, 1964 to '66, at Phoenix College, and you
2  had told me one year.  I just want to clarify that with
3  you now.
4      Is it one or two years at Phoenix College?
5  A.  That should be -- it's probably an error,
6  because I have '63 to '64 Northern Arizona University.
7  I'm sorry.  Two years at Phoenix College, yes, sir.  Three
8  years of college --
9  Q.  Okay.
10  A.  -- instruction total.  I'm sorry.  I'm --
11  Q.  That's okay.  I just want to make sure I'm on
12  the same page with you.
13      Aside from mechanical engineering being your
14  major at both of those colleges did you have any other
15  majors or minors that you were focused in at that time?
16  A.  No.
17  Q.  Aside from the education listed on your CV,
18  Mr. Nelson, have you attended any other types of colleges,
19  junior colleges, community colleges, anything of that
20  nature?
21  A.  No.
22  Q.  All right.  Have you obtained, to date, any type
23  of degree based in engineering?
24  A.  I have not.
25  Q.  To date, have you obtained any type of a degree

1  at all?
2  A.  No, sir.
3  Q.  So then I take it, and correct me if I'm wrong,
4  there would not be any type of postgraduate secondary
5  education in your background, correct?
6  A.  Correct.
7  Q.  Mr. Nelson, have you taught any courses in the
8  past?
9  A.  Can you expand on that a little bit?
10  Q.  Yeah, I can.  I'll break it down for you.
11      Have you taught any courses in a, in a school
12  setting of any kind, like a university, a junior college,
13  community college, anything like that?
14  A.  Not in a college environment, no.
15  Q.  Okay.  I take it from your answer you have
16  taught, though.  Is that correct?  Is that what you're
17  alluding to?
18  A.  Yes.
19  Q.  Okay.  What have you -- where have you taught?
20  A.  Well, it would be the SOS truck driving school.
21  I was an instructor in that school for a little shy of ten
22  years.
23  Q.  Okay.  And have you taught anywhere else besides
24  the SOS truck driving school?
25  A.  We'll, I suppose you could look at it as a

1  teaching position.  I was Pepsi Cola's chief training
2  instructor for two different occasions in the past,
3  instructing individuals on how to operate a
4  tractor-trailer.
5  Q.  And which years were you in that position at
6  Pepsi?
7  A.  Oh, let's see, I probably need to get my CV on
8  the screen.  1985 to 1995 for the truck driving school,
9  and I don't have a date for instructor position at Pepsi
10  Cola, but it was during the early '90s, '90, '91,
11  somewhere in there.
12  Q.  Okay.  And just so I'm on the same page with
13  you, sir, the SOS truck driving school that you referred
14  to earlier, is that on your CV?
15  A.  Yes.
16  Q.  Okay.  Which page is that on?
17  A.  It's under D&A Consultants.
18  Q.  Okay.  So when you have SOS Big Rig Driver
19  Training that's what you're referring to?
20  A.  Yes, sir.
21  Q.  All right.  And then the Pepsi Cola position
22  you're saying is or is not on your CV?
23  A.  It is.  It's right above that line, driver
24  training instructor for Pepsi Cola.
25  Q.  Okay.  You're just saying you don't have a year

---

1    on there?
2  A.  Correct.  But if I remember right --
3  Q.  That's what I --
4  A.  -- somewhere around '90 or '91.
5  Q.  Okay.  Aside from those two positions would you
6    describe your prior experience as a, as a teacher in any
7    other fashion?
8  A.  No.
9  Q.  Okay.  Now, we talked about this earlier,
10   Mr. Nelson, but you have your own company currently that's
11   Commercial Vehicle Forensics.  Is that right?
12  A.  Yes, sir.
13  Q.  And you've had that from September 2016 to the
14   present?
15  A.  Yes, I have.
16  Q.  All right.  Do you have any employees working
17   for you, or do you solely operate that by yourself?
18  A.  I'm by myself.
19  Q.  Okay.  And has it been that way since you
20   started?
21  A.  Yes, sir, it has.
22  Q.  Okay.  And what do you do with that company
23   itself?  What are your -- what's your role with that
24   company?  What type of service do you provide?
25  A.  Well, it hasn't changed much over the years.

---

1    The services I provide are services that render itself to
2    litigation issues concerning vehicle collisions and,
3    namely, commercial vehicle collisions.
4  Q.  Okay.  And do you hold yourself out to be a
5    consultant in that fashion?
6  A.  I do.
7  Q.  Okay.  Your consulting work that you do for
8    Commercial Vehicle Forensics, is it solely tied to
9    litigation based matters?
10  A.  Yes.  Now --
11  Q.  And -- go ahead.
12  A.  -- nowadays it is.
13  Q.  Okay.  Was there a point in time -- let me ask
14   it this way.
15       You say nowadays.  Is nowadays, when you say
16   that means September 2016 to the present or a different
17   time frame?
18  A.  I would agree to that.  Before that there were
19   other consulting positions that I performed.
20  Q.  Okay.  And what would those be?
21  A.  That would be, as an example, let's say an
22   insurance company wants to insure a trucking company.
23   They would call us, and us being the prior companies I
24   worked for, to go into the trucking company and examine
25   their operation in terms of driver qualification, their

---

1    compliance with the Federal Motor Carrier Safety
2    Regulations, their maintenance shop, if they had one, and
3    what their scheduling, make sure their scheduling complied
4    with regulation, and things of that nature.
5  Q.  How long did you do that before it solely, your
6    consulting work solely focused on litigation matters?
7  A.  Well, that would have been when I was employed
8    by D&A Consultants both times.
9  Q.  Okay.
10  A.  Also when I was employed by Ruhl Forensics and
11   Evidence Solutions.
12  Q.  All right.  Now, Evidence Solutions is the next
13   company down on your CV.  You have that listed from being
14   from March 2014 to September 2016.
15       Did you own and operate that business as well?
16  A.  No.
17  Q.  Okay.  What was your title with that company?
18  A.  I was an employee.
19  Q.  Okay.  The description you just gave me with
20   regards to the type of consulting work you've done in the
21   past and nonlitigation, in a nonlitigation context, did
22   you do that with Evidence Solutions?
23  A.  Sometimes, yes.
24  Q.  Okay.  Did you also do work related to
25   litigation matters with Evidence Solutions?

---

1  A.  Yes.
2  Q.  Does that generally describe the type of work
3    you performed for that company?
4  A.  Well, generally, yes.  I mean, it's, you know,
5    when you start analyzing cases, or start consulting in
6    trucking companies, you know, there's lots of different
7    areas down underneath that.  But generally, yes, I would
8    agree.
9  Q.  Okay.  And by that, when I say generally, I mean
10   you told me about the context of consulting on behalf of,
11   say, an insurance carrier as your client for a trucking
12   business in addition to consulting in a litigation
13   context.  That's what I was referring to when I said
14   generally.
15  A.  Okay.  I'll agree to that.
16  Q.  Okay.  Now, the next company down is D&A
17   Consultants in Phoenix.  And you mentioned working for
18   them on two separate occasions.
19       What specific work did you do for D&A
20   Consultants?
21  A.  Well, let me preface this answer by saying that
22   D&A Consultants the first time around was the first place
23   I worked after I got out of the Navy, and D&A Consultants
24   was my introduction into the litigation analysis area,
25   working for both defense and plaintiff attorneys.  Also,

---

08:55:33-08:56:55                                          Page 18

1    at that time, the owner of D&A Consultants owned the
2    trucking company that I became an instructor in.  And also
3    during that time I was the training instructor for Pepsi
4    Cola on two different occasions, along with other
5    responsibilities such as consulting with trucking
6    companies or businesses in the commercial vehicle area,
7    things of that nature, along with, of course,
8    investigating and reconstructing commercial vehicle
9    collisions.
10   Q.  Okay.  So I have from you then that with D&A
11   Consultants that was your introduction into the litigation
12   field.  You were an instructor for a trucking company.
13   You consulted, as well, as we have discussed, in that
14   litigation context and nonlitigation context, and then you
15   said during that time frame you also was, were a training
16   instructor for Pepsi.
17   A.  Yes, sir.
18   Q.  Okay.  Now, D&A Consultants, was that owned by
19   Don Asa?
20   A.  Correct.
21   Q.  And I see also on your CV you worked for a
22   Bashas', Inc., worked for them for two years.  Is that
23   correct?
24   A.  Well, that was while I was with D&A Consultants.
25   That was another, another job aspect that -- only because

08:57:00-08:58:19                                          Page 19

1    Don Asa was the safety director at Bashas'  and another
2    company called Western Produce which Bashas' owned at the
3    time.  So --
4    Q.  Now -- go ahead.
5    A.  From time to time I'd drive a tractor-trailer
6    for them picking up groceries throughout the state of
7    California, Nevada, and such, as a casual driver.  And
8    casual driver meant that, let's say one of their employee
9    drivers was on sick leave and they needed a load to go
10   out, they'd had call over to D&A Consultants and one of
11   two of us that did this would then go over and drive a
12   truck and deliver groceries.
13   Q.  And you worked in that fashion for two years?
14   A.  Yes.
15   Q.  Okay.  Bashas', Inc. that you mentioned earlier,
16   is it a grocery delivering business?
17   A.  Bashas' is a grocery store here in Arizona.
18   Q.  Right.  And so the work you did for them was to
19   drive a truck and deliver groceries?
20   A.  Yes.
21   Q.  All right.  Was there a specific reason why that
22   only lasted for two years?
23   A.  Well, I don't know if there was a specific
24   reason.  That's just the time that they used me, in
25   particular, as a casual driver for the company.

08:58:21-08:59:31                                          Page 20

1    Q.  How many states did you drive in for Bashas',
2    Inc.?
3    A.  It would be, generally, Arizona and California.
4    Q.  Okay.  So the work that you performed, and
5    correct me if I'm wrong, as I understand it, would it be
6    delivering the groceries from the warehouse to the grocery
7    store?
8    A.  Yes.
9    Q.  Okay.  Were there any other driving duties
10   besides that?
11   A.  No.
12   Q.  Besides driving for Bashas', Inc., in your past
13   have you driven for any other motor carrier?
14   A.  I have not.
15   Q.  I see also on your CV that you worked for the
16   Arizona Department of Public Safety for a period of time.
17   Did you ultimately retire from the Department of
18   Public Safety?
19   A.  No.  I resigned.
20   Q.  Okay.  While you were with the Department of
21   Public Safety did you have any type of disciplinary action
22   taken against you?
23   A.  No.
24   Q.  Were you ever suspended for any reason while
25   working with them?

08:59:32-09:00:51                                          Page 21

1    A.  No.
2    Q.  Okay.  I note on your CV that you identify
3    investigating commercial motor vehicle events or incidents
4    on there.
5        How much -- or what percentage of your work with
6    the Arizona Department of Public Safety involved
7    tractor-trailer related investigations?
8    A.  Quite a bit because I was stationed on a major
9    highway in Arizona and it had a lot of heavy truck traffic
10   at the time.
11   Q.  Can you approximate what you mean by quite a
12   bit?
13   A.  Well, the truck drivers, the trucking companies
14   would either use Interstate 8, US 60, or Interstate 40 for
15   truck traffic.  And so, of those three passageways, I was
16   on US 60.  And truck traffic, of course, was heavy on that
17   road because there were only three, three roads to the
18   west coast coming through Arizona.
19   Q.  So, Mr. Nelson, are you able to approximate the
20   percentage of your work that involved tractor-trailer
21   investigations?
22   A.  No, I can't.  I can tell you that there were a
23   lot of wrecks on US 60 involving commercial vehicles.
24   And, in fact --
25       MR. FINLEY: Object to nonresponsive.

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 8 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

09:00:53-09:01:59                                    Page 22

     BY MR. FINLEY:
 2  Q.  So, just to be clear, you cannot approximate the
 3  percentage?
 4  A.  No, I can't.  You know, when you, when you're an
 5  officer out on the, in the field and enforcing the laws
 6  and investigating accidents on the highways it's hard to
 7  approximate how many truck wrecks you had versus how many
 8  motorcycle wrecks you had, versus how many passenger
 9  vehicle wrecks you had and so forth.
10     MR. FINLEY: Object to nonresponsive after no, I
11  can't.
12     BY MR. FINLEY:
13  Q.  With regards to your CV, Mr. Nelson, do you hold
14  an accreditation with ACTAR, so the Accreditation
15  Commission for Traffic Accident Reconstruction?
16  A.  Not any more.
17  Q.  Okay.  Have you ever held that ACTAR -- and I'm
18  going to use that acronym just to make things easier --
19  have you ever held the ACTAR certification?
20  A.  I did.
21  Q.  Okay.  What period of time did you hold that
22  for?
23  A.  While I was employed with Ruhl Forensics.
24  Q.  All right.  So can I -- is it fair for me to go
25  off of your CV, then, to say that you held it from 1995 to

09:02:07-09:03:23                                    Page 23

 1  2003?
 2  A.  No.  I think I received that certification
 3  somewhere in '98 or '99, something like that.
 4  Q.  Okay.  And then how long did you have that in
 5  effect, or how long was that certification valid for?
 6  A.  I think it was until the time I left Ruhl
 7  Forensics.
 8  Q.  So 1998 to 2003?
 9  A.  That's -- I would estimate that, yes.
10  Q.  Okay.  During that period of time, Mr. Nelson,
11  did you have to have the certification renewed, or was it
12  valid for the entire five years without renewal?
13  A.  I think it was valid for the entire five years.
14  Q.  Okay.  When you got the certification initially
15  did you have to take any type of an examination and pass
16  it to get the certification?
17  A.  Yes.
18  Q.  Okay.  Did you pass the exam on the first try?
19  A.  I did.
20  Q.  Okay.  Is that the only time you've taken the
21  examination for the ACTAR certification?
22  A.  Yes.
23  Q.  Okay.  And since 2003 you have not renewed that
24  certification?
25  A.  That's correct.

09:03:24-09:04:48                                    Page 24

 1  Q.  Okay.  Why have you not renewed it since then?
 2  A.  Well, I have slowly got away from accident
 3  reconstruction --
 4  Q.  Okay.
 5  A.  -- after Ruhl Forensics.
 6  Q.  Now, I see here on your CV you identified
 7  professional societies, different societies itself.
 8     Are you currently a dues paying active member of
 9  any of those societies on your CV?
10  A.  I am not.
11  Q.  Okay.  With respect to the Arizona Trucking
12  Association when was the last time you were an active
13  member of that association?
14  A.  I don't recall.
15  Q.  Okay.  With respect to the National Association
16  of Professional Accident Reconstruction Specialists when
17  was the last time you were an active member of that
18  association?
19  A.  That's probably while I was with Ruhl Forensics,
20  as is Truckload Carriers Association and the National
21  Safety Council.
22  Q.  Okay.  So for those three societies or
23  associations that you just mentioned you have not been an
24  active member with those societies since 2003 at the
25  latest?

09:04:48-09:06:06                                    Page 25

 1  A.  Yes.
 2  Q.  Okay.  And I believe the final one on here would
 3  be the Southwestern Association of Technical Accident
 4  Investigators.
 5     Are you currently an active member of that
 6  association?
 7  A.  No, I am not.
 8  Q.  Okay.  And when were you last an active member
 9  of that association?
10  A.  While I was employed with Evidence Solutions.
11  Q.  So that would have been as of 2016?
12  A.  Yes.
13  Q.  Okay.  The, the memberships or societies that
14  you listed on here, and correct me if I'm wrong, but it
15  sounds like from your testimony memberships that you note
16  on your CV, or prior memberships I should say, were tied
17  to your employment with Ruhl Forensics as well as Evidence
18  Solutions, correct?
19  A.  Yes.
20  Q.  And by that I mean were you individually a
21  member or were you a member associated with your firm or
22  company being a member to that society?
23  A.  I think two of those -- the Arizona Trucking
24  Association, the Truckload Carriers Association, and the
25  National Safety Council were all firm memberships.

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

09:06:10-09:07:23 — Page 26

1  Q.  Okay.  And so it should say firm membership,
2  then, on your CV for Truckload Carriers Association as
3  well?
4  A.  Yes.
5  Q.  All right.  Would it not be more accurate, then,
6  on your CV to indicate that you're no longer in those
7  societies --
8  A.  That would be correct.
9  Q.  -- so it accurately represents what your society
10  membership is or is not?
11  A.  Yes.
12  Q.  Okay.  Do you hold any certification, brake
13  certifications?
14  A.  Other than going to a brake school -- in fact,
15  other training and seminars I have listed as Air Brake
16  Consultants Seminar of the Arizona Trucking Association.
17  Q.  Okay.  So the answer -- the original question,
18  then, do you hold any certification, brake certifications?
19  A.  None from other than one from attending that
20  seminar.
21  Q.  Okay.  And I have got your CV here in front of
22  me on what is going to be the fourth page of it, or
23  starting on the third going into the fourth.
24      Can you refer me to which seminar you're talking
25  about?

09:07:23-09:08:21 — Page 27

1  A.  It would be the Air Brake Consultant Seminar by
2  the Arizona Trucking Association.
3  Q.  All right.  And that -- I'm sorry.
4  A.  Dealing with Bendix brake systems.
5  Q.  I see that's the second item listed under other
6  training and seminars, correct?
7  A.  Yes.
8  Q.  And there's not a specific year or date for that
9  seminar.
10      When did that occur?
11  A.  I don't remember.
12  Q.  Okay.
13  A.  I think it was while --
14  Q.  Do you have a --
15  A.  I think it was while I was with Ruhl Forensics.
16  Q.  So sometime in the 1998 to 2003 period -- or '95
17  to '03 period?
18  A.  Yes, sir.
19  Q.  Okay.  And, just to be clear, did you obtain any
20  type of a certification from attending that seminar, or is
21  that just a seminar you attended relating to brakes?
22  A.  Well, you receive a certification after you
23  attend the seminar that you --
24  Q.  Okay.
25  A.  -- that you, in fact, attend the seminar and

09:08:25-09:10:12 — Page 28

1  left there with the understanding of a braking system.
2  Q.  Is that certification, beyond saying that you
3  went to the school, is it some type of a certification
4  that you have currently active that had to be renewed over
5  time?
6  A.  No.  Not at all.
7  Q.  Okay.  Now, your, your CV talks about, under
8  publications, editorial duties for the Truck and Trucking
9  Handbook with Ruhl and Associates.
10      What did you do specifically?  What were your
11  editorial duties?
12  A.  It was a publication originated by Ruhl
13  Forensics, or the staff at Ruhl Forensics.  They wanted an
14  update from a book that Don Asa had published some years
15  back.  So, along with myself, Don Asa and another employee
16  at Ruhl Forensics sat down and created the
17  tractor-trailers -- I'm sorry -- the, the Truck and
18  Trucking Handbook for Ruhl Forensics to be edited and
19  published for various attorney firms.
20  Q.  Okay.  Were these attorney firms clients of Ruhl
21  Forensics or Ruhl Associates?
22  A.  Yes.  Both plaintiff and defense.
23  Q.  And your duties with respect to editing, did you
24  actually write or have a hand in writing the handbook, or
25  just editing the content of the book?

09:10:14-09:11:37 — Page 29

1  A.  No.  My job was to write different chapters of
2  the book.  The editing was done by other staff members
3  before the book was finalized and published.
4  Q.  How many other individuals had a hand in writing
5  the handbook besides yourself?
6  A.  It would be Don Asa and an individual by the
7  name of Robert Coulter and myself.
8  Q.  Okay.  So you did not actually do the editing.
9  It sounds like you're telling me you're more of the
10  drafting side of that book?
11  A.  Right.  That's correct.  Staff at Ruhl Forensics
12  edited the publication for us.
13  Q.  Okay.  Now, I see on your CV you have two
14  presentations identified in the past.
15      Both of those associations that you presented to
16  would those be plaintiff lawyer based associations?
17  A.  Yes.
18  Q.  Okay.  Now, in your experience, Mr. Nelson, have
19  you become familiar with the title safety director in the
20  context of a motor carrier business?
21  A.  Sure I have.
22  Q.  Have you ever been a safety director before?
23  A.  I have not.
24  Q.  Have you ever been the vice president of safety
25  for a motor carrier company?

09:11:39-09:13:00                                      Page 30

1  A.  No.
2  Q.  Have you ever been a safety manager for a motor
3  carrier company?
4  A.  No.
5  Q.  Have you ever been a safety supervisor for a
6  motor carrier company?
7  A.  No.
8  Q.  In your past, working for motor carriers that
9  you identified on your CV, that being Bashas', have you
10 ever been responsible for hiring truck drivers?
11 A.  I have not.  Not for Bashas'.
12 Q.  Okay.  Have you been responsible for hiring
13 truck drivers before for another company?
14 A.  I have not.
15 Q.  Okay.  Now, earlier you talked about working for
16 Bashas' and then for D&A Consultants.
17    With respect to hiring truck drivers, if you
18 have not run them before, I take it then you never had to
19 make the decision to hire or not hire a driver based upon
20 his MVR report?
21 A.  That's correct.  Only in litigation.
22 Q.  In terms of evaluating decisions made by other
23 companies?  Is that what you're talking about?
24 A.  Yes, sir.
25 Q.  Okay.  Now, in this particular lawsuit,

09:13:09-09:15:31                                      Page 31

1  Mr. Nelson, you were hired by counsel for the plaintiff to
2  be a witness in this case.  Is that correct?
3  A.  Yes, sir.
4  Q.  All right.  And you expect to be paid for your
5  services, I take it?
6  A.  I would hope so.
7  Q.  What is the payment arrangement that you have
8  with counsel for plaintiff?
9  A.  Oh, boy.  Hang on a minute.
10 Q.  Okay.  And why don't we do this.  Let's attach,
11 it's going to be Exhibit 2 to this deposition, the invoice
12 provided by Mr. Nelson.
13    (Exhibit 2 was marked for identification.)
14    THE WITNESS:  Okay.  The answer to your
15 question, my arrangement with Mr. Fischel's office is that
16 they will be billed at a rate of 325 an hour, and
17 deposition testimony would be billed at 375 an hour with
18 three hour minimum.
19    BY MR. FINLEY:
20 Q.  Okay.  And the deposition testimony hourly rate
21 is that the same rate for trial testimony as well too if
22 you have to testify at trial?
23 A.  Yes, sir.
24 Q.  Is any of the work you're providing based on a
25 flat fee schedule?

09:15:32-09:16:43                                      Page 32

1  A.  Well, the flat fee -- no.  Hourly rate only.
2  Q.  Okay.  And we had here identified as Exhibit 2
3  in your deposition, Mr. Nelson, a copy of an invoice that
4  you have provided here in this case.
5     Is this the only invoice that's been submitted
6  thus far for your work in this case?
7  A.  Yes, sir.
8  Q.  Okay.  In looking at the invoice itself --
9     Do you have a copy in front of you, Mr. Nelson?
10 A.  I do.
11 Q.  All right.  I see here that you have a total of
12 13 hours thus far that you billed for the case.
13 A.  Yes.
14 Q.  Okay.  Beyond that 13 hours identified on that
15 invoice is there additional time that you put into the
16 case thus far not including your deposition time right
17 now?
18 A.  It would probably be prep time, getting ready
19 for deposition testimony.
20 Q.  Okay.  How much prep time did you have for
21 getting ready for the deposition?
22 A.  Oh, I would say six hours.
23 Q.  Okay.  And, in addition to your time spent here
24 in the deposition and those six hours, is there any
25 additional work you've put into this file beyond that as

09:16:47-09:23:28                                      Page 33

1  we see on Exhibit No. 2, your, this invoice?
2  A.  No.  Not unless I'm asked.
3  Q.  Okay.  The six hours of prep time, what did you
4  do to prepare for the deposition?
5  A.  Reviewed the case file.
6  Q.  Okay.  And we'll go through the contents of that
7  here in a second.
8     Did you do anything else besides reviewing the
9  case file?
10 A.  No.
11    MR. FINLEY:  With respect to your case file can
12 we attach the deposition notice for Mr. Nelson as
13 Exhibit 3 to the deposition.
14    (Exhibit 3 was marked for identification.)
15    THE WITNESS:  Would this be a good time to take
16 a break, Mr. Finley?
17    MR. FINLEY:  That would be fine.
18    THE VIDEOGRAPHER:  We are going off the record
19 at 9:18 a.m.
20    (Recess taken from 9:18 a.m. to 9:23 a.m.)
21    THE VIDEOGRAPHER:  We are back on the record at
22 9:23 a.m.
23    BY MR. FINLEY:
24 Q.  All right.  We're back on the record.
25    Mr. Nelson, are you ready to proceed forward?

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 11 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

09:23:32-09:25:21                                            Page 34

1  A.  Yes, sir.
2  Q.  Before we got off the record we were going to
3  have pulled up I believe Exhibit No. 3 to your deposition
4  which is going to be the deposition notice for your
5  deposition here today.
6  A.  Okay.
7  Q.  And while that's being pulled up, Mr. Nelson, I
8  want to follow up with you on one more quick item.  I
9  asked you earlier about the ACTAR certification related to
10 accident reconstruction and you answered some questions
11 related to that.  Let me ask you this.
12     Do you hold any current certification related to
13 accident reconstruction?
14 A.  No, sir.
15 Q.  Okay.  Was the ACTAR certification the last time
16 you held a certification of any kind related to accident
17 reconstruction?
18 A.  Yes.
19 Q.  And have you held any other certifications
20 besides the one from ACTAR in the past for accident
21 reconstruction?
22 A.  No.
23     MR. FINLEY: Can we have the -- okay.
24     (Off the record discussion was held regarding
25 question from the Reporter regarding Exhibit No. 3.)

09:25:21-09:26:22                                            Page 35

1     BY MR. FINLEY:
2  Q.  So, Mr. Nelson, looking, then, at Exhibit No. 3,
3  have you seen that before today, your deposition notice?
4  A.  Yes, sir, I have.
5  Q.  All right.  Did you have a chance to review the
6  items requested in the subpoena duces tecum?
7  A.  I did.
8  Q.  All right.  Did you respond and provide all
9  items requested on that subpoena?
10 A.  Yes.
11 Q.  Okay.  If we could, Mr. Videographer, if we
12 could go to, I believe it's on, page three where the
13 subpoena begins.
14     And in looking at that, Mr. Nelson, do you have
15 available to provide your entire file pertaining to your
16 retention, the work you performed, item No. 1?
17 A.  I do.
18 Q.  All right.  And before we went on the record
19 today, Mr. Nelson, because of the circumstances we're in
20 right now, everyone being remote, we went through the
21 items that you have in your file.  Is that correct?
22 A.  Correct.
23 Q.  All right.  And while we are on the record I'm
24 going to go through with you all those items to confirm
25 that is in fact what you have in your file.

09:26:24-09:27:54                                            Page 36

1     You have a letter from Mr. Fischel, the
2  plaintiff's attorney, from November 2019; you have two
3  depositions, one of Mr. Boecken, one of Ms. Perez, the
4  plaintiff; you have one invoice that we have gone over
5  here today; you have a copy of the police report for the
6  subject accident in this case; you have the defendants'
7  expert designation; you have a report from Andy Sievers;
8  and you have items or documents produced by the defendants
9  Bates labeled 1 to 118 and 155 to 161; you have a
10 deposition notice for your deposition here today; you have
11 three photographs of the plaintiff's vehicle; you have a
12 report authored by yourself, Kerry Nelson; and then you
13 have notes that hand -- or are your own notes that you
14 prepared for the work you did in this case.
15     Are those all the items in your file?
16 A.  Yes, sir.
17 Q.  All right.  And am I correct, Mr. Nelson, that
18 you have that file available on a flash drive that you can
19 send to the court reporter in this case?
20 A.  I can do that.
21 Q.  All right.  I'll ask that you send that flash
22 drive after the deposition here today to the court
23 reporter.  And if we could have that collectively marked
24 as Exhibit 4 to the deposition.
25     Looking at the subpoena to your deposition,

09:27:59-09:29:08                                            Page 37

1  Mr. Nelson, No. 2, item No. 2, all documents and tangible
2  things, reports, models, or data compilations that have
3  been provided to, reviewed by, or prepared by you in
4  anticipation of your testimony, those would be contained
5  in your file we just went through.
6  A.  Yes, sir.
7  Q.  Okay.  No. 3, all witness statements, diagrams,
8  and investigative reports that you've reviewed related to
9  your work in this case, that would be contained in your
10 file?
11 A.  Yes, sir.
12 Q.  All treatises -- or treaties, literature,
13 statutes, rules, and regulations, trade publications, and
14 manuals that you reviewed, referred to, or relied upon,
15 would that be contained in your file?
16 A.  Well, not necessarily.  I mean, I, you know, I
17 review the Federal Motor Carrier Safety Regulations from
18 time to time which is in my little green book such as
19 this, which I have --
20 Q.  And you're referring -- go ahead.  I'm sorry.  I
21 cut you off.
22 A.  Which I have handy to review when I'm going
23 through case files.
24 Q.  All right.  Is there any, is there any
25 literature, statutes, rules, or regulations that you have

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

09:29:11-09:30:35          Page 38

1   reviewed or relied upon for your opinions in this case
2   besides the green book that you just showed us?
3   A. I think the only other publication would be the
4   Texas Commercial Motor Vehicle Driver's Handbook that I
5   would refer to, which contains recommendations for
6   commercial drivers.
7   Q. Aside from those two publications any other
8   publications that you reviewed or relied upon in this case
9   for your opinions?
10   A. No, sir.
11   Q. All right. Item No. 5, all reports which you
12   prepared including all diagrams, photographs, and other
13   visual images, are those contained in the file that you
14   will be providing in this case?
15   A. Yes.
16   Q. All of your handwritten notes and materials that
17   you prepared, are those contained in the file that you're
18   providing in this case?
19   A. Yes.
20   Q. Item No. 7, all correspondence between you or
21   your personnel and the attorneys for the plaintiff,
22   Jessica Perez, would those be, are all those contained in
23   the file you're providing in this case?
24   A. Yes.
25   Q. With regards to item No. 7, Mr. Nelson, you

09:30:40-09:32:13          Page 39

1   provided before the deposition here today a letter that we
2   have talked about earlier from the plaintiff's attorney, I
3   believe it's from November of 2019.
4   A. Yes, sir.
5   Q. And I'm going to refer you to that here at this
6   time, if we can have that labeled and identified as
7   Exhibit No. 5 to the deposition.
8   (Exhibit 5 was marked for identification.)
9   BY MR. FINLEY:
10   Q. And, Mr. Nelson, do you have a copy of that
11   letter in front of you?
12   A. Hang on just a second.
13   Q. Sure. Do you see a copy of the letter in front
14   of you, Mr. Nelson?
15   A. Okay. I have that.
16   Q. All right. The letter dated November 11th of
17   2019 from Mr. Fischel, the plaintiff's attorney, to you
18   refers to a signed retainer that was provided back along
19   with the retainer check.
20   A. Yes.
21   Q. Do you have a copy of the retainer agreement
22   signed on behalf of Ms. Perez by her attorney still?
23   A. Well, let me look. Hang on.
24   Q. Okay.
25   A. Are you talking about the contract?

09:32:16-09:33:42          Page 40

1   Q. Yes, sir, I am. If that's what signed
2   retainer -- if you had just one retainer, agreement, or
3   contract that's what I'm referring to.
4   A. Yes. I have a signed contract.
5   Q. Okay. I'm going to ask if you can provide that,
6   as well, to the court reporter along with your entire file
7   documents that you're putting on the flash drive.
8   Will you do that, sir?
9   A. Okay.
10   Q. Okay. And we will leave a blank, then, for
11   Exhibit No. 6 to be the signed retainer agreement you have
12   with counsel for plaintiffs in this case.
13   Mr. Nelson, do you have the ability while we are
14   here today during the deposition to send that to the court
15   reporter, to email it to her?
16   A. Well, we can -- well, yes, I can email it to
17   her. I'll need an email address.
18   Q. Sure. When we take a break we'll go ahead and
19   do that. Okay?
20   A. Okay.
21   Q. All right. Going back, then, Mr. Nelson, I'll
22   refer you back to Exhibit No. 3 to your deposition and
23   specifically the subpoena for that deposition notice.
24   We've gone over item No. 8 already, which is going to be
25   all invoices for work you've done in this case. Is that

09:33:45-09:35:02          Page 41

1   correct?
2   A. Yes.
3   Q. We've talked about previously on your CV,
4   Mr. Nelson, the book that you identify, in your CV at
5   least, as being editorial duties related to it with Ruhl
6   and Associates.
7   Is that the complete bibliography of all books,
8   articles, or treatises that you've authored?
9   A. No, it is not.
10   Q. Okay. What other items or books, articles, what
11   have you, have you authored, or had a hand in authoring?
12   A. I wrote a few other articles -- no, let me put
13   it this way. Aside from the book that we, that the
14   company published I had written some articles on different
15   topics over my years at Ruhl Forensics (indiscernible) to
16   creating the primer.
17   Q. You wrote articles that went into creating the
18   primer. Is that correct?
19   A. No. Articles aside from that published book.
20   Q. Aside from the primer. Okay.
21   How many of those did you author?
22   A. I believe two.
23   Q. Okay. What were the names of those?
24   A. I don't recall the names of them.
25   Q. Okay. Were you the only author for those two

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 13 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

09:35:07-09:36:30 — Page 42

1  articles, or were there any other?
2  A.  Yes.  I was the only author.
3  Q.  And when would those articles have been
4  authored?
5  A.  While I was at -- during my employment with Ruhl
6  Forensics.
7  Q.  Okay.  Do you have copies of those articles
8  still?
9  A.  No, sir.
10  Q.  Do you know where copies of those articles
11  exist, if they still do?
12  A.  I have no idea.  Both, both individuals at Ruhl
13  Forensics have passed away since then.  I don't know where
14  anybody else is that used to work there and I have no idea
15  even where the primer book is nowadays.
16  Q.  Okay.  The two articles, I know you don't recall
17  the names of them, can you tell me the subject matter of
18  one or both of the those articles.
19  A.  One of the articles was referencing pre-trip
20  inspections of tractor-trailers, or commercial vehicles.
21  The other article involved loading and unloading issues.
22  Q.  Do you know if either one of those articles was
23  ever peer reviewed?
24  A.  Well, they were peer reviewed by the staff at
25  Ruhl Forensics.

09:36:30-09:37:23 — Page 43

1  Q.  Outside of the staff at Ruhl do you know if any
2  other colleagues in the industry have peer reviewed it?
3  A.  I have no idea.
4  Q.  Okay.  Moving on to your subpoena, or going back
5  to your subpoena.  We've looked at your CV and resumé.
6      That's the only CV and resumé you have, Mr.
7  Nelson, correct?
8  A.  That's correct.
9  Q.  No. 11, all physical or visual models,
10  compilations of data, notes, studies, and documents
11  prepared by you in anticipation of trial, or your
12  deposition testimony are contained in the file that we
13  have gone over today?
14  A.  Yes.
15  Q.  That you will be providing to the court
16  reporter?
17  A.  Yes, sir.
18  Q.  To the extent that there is any video or motion
19  picture images which you possess related to the work
20  you've done in the case, that would be contained in your
21  file as well?
22  A.  There are none.
23  Q.  There's none?  Okay.
24      To the extent there's any calculations you've
25  done in the case would those be contained in your file if

09:37:28-09:38:45 — Page 44

1  any exist?
2  A.  I don't believe I did any calculations in this
3  case.
4  Q.  Okay.  And No. 14 was referring to a copy of any
5  lists that were prepared by you which reflects cases in
6  which you have given testimony.
7      Mr. Nelson, I have been provided in this case a
8  testimonial history list.  Is that the only list that you
9  possess related to prior testimony?
10  A.  You're speaking of the Rule 26 list?
11  Q.  Yes, sir, I am.
12  A.  Yes.  That's the only one.
13  Q.  Okay.  Mr. Nelson, in terms of your retainment
14  in this case and your hiring, how were you hired?  Was
15  it -- were you called by plaintiff's counsel?  Were you
16  emailed by him?
17  A.  It was a phone call, I'm sure.
18  Q.  Okay.  And who was that from?
19  A.  Mr. Fischel.
20  Q.  And would that have been at or near the time of
21  his letter to you November of 2019?
22  A.  I'm sure it had to be before that time.  As to
23  the exact date, I don't know.
24  Q.  Okay.  If it was before -- I'm sorry.  I didn't
25  catch that last part.

09:38:47-09:40:00 — Page 45

1  A.  It was near the date of the letter.
2  Q.  Okay.  So near November of 2019 if not in
3  November?
4  A.  Yes.
5  Q.  All right.  Now, have you ever worked for
6  Mr. Fischel before --
7  A.  I have.
8  Q.  -- as a consultant for a lawsuit?
9      How many times have you worked before him -- for
10  him, I'm sorry, in the past?
11  A.  I think it was one other case, maybe two.
12  Q.  Okay.  Those one or two other cases were they,
13  were they both or was that one in Texas as well?
14  A.  Yes.
15  Q.  And do you know the years in which you worked
16  for him on those one or two other cases?
17  A.  No, sir, I don't.  Either 2019, 2018, 2017.  I
18  can't be sure.
19  Q.  But in that time period?
20  A.  Yes.
21  Q.  Okay.  And in those prior occasions when you
22  worked for him were you working for him on one or both of
23  those times on behalf of the plaintiffs, the plaintiff in
24  that case?
25  A.  Yes, sir.

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

09:40:00-09:41:21                                      Page 46

1  Q.  Okay.  In those prior occasions in which you
2  worked for Mr. Fischel did you have to end up testifying
3  in a deposition or at trial?
4  A.  Yes.
5  Q.  In both those occasions?
6  A.  One I remember.
7  Q.  Okay.  Was it a deposition or trial?
8  A.  Deposition.
9  Q.  Now, Mr. Fischel is working with the Davis Law
10  Firm.
11     Have you ever been hired by an attorney with the
12  Davis Law Firm before besides Mr. Fischel?
13  A.  No.
14  Q.  When Mr. Fischel hired you in the past do you
15  know which law firm he was working with at that time?
16  A.  Thomas J. Henry.
17  Q.  Was that on both occasions when he hired you in
18  the past?
19  A.  Yes.
20  Q.  Now, that firm, to your understanding, is that
21  primarily a plaintiffs attorneys firm, if you will?
22  A.  That's my understanding, yes, sir.
23  Q.  Okay.  And that being the Thomas J. Henry firm,
24  how many times have you been hired by them?
25  A.  I can't give you a definite number on that.

09:41:26-09:42:49                                      Page 47

1  Since I --
2  Q.  If you can --
3  A.  In the past three years.
4  Q.  It's been in the past three years?
5  A.  Yes.
6  Q.  Are you an able to approximate how many times?
7  A.  Oh, probably 50, 60 times.
8  Q.  With that firm in the last three years?
9  A.  Yes, sir.
10  Q.  Okay.  And in those 50 or 60 times has it all
11  been on behalf of the plaintiff?
12  A.  It has, since Thomas J. Henry is a plaintiffs
13  firm.
14  Q.  Okay.  Now, in this particular, in this
15  particular case, Mr. Nelson, what was the scope of your
16  retention?
17  A.  In this case?
18  Q.  What were you -- yes, sir.  What were you asked
19  to do?
20  A.  I was asked to, of course, take a look at the
21  collision and the collision sequence and the events
22  leading up to the collision sequence.  I was also asked to
23  take a look at the validity of Mr. -- of the defendant's
24  qualification in terms of a professional driver and of the
25  company's responsibilities in terms of being compliant

09:42:55-09:44:17                                      Page 48

1  with the federal regulations.
2  Q.  Okay.  And I wrote down some notes as you were
3  saying that, so I just want to make sure I got it correct.
4     You were asked to look at the collision
5  sequence, the events leading up to the sequence of the
6  accident, the qualifications of Mr. Boecken, and the
7  compliance of Jim Ballard d/b/a CAB Transport.  Is that
8  correct?
9  A.  Yes, sir, that's correct.
10  Q.  Is there anything I left off that list?
11  A.  No.
12  Q.  Okay.  When you were hired by counsel for
13  plaintiff were you told why you were being retained?  Were
14  you told specifically the scope of the work expected from
15  you?
16  A.  No.  I don't think I was told specifically,
17  specifically, I'm sorry, of the work expected of me.  I
18  think Mr. Fischel knew the type of work and type of
19  litigation that I was involved with, that being a
20  consultant in the commercial trucking industry.  You know,
21  since it's a case involving a commercial vehicle he called
22  me to take a look at it and see if --
23  Q.  I take it -- all right.  I cut you off.  I'm
24  sorry.
25  A.  I just said to see if I could assist him.

09:44:20-09:45:42                                      Page 49

1  Q.  Okay.  Is it fair to say, then, that you
2  determined the scope of the work you were going to perform
3  as opposed to the attorney telling you?
4  A.  That's correct.  Provided I received the
5  necessary information to do that.
6  Q.  Okay.  And in your retention itself were you
7  told by counsel for the plaintiff to consider the actions
8  of Jessica Perez with regards to this accident?
9  A.  That's the reason why I needed to analyze the
10  collision sequence involving the truck and passenger
11  vehicle.
12  Q.  Okay.  And was it -- specifically when you were
13  retained were you told to also consider her actions in
14  looking at the accident?
15  A.  No.  I wasn't told to consider anything.  I was
16  just told about the accident itself, the way it happened,
17  and then from that point on the documents were sent to me
18  and then I get to review the documents and develop my
19  opinions.
20  Q.  Okay.  Did you interview anyone in formulating
21  your opinions?
22  A.  No.
23  Q.  Aside from the two deposition transcripts that
24  we talked about earlier as being in your file, have you
25  reviewed any other statements related to anyone purporting

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 15 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

1  to be a witness to this accident?
2  A.  Only the statement that was written by
3  Mr. Boecken, or allegedly written by Mr. Boecken.
4  Q.  And the statement you're referring to is that
5  one of the Bates labeled documents produced in this case
6  by defendants?
7  A.  Yes.
8  Q.  Okay.  And I believe that would be Bates labeled
9  Ballard 2 through 4 if you have those in front of you.  If
10  you don't, that's what I believe you're referring to.
11  A.  Well, let's see.  I'm looking at something from
12  Commercial Truck Claims Management entitled driver's
13  statement form.  And, you're correct, it's Ballard 2
14  through 4.
15  Q.  Okay.  So aside from the two deposition
16  transcripts and that statement you haven't reviewed any
17  other statements.  Is that correct?
18  A.  I don't have any other statements to review.
19  Q.  Okay.  Okay.  In terms of any research
20  documentation have you reviewed any that you relied upon
21  in this case?
22  A.  What do you mean research documentation?
23  Q.  Well, any type of peer review literature,
24  treatises, articles, things of that nature.
25  A.  Other than the Federal Motor Carrier Safety

1  Regulations and the Texas CDL Manual, no.
2  Q.  Okay.  The documents that you were provided by
3  counsel for plaintiff, when did you receive those?
4  A.  All right.  Let's see.  It had to be, it had to
5  be included with the November 11th, 2019 letter from Davis
6  Law Firm.
7  Q.  Did you receive items at a later date besides
8  that?
9  A.  The only other item that I can remember
10  receiving would be Andy Sievers' report.
11  Q.  Okay.  And that would have been after
12  November 11th, correct?
13  A.  Yes.
14  Q.  Any other items besides Mr. Sievers' report that
15  you received at a later date that you're aware of?
16  A.  Not that I know of.
17  Q.  Okay.  In formulating and conducting your
18  analysis in this case and formulating your opinions did
19  you review any other expert reports besides the one from
20  Mr. Sievers?
21  A.  No.
22  Q.  Have you spoken to any other expert witnesses in
23  this case?
24  A.  I have not.
25  Q.  Have you considered any other information in

1  formulating your opinions about this case aside from
2  what's been provided to you previously by the plaintiff's
3  attorney, and aside from the Federal Motor Carrier Safety
4  Regulations that you referred to earlier and the Texas
5  commercial driver's handbook?
6  A.  The only, the only other information would be
7  my, of course my knowledge, training, and experience in
8  the last 35 years doing this work.
9  Q.  Okay.  But in terms of actual documents,
10  literature, notes, what have you, nothing else besides
11  those items that I just mentioned?
12  A.  Right.  And the items contained in the case
13  file.
14  Q.  That's correct.  Now, Mr. Nelson, what areas do
15  you consider yourself to be an expert witness in?
16  A.  It would be commercial vehicle accident
17  investigation and reconstruction; it would be litigation
18  matters involving commercial vehicle collisions, or any
19  vehicle collision as a matter of fact, but more so towards
20  the commercial vehicle side.
21  Q.  So I have commercial vehicle accident
22  investigations and reconstruction.  And what else?
23  A.  Well, it would be the, the compliance with the
24  Federal Motor Carrier Safety Regulations and state
25  regulations.  I think my CV has that listed.

1  Q.  I see you have a generic itemization there of
2  duties, if you will, or areas that you worked on under
3  Commercial Vehicle Forensics.
4      Is that what you're referring to?
5  A.  Yes, sir.
6  Q.  Okay.  I take it, then, Mr. Nelson, you're not a
7  biomechanical engineer, correct?
8  A.  That's correct.
9  Q.  And you're not a biomechanical expert of any
10  kind, are you?
11  A.  That's correct.
12  Q.  All right.  You're not a licensed physician?
13  A.  No.
14  Q.  You're not qualified to give opinions on injury
15  causation, are you?
16  A.  That's correct.
17  Q.  And you're not planning to testify as to any
18  alleged injuries from this accident, are you?
19  A.  That's correct.  Those guys charge a whole lot
20  more money than I do.
21  Q.  You're not a humans factors, a human factors
22  expert either, are you?
23  A.  Correct.
24  Q.  Now, with regards to the areas that you, that
25  you testified to being an expert in, when did you first

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 16 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

**09:52:05-09:53:20**        Page 54

1 become a consultant in the field of commercial vehicle
2 accident reconstruction and investigation?
3 A.  I believe that would be sometime during 1985
4 after I left the department and became employed by D&A
5 Consultants the first time.
6 Q.  Okay.  With regards to your training, what do
7 you rely upon in terms of your training for holding
8 yourself out to be an accident reconstruction expert?
9 A.  That would have been my training with the
10 Department of Public Safety, various classes and courses I
11 took along the way regarding accident reconstruction, and,
12 of course, my work in the field of accident
13 reconstruction, applying those methods.
14 Q.  Which classes specifically are you referring to?
15 A.  There were several classes.  I have gone to
16 several seminars specifically geared toward accident
17 reconstruction and --
18 Q.  Okay.  Can you identify, can you identify those
19 in your CV?
20 A.  I believe I have, yes, sir.
21 Q.  No.  I'm sorry.  Can you for me now just so I
22 know which ones you're talking about?
23 A.  Let me get the CV, I need the CV in front of me
24 to do that.
25     MR. FINLEY: Okay.  If the videographer can pull

---

**09:53:25-09:55:30**        Page 55

1 up Exhibit No. 1.
2     THE VIDEOGRAPHER: Is this the area?
3     THE WITNESS: Yes.
4     MR. FINLEY: Yes.
5     THE WITNESS: As you can see, directly under
6 other training and seminars is the SATAI annual conference
7 in Glendale, and that is entirely geared towards accident
8 reconstruction.
9     BY MR. FINLEY:
10 Q.  Okay.
11 A.  Commercial vehicle crash testing in Germany was
12 a direct, directly geared to accident reconstruction.  The
13 Collision Investigation and Reconstruction, the World
14 Reconstruction Exposition in College Station, Texas was
15 another one.  Advanced Accident Reconstruction Course by
16 Texas A&M University is another one.  Accident
17 Reconstruction Course from Dynamic Science in the year of
18 1977 while I was still on the department is another area
19 of reconstruction instruction.  And, of course, working
20 with reconstruction calculations, and what have you,
21 concerning vehicle collisions over the years.
22 Q.  Mr. Nelson, I want to refer you now to what I'm
23 going to have identified as Exhibit -- I believe we're on
24 No. 7 -- and that's going to be a copy of the plaintiff's
25 expert designation.

---

**09:55:30-09:57:26**        Page 56

1     (Exhibit 7 was marked for identification.)
2     BY MR. FINLEY:
3 Q.  And if we look at, if we look at page nine from
4 that document -- we have that pulled up.
5     Mr. Nelson, the second sentence in the
6 description of your expert designation provided there
7 states that you're expected to testify as to the link
8 between force magnitude and visible damage in a motor
9 vehicle collision that resulted in vehicle damages,
10 relationship between impact force on the vehicle and the
11 force transmitted to the vehicle occupants during the
12 accident in this case.
13     Did I read that correctly?
14 A.  Yes.
15 Q.  Okay.  I have read through your report, Mr.
16 Nelson, and we've talked about the areas in which you hold
17 yourself out to be an expert witness.  I have not
18 identified anything in your report with regards to a link
19 between force magnitude and visible damage in a collision
20 that results in a vehicle damaged, or the relationship
21 between impact force on the vehicle and the force
22 transmitted to vehicle occupants.
23     Am I correct in that, in that reading of your
24 report?
25 A.  Yes.

---

**09:57:28-09:58:54**        Page 57

1 Q.  Okay.  The areas described here in your
2 designation those do not match up with what you were
3 providing in terms of opinions in this case.  Is that
4 correct?
5 A.  I would agree.
6 Q.  Okay.  Mr. Nelson, with regards to your work as
7 a consultant or expert witness, what percentage of your
8 income is derived from litigation related services versus
9 nonlitigation services?
10 A.  The only other income that's provided to me is
11 my social security check.
12 Q.  So in terms of the work that you do today would
13 it be fair to say that 100 percent is related to
14 litigation based services?
15 A.  Yes, sir.
16 Q.  Okay.  What percentage of your consulting or
17 expert practice in litigation is on behalf of plaintiffs
18 versus defendants?
19 A.  Well, for the past year now I would say it's
20 leaned towards 75 percent plaintiff; however, in the past
21 it would depend on the caseload that I had.  Sometimes it
22 was 50/50, sometimes 70 percent plaintiff 30 percent
23 defendant.
24 Q.  You said the past year it's gone to 75 percent
25 plaintiff, 25 percent defendant.  And then, if I heard you

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

---

09:58:56-10:00:07                                    Page 58

1  correctly, in the past it's been at times 70 to plaintiff
2  versus 30 for defendant, correct?
3  A.  It's 95 percent plaintiff in the past year.
4  Q.  Oh, you said 95.  I'm sorry.  I thought I heard
5  75.  Okay.  95 in the past year.
6     Was that correct, though, in what you said about
7  prior testimony, or prior work history?
8  A.  Yes, sir.
9  Q.  Okay.  When you were referring to the past it
10  being sometimes 70/30, sometimes 50/50, how far back are
11  you going?
12  A.  It would probably, up to and including my first
13  year on my own with my own business, beyond that it's been
14  mostly plaintiff cases.
15  Q.  Okay.  And when was your first year on your own,
16  then?
17  A.  2016.
18  Q.  Okay.  I believe we're on --
19  A.  Actually, I think --
20  Q.  Go ahead, sir.
21  A.  -- 2016.
22     MR. FINLEY: Correct me if I'm wrong, Ms. Court
23  Reporter, but I believe we are on Exhibit No. 8.  Assuming
24  that is the case, can we make that the Rule 26 Testimonial
25  History list for Mr. Nelson.

---

10:00:54-10:02:25                                    Page 59

1     (Exhibit 8 was marked for identification.)
2     MR. FINLEY: If we have that pulled up for
3  Mr. Nelson please let me know.
4     BY MR. FINLEY:
5  Q.  Okay.  Mr. Nelson, can you see that list in
6  front of you?
7  A.  I can.
8  Q.  Okay.  I see that list and it dates back to 2011
9  as far as I can tell.  Is that correct?
10  A.  Yes, sir.
11  Q.  All right.  Now, am I correct in that you've
12  been testifying longer as an expert witness than 2011?
13  A.  Yes.
14  Q.  This is just a list as far back as you have it
15  compiled.  Is that correct?
16  A.  That's correct.
17  Q.  All right.  Now, does this list contain all
18  cases in which you've testified either at trial or in
19  deposition, or is it limited to one or the other?
20  A.  No.  Both.
21  Q.  Both of those.  Okay.
22     If we start here at the bottom of your list, the
23  most recent case you have on there is from November of
24  2019.
25     Is this list up to date, or have you testified

---

10:02:28-10:03:32                                    Page 60

1  since that time?
2  A.  This list is not quite up to date and I have
3  testified since then.
4  Q.  All right.  How many times have you --
5  A.  What I can do is bring it up to date if you'd
6  like and resubmit --
7  Q.  Yeah.  I'd ask, if you can, I'd ask you to
8  supplement or bring the list up to date.  When -- you
9  know, we can do that and have that supplemented after the
10  deposition but with current testimony, or, you know,
11  current list of what you've testified in.  Let me ask you
12  this, sir.
13     Since that time how many other cases have you
14  testified in?
15  A.  I'd have to research my calendar to give you
16  that information.
17  Q.  All right.  Are you able to approximate as we
18  sit here?
19  A.  Maybe four, five, six.  I don't know.
20  Q.  Okay.  Those four to six cases, roughly, have
21  they been all for plaintiff?  Have they been mixed?
22  A.  Plaintiff.
23  Q.  Okay.  And, any of those cases, have they been
24  in Texas?
25  A.  Yes.

---

10:03:33-10:04:36                                    Page 61

1  Q.  Okay.  What, if you know, how many of the four
2  to six have been in Texas?
3  A.  All of them.
4  Q.  All right.  And then the cases that we look at
5  here on your list, Mr. Nelson, is there any way of
6  distinguishing, just from looking at your list, whether or
7  not they were a, a testimony on behalf of plaintiff or
8  defendant?
9  A.  No.  I have -- I don't have that singled out as
10  such.
11  Q.  Okay.  I understand.
12     Of the list we have here in front of us are you
13  able to give me, as best you can by looking at that list,
14  the percentage breakdown, approximately, of what it would
15  be in terms of testimony for plaintiffs versus defendants?
16  A.  No.
17  Q.  Okay.  Do you have an approximation as to what
18  it would be?  Do you know what that would be --
19  A.  No.
20  Q.  -- going back to 2011?
21  A.  No, I don't.
22  Q.  So, as you sit here, you couldn't tell me if it
23  was 50/50, 70/30, one way or the other, in terms of your
24  testimonial history breakdown plaintiff versus defendant?
25  A.  That's correct.

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

10:04:37-10:05:43                                     Page 62

1  Q.  Is it fair to say that it would mirror the
2  numbers that you gave me earlier?  Well, let me strike
3  that, because that's not a fair assumption to make.
4      You told me earlier, and correct me if I'm
5  wrong, that percentage breakdown is of the cases you've
6  been retained in, correct?
7  A.  Yes.
8  Q.  All right.  So your testimony, then, is that you
9  cannot give me a breakdown percentage of the cases that
10  you've testified in whether it be for plaintiff or
11  defendant?
12  A.  Well, it's going to be the same percentage, per
13  se, depending on, you know, the cases that I have
14  testified in over the years.  I just can't tell you --
15  Q.  And --
16  A.  -- one way or the other.
17  Q.  And that's what I'm getting at is you gave me
18  earlier a percentage breakdown of retention in terms of
19  who you were retained on behalf of.
20      Can you give me that same type of approximation
21  for a breakdown of cases in which you testified, if you
22  testified on behalf of plaintiff or defendant?
23  A.  No, sir, I can't.  It's just too far back.
24  Q.  All right.  Let's break it down then.  Let's go
25  back to 2016, since you opened up your own business.

10:05:47-10:07:11                                     Page 63

1      Can you give me an approximation breakdown of
2  plaintiff versus defendant testimony since that time?
3  A.  Oh, it would probably be 80 percent plaintiff,
4  20 percent defense, just an estimation.
5  Q.  Okay.
6  A.  Of course you have to realize that once I'm done
7  with a case it goes away and I go to the next one.  So
8  memory wise is not real sharp when it comes to this.
9  Q.  I understand.  I'm just asking you to give me
10  your best approximation as we sit here now with regards to
11  the breakdown in the past.
12      Are you able to give me an idea, approximately,
13  of how many depositions you've given before in the past?
14  A.  Probably hundreds.
15  Q.  In the hundreds?
16  A.  Yes.
17  Q.  Okay.  And how far back does that span?
18  A.  1985.
19  Q.  Okay.  Since you opened up your own business in
20  2016 can I take the number of cases identified here on
21  this list as being the number of times you've testified,
22  or given a deposition?
23  A.  Yes.
24  Q.  Okay.  Same thing for this question.
25      In the past year can I rely upon this list to

10:07:15-10:08:08                                     Page 64

1  accurately show how many times you've testified?
2  A.  Yes.
3  Q.  All right.  What was the -- do you recall the
4  last case in which you gave any testimony in specifically?
5  A.  I'd have to go back to my calendar to tell you
6  that.
7  Q.  Okay.  And would you be able to give me the name
8  of that case --
9  A.  No.
10  Q.  -- without looking at the calendar right now?
11  A.  No.  I'd have to look at the calendar to see
12  which one it is.
13  Q.  All right.  If you recall, was it in this month,
14  or was it last month?  Do you know when you approximately
15  testified?
16  A.  It was this month.
17  Q.  Okay.
18  A.  In fact, I think it was last week.  We were
19  doing the same thing we are doing here today.
20  Q.  All right.  Was that a case in Texas?
21  A.  Yes.
22  Q.  All right.  Was it in San Antonio, Bexar County,
23  or do you know where in the state?
24  A.  I'd have to look that up to tell you that.
25  Q.  Sure.  Do you know if it's a federal case or a

10:08:10-10:09:27                                     Page 65

1  state court case?
2  A.  I don't remember.
3  Q.  And that case, I take it from your prior
4  testimony, was on behalf the plaintiff?
5  A.  Yes.
6  Q.  Do you recall the last time you testified at
7  trial?
8  A.  No, I don't.
9  Q.  Would it be on your list here or would it be one
10  of the cases in which is not on your list currently?
11  A.  That I don't know.  I would have to look at the
12  calendar, once again, to give you that information.
13  Q.  Okay.  Is that something you would be able to do
14  on a break here today?
15  A.  I probably could.  All I have to do is get to my
16  calendar.  And hopefully I didn't delete it.
17  Q.  All right.  Mr. Nelson, in your experience have
18  you ever been struck before as an expert witness, or
19  limited in testimony?
20  A.  Limited in testimony, yes.
21  Q.  Okay.  How many times?
22  A.  Once that I know of.
23  Q.  Okay.  And where was that?
24  A.  In Wyoming.
25  Q.  Was that a federal court case or state court?

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

---

10:09:34-10:11:04                                    Page 66

1  A.  Oh, I don't remember.  It was sometime ago.
2  Q.  Okay.  And approximately how long ago was it?
3  A.  Geez, I don't know.  It's been awhile.
4  Q.  Okay.
5  A.  Probably 15 years ago.
6  Q.  All right.  And, specifically, do you know the
7     issues that were involved that you were limited to not be
8     able to testify about?
9  A.  I do.  It was --
10 Q.  What were those?
11 A.  Let me explain the case to you a little bit
12    and --
13 Q.  Okay.
14 A.  -- we can ferret out the issues that were
15    involved.
16    It was a snow storm in the middle of Wyoming.
17    Two trucks were traveling down the interstate.  Up ahead
18    was a prior accident involving six or seven trucks and a
19    number of passenger vehicles that were stopped and
20    blocking the highway.  The truck following the other truck
21    was at a safe distance at the time that the other truck
22    decided to swerve to the right to avoid the collision that
23    had occurred prior to them arriving to the scene.  At that
24    moment in time it opened up the road to the truck behind.
25    He couldn't stop because of inclement weather conditions

---

10:11:09-10:12:28                                    Page 67

1     and struck one of the trucks.
2        I, in turn, provided an opinion that the driver
3     was following at a safe distance in accordance with the
4     recommendations in the commercial driver's license manual
5     and in accordance with federal regulation under a
6     hazardous condition, but the judge struck, or at least
7     limited, my testimony in that regard saying that I didn't
8     reconstruct the accident, or it was part of a
9     reconstruction, and I didn't reconstruct the accident.  I
10    was only opining on commercial driver's license manual
11    recommendations.
12 Q.  So the testimony that was limited by you or
13    struck in some fashion related to reconstruction opinions
14    of the accident.  Is it fair to say?
15 A.  That's what he said, but, actually, there was no
16    reconstruction performed on this accident in terms of my
17    opinions in the case.
18 Q.  I understand that.  I'm saying your
19    understanding of the order issued by the court was that
20    you could not provide testimony related to a
21    reconstruction of the accident.  Is that correct?
22 A.  That's right.
23 Q.  Okay.  Why don't we do this.  I think we're at a
24    good point to take a brief break, and, Mr. Nelson, if you
25    could look at your calendar while we're on the break to

---

10:12:31-10:22:13                                    Page 68

1     look at the testimonial history we talked about earlier.
2  A.  Okay.
3     MR. FINLEY: Let's go off the record.
4     THE VIDEOGRAPHER: Going off the record at
5     10:12 a.m.
6     (Recess taken from 10:12 a.m. to 10:21 a.m.)
7     THE VIDEOGRAPHER: Back on the record at
8     10:21 a.m.
9     BY MR. FINLEY:
10 Q.  Mr. Nelson, we're back on the record.
11    Are you ready to proceed?
12 A.  Yes, sir.
13 Q.  All right.  We went on a break, and before we
14    went on the break we talked about you looking at your
15    calendar to see the last time you testified.
16    Were you able to do that on the break?
17 A.  Yes, sir.
18 Q.  When was the last time you provided testimony?
19 A.  Last week.
20 Q.  All right.  And what date, specifically, if you
21    have it?
22 A.  It would be Monday April 13th.
23 Q.  Okay.  And do you have the style of the case in
24    front of you?
25 A.  Hang on a minute and I'll get that for you.

---

10:22:13-10:24:03                                    Page 69

1  Q.  Okay.
2  A.  It would be cause No. 18-427 in the District
3     Court of Kindle County, Texas.
4  Q.  Just to be clear, that was cause No. 18, one
5     eight, dash 427?
6  A.  Yes, sir.
7  Q.  And in that particular matter is was a
8     deposition, correct?
9  A.  Yes.
10 Q.  On behalf of the plaintiff?
11 A.  Yes, sir.
12 Q.  Now, Mr. Nelson, in this particular case, with
13    regards to the work you performed, did you at all attempt
14    to reconstruction this accident?
15 A.  I did not.
16 Q.  Okay.  With regards to the work you performed in
17    this case did you provide -- I'm sorry -- did you perform
18    any type of inspection at the scene of the accident?
19 A.  No, sir.
20 Q.  Did you inspect the tractor-trailer operated by
21    Mr. Boecken?
22 A.  No.
23 Q.  Did you inspect the vehicle operated by
24    Ms. Perez?
25 A.  I did not.

---

Case 5:19-cv-00375-XR     Document 50-2     Filed 05/11/20     Page 20 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

10:24:04-10:26:15                                          Page 70

1  Q.  I take it, then, because there were no
2  inspections performed of either one of those two vehicles,
3  no measurements were performed by you of the vehicles
4  involved in the accident?
5  A.  That's correct.
6  Q.  Okay.  No measurements performed of the scene,
7  as well, by you?
8  A.  Correct.
9  Q.  Have you ever been to the scene of the accident,
10  whether or not related to this case?
11  A.  I don't know if I have been through there at
12  some point in my life or not, but not specifically for
13  this collision.
14  Q.  Okay.  Have you been provided any photographs
15  from the scene of the accident or any videos from the
16  scene of the accident?
17  A.  I have been provided photographs by your office.
18  Q.  Were any of those photographs of the scene to
19  your understanding?
20  A.  Let me look.
21  Q.  Okay.
22  A.  Not that I can see.
23  Q.  All right.
24  A.  Any scene of the accident photographs either.
25  Q.  Or videos for that matter?

10:26:18-10:27:30                                          Page 71

1  A.  Correct.
2  Q.  Okay.  Are there any measurements that you
3  performed related to your opinions in this case?
4  A.  No, sir.
5  Q.  Okay.  Have you performed any speed calculations
6  related to the opinions you have in this case?
7  A.  No.
8  Q.  And I take it, then, you have not come to any
9  conclusions regarding the speed of the plaintiff's vehicle
10  at any point in time before the accident?
11  A.  Only by deposition testimony.
12  Q.  And by that you mean you're relying upon the
13  testimony of Ms. Perez and what she has said?
14  A.  And Mr. --
15  Q.  Or Mr. Boecken?
16  A.  Yes, sir, that's correct.
17  Q.  Okay.  But you have not done an independent
18  analysis or calculations of the testimony they provided in
19  formulating your opinions?
20  A.  That's correct.
21  Q.  Okay.  With regards to the testimony provided by
22  Mr. Boecken, and specifically the vehicle he refers to as
23  cutting him off before this accident occurred in his
24  deposition, have you done any type of analysis to
25  formulate an opinion or conclusion regarding the speed of

10:27:33-10:28:42                                          Page 72

1  that vehicle any time before the accident?
2  A.  There's no information on that vehicle other
3  than a blue Toyota.  So it would be impossible to come up
4  with any speed calculations.
5      MR. FINLEY: I will object to nonresponsive.
6      BY MR. FINLEY:
7  Q.  My question simply is have you performed any
8  calculations related to that vehicle, the blue Toyota?
9  A.  No.
10  Q.  And I take it from your testimony you have no
11  basis supported by any calculations to offer opinions
12  regarding the speed of any vehicles before the accident
13  occurred.  Is that correct?
14  A.  Not as a result of performing mathematical
15  calculations, that would be correct.
16  Q.  Did you perform any type of a crush analysis in
17  this case?
18  A.  No, sir.
19  Q.  Did you perform any type of a comparative damage
20  analysis?
21  A.  What do you mean comparative damage?
22  Q.  Did you at all do any type of analysis in which
23  you formulated opinions regarding the damage to the
24  vehicles in comparing one to the other?
25  A.  No.  Other than perusing the photographs of the

10:28:48-10:29:53                                          Page 73

1  damage, of the physical damage of both vehicles.
2  Q.  Okay.  And by that --
3  A.  (Indiscernible.)
4  Q.  I'm sorry.  I -- can you speak up?
5  A.  I have done no other work in that area.
6  Q.  Besides looking at the photographs of the
7  vehicles, correct?
8  A.  The physical damage, yes, sir.
9  Q.  Yes.  That's what I'm -- okay.
10      In your analysis, Mr. Nelson, did you perform
11  any calculations as the to the amount of time the
12  plaintiff, Jessica Perez, was positioned alongside the
13  truck of Mr. Boecken before the accident on the highway?
14  A.  No.  Only from deposition testimony.
15  Q.  And by that you mean simply relying upon what
16  she said?
17  A.  Yes.  That's correct.
18  Q.  Okay.  Did you perform any calculations or
19  conduct any independent investigation as to the amount of
20  time that elapsed between the time Ms. Perez claims
21  Mr. Boecken passed her on the highway and the time of the
22  accident?
23  A.  No.
24  Q.  And specifically, I take it then, you did not do
25  anything in terms of calculating time that elapsed between

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

| 10:29:57-10:31:00 | Page 74 |
|---|---|

1  the time Mr. -- I'm sorry -- between the time that you
2  claim Mr. Boecken should have seen Ms. Perez on the
3  highway and before the accident?
4  A.  Oh, boy.  You want to ask me that one again?
5  Q.  Yeah.  I'll rephrase it.  I can do a better job
6  with that.
7     In your report I reviewed that one of your
8  opinions is that Mr. Boecken should have seen Ms. Perez on
9  the highway as she claims he passed her before the
10  accident.  Is that correct?
11  A.  Yes, sir.
12  Q.  All right.  In coming to that opinion, or
13  related to that opinion, did you perform any type of a
14  calculation as to how much time elapsed between the time
15  she contends Mr. Boecken passed her on the highway when
16  you contend he should have seen her and the time of the
17  accident?
18  A.  No.
19  Q.  In reviewing your report you, like I said, make
20  note of the fact you believe Mr. Boecken should have seen
21  Ms. Perez.  Is that correct?
22  A.  Yes, sir.
23  Q.  And you expect him to make a mental note of her
24  vehicle before the accident?
25  A.  Of course I do.

| 10:31:01-10:32:12 | Page 75 |
|---|---|

1  Q.  If she did nothing out of the ordinary in the
2  operation of her vehicle that would have caught his
3  attention while driving down the highway do you still
4  expect him to have made mental note of her vehicle?
5  A.  Yes.
6  Q.  Is there a reason why you think he should have
7  seen her vehicle before the accident if she did nothing
8  out of the ordinary and not knowing how much time elapsed
9  between the time that he passed her allegedly and the time
10  of the accident?
11  A.  What was the --
12     MR. FISCHEL: Object to form.
13     THE WITNESS: I'm sorry.  Go ahead.
14     MR. FISCHEL: I said --
15     BY MR. FINLEY:
16  Q.  Mr. Fischel objected to form.  You can still
17  answer.
18  A.  That's what I thought I heard.
19     Number one, it's his job as a professional
20  driver to be aware of traffic around his vehicle while he
21  is driving down the highway.  And, number two, Mr. Boecken
22  has testified that every two to five seconds -- I'm
23  sorry -- every three to five seconds he looks in the
24  mirror to determine if there's any vehicles around his
25  vehicle or the area around his truck while he's traveling

| 10:32:16-10:33:36 | Page 76 |
|---|---|

1  down the road.
2     Had he done that as he testified, looking in the
3  mirror every three to five seconds, he should have been
4  aware of the Perez vehicle alongside of his truck.  Plus
5  the fact that he has a nose mirror on the right front
6  fender up ahead by the hood on his truck to give a view
7  down the right side of the tractor.
8     None of these items were apparently performed by
9  Mr. Boecken, because he never knew the Perez vehicle was
10  near his truck at all; never saw the truck -- I'm sorry --
11  never saw the Perez car at any time prior to the impact.
12  Q.  In the amount of time that he was driving on the
13  highway before this accident, Mr. Nelson, did you perform
14  any type of analysis or calculation as to how many
15  vehicles he would have passed on the highway that day?
16  A.  No.  I didn't need to do that analysis.  Because
17  his job, and his only job, is to keep a proper lookout,
18  number one, and that means not only ahead but alongside
19  his vehicle as well while he's traveling down the highway.
20  That's his job as a truck driver.
21     MR. FINLEY: Object to nonresponsive after no.
22     BY MR. FINLEY:
23  Q.  With regards to the amount of vehicles that he
24  would have passed after passing, allegedly, Ms. Perez
25  before this accident did you do any type of calculations

| 10:33:38-10:34:48 | Page 77 |
|---|---|

1  or analysis as to how many vehicles he passed during that
2  time frame?
3  A.  No.  Of course not, because there's no
4  information to that effect.
5  Q.  Did you do any measurements, Mr. Nelson, on the
6  height of Ms. Perez's vehicle next to the tractor operated
7  by Mr. Boecken?
8  A.  No.
9  Q.  Okay.  Did you perform any type of a sight-line
10  analysis to determine the visual capabilities of Ms. Perez
11  from her position in the driver's seat of her vehicle
12  before the accident, immediately before the accident as
13  she is sitting next to the tractor of Mr. Boecken?
14  A.  What do you mean sight line of the Perez
15  vehicle?
16  Q.  Did you perform any calculation or analysis of
17  her ability to see in front of her to the left, to the
18  right, in any direction from her vantage point sitting
19  next to the tractor that she contends she was next to
20  driven by Mr. Boecken before the accident?
21  A.  You're saying did I perform any calculations.
22  Q.  Or any type of analysis regarding her sight
23  line.
24  A.  Other than the fact that she began to accelerate
25  which puts her position at the right front bumper of the

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

10:34:55-10:36:01                                    Page 78

1   front of the tractor-trailer. Other than that I made no
2   calculation or measurement.
3  Q. Regarding sight-line analysis?
4  A. You broke out there. What --
5  Q. Sorry. My question was you made no calculation
6   or measurement regarding sight-line analysis?
7  A. Correct.
8  Q. The sight line of Ms. Perez.
9  A. Correct.
10 Q. Okay. And with regards to her position at that
11  time that you refer to in your answer you're relying upon
12  her deposition testimony for that?
13 A. Yes, sir, that's correct.
14 Q. Okay. Are you relying on any other information
15  provided to you besides her deposition testimony?
16 A. As far as her sight line?
17 Q. Yeah. When -- your answer as to her position
18  before the accident.
19 A. Her position is only determined by her
20  testimony, and her testimony only, since Mr. Boecken never
21  saw the Perez vehicle.
22 Q. Did you perform any type of a sight-line
23  analysis for Alvin Boecken as to his ability to see
24  Ms. Perez's vehicle alongside his tractor-trailer
25  immediately before the accident?

10:36:02-10:37:22                                    Page 79

1  A. The only analysis I would perform is my past
2   experience of sitting in this type of rig, or the cab of
3   this type of tractor and peering out through the
4   windshield and looking in the mirrors, et cetera and et
5   cetera, while you're driving down the road.
6  Q. Did you conduct any type of analysis from
7   sitting in an exemplar tractor, as to the one Mr. Boecken
8   was driving, in forming your opinions in this case?
9  A. It would be my analysis on prior cases, which I
10  have done that many times.
11 Q. Did you do it in this case?
12 A. I did not sit in the exemplar tractor, such as
13  the one being operated by Mr. Boecken for this particular
14  case.
15 Q. And in the prior cases you refer to when was the
16  last time you claim to have done some type of similar
17  analysis?
18 A. I don't remember. It's been a while, but I have
19  done it many, many times in the past.
20 Q. Okay. But you can't tell me when it was?
21 A. I don't know when it was, the last time
22  specifically.
23 Q. Okay. Can you tell me how many times?
24 A. Probably 20 to 30 times at the very least.
25 Q. Do you have any evidence to support an opinion

10:37:34-10:38:47                                    Page 80

1   in this case, Mr. Nelson, that Mr. Boecken did not check
2   his mirror before changing lanes?
3  A. The evidence is he never saw the Perez vehicle,
4   and the Perez vehicle --
5  Q. Did you do any --
6  A. -- was there to be seen.
7  Q. Did you do any analysis to confirm that he could
8   have seen the Perez vehicle in this particular case?
9  A. The only analysis that I could perform in this
10  case would be the testimony of both defendant and
11  plaintiff, and that tells me that Ms. Perez had been on
12  the highway for the last, as she stated, for the last five
13  to seven minutes, and the Boecken vehicle came up
14  alongside of her. I don't know --
15 Q. Okay. Did you do any type of independent --
16 A. I don't know that that testimony can be disputed
17  because Mr. Boecken never saw the Perez vehicle.
18 Q. Did you do any type of independent analysis or
19  investigation to confirm the testimony of Ms. Perez as to
20  how long she was on the highway before the accident?
21 A. Her testimony indicates five to seven minutes.
22 Q. Right. Did you do anything, independent of her
23  testimony, to confirm that time frame?
24 A. No.
25 Q. Okay. Did you do any type of independent

10:38:52-10:40:05                                    Page 81

1   investigation or analysis to confirm as to whether or not
2   Mr. Boecken could have seen her in his mirrors before the
3   accident on the right side of his tractor?
4  A. The only analysis that I performed was, first of
5   all, looking at the pictorial evidence of the picture of
6   the tractor which indicates he has a nose mirror which
7   allows him to see down the right side of the tractor. And
8   plus the fact that if, in fact, he is approaching the
9   Perez vehicle he can see it up ahead before he gets up
10  alongside the vehicle.
11 Q. Right. So you're relying simply on that
12  assertion, Ms. Perez's testimony, correct?
13 A. Well, and Mr. --
14 Q. That, that he passed her before the accident?
15 A. That's one testimony from Ms. Perez. The other
16  testimony is that Mr. Boecken says he checks his mirrors
17  every three to five seconds.
18 Q. All right. And with respect to -- sorry. I cut
19  you off.
20 A. I'm sorry. If Ms. Perez is along side of the
21  truck he should be able to see her in his mirror.
22 Q. All right. And with respect to that opinion did
23  you actually inspect the tractor driven by Mr. Boecken to
24  confirm that sight line?
25 A. No.

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 23 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

| 10:40:05-10:41:20 | Page 82 |
| --- | --- |

1 Q. Okay. And you, correct me if I'm wrong, but you
2 have not inspected any exemplar tractors with respect to
3 your opinions in this case regarding that opinion as to
4 what Mr. Boecken should or should not be able to see?
5 A. No. Only from past experience sitting in the
6 cab of a similar tractor. And it could be exemplar, for
7 all I know. But tractors with nose mirrors or the like --
8 and that's the reason they have a nose mirror up there in
9 that position so that they can see down alongside the
10 right side of the tractor, because notoriously that's a
11 blind spot area.
12    MR. FINLEY: Objection as nonresponsive after
13 no.
14    BY MR. FINLEY:
15 Q. Have you done any type of experiments with
16 regards to your opinions in this case, Mr. Nelson?
17 A. What do you mean by that?
18 Q. Have you conducted any type of an experiment to
19 test any of your opinions in the case?
20 A. No experiments.
21 Q. Have you done any type of simulations of the
22 accident with respect to your opinions?
23 A. No.
24 Q. Beyond the actual Bates labeled documents we
25 talked about earlier today and the depositions that were

| 10:41:22-10:42:33 | Page 83 |
| --- | --- |

1 provided to you, have you reviewed any of the pleadings in
2 this case?
3 A. I don't believe I have any pleadings in this
4 case.
5 Q. Okay. Have you reviewed -- excuse me -- have
6 you reviewed any of the written discovery answers provided
7 in this case by the parties?
8 A. That would be under pleadings if I had them.
9 Q. Okay. Did you review any of the medical records
10 for Ms. Perez?
11 A. No.
12 Q. Have you recommended to the plaintiff's attorney
13 that there be additional work for you to perform in this
14 case?
15 A. No, sir, I have not.
16 Q. Okay. Have you been asked by plaintiff's
17 counsel to perform any additional work beyond that which
18 you've already done?
19 A. Not yet.
20 Q. Since issuing your report, Mr. Nelson, have you
21 been provided any additional information or documents by
22 the plaintiff's attorney beyond, I believe you mentioning,
23 the report of the Andy Sievers?
24 A. That was defense offering, not plaintiff.
25 Q. I understand that, but I'm saying I, and tell me

| 10:42:37-10:44:00 | Page 84 |
| --- | --- |

1 if I'm wrong, presume you would have gotten it from the
2 plaintiff's attorney, that report?
3 A. Yes, sir, that's correct.
4 Q. Okay. Have you been provided any additional
5 information by the plaintiff's attorney beyond
6 Mr. Sievers' report or documents?
7 A. None other than the notice of deposition.
8 Q. Okay. Have you been asked to make any changes
9 to your report since it was originally issued?
10 A. No.
11 Q. Do you have any changes, revisions, or
12 corrections that you would like to make to your report at
13 this time?
14 A. No, sir.
15 Q. Are the conclusions offered in your report all
16 of your conclusions with respect to the accident in this
17 case?
18 A. At this time, yes.
19 Q. Well, do you have any changes that you plan on
20 making at this time or corrections or revisions?
21 A. Not so far.
22 Q. In coming to your conclusions rendered in this
23 case did you adopt the, the version of the accident by
24 Ms. Perez with respect to the blue Toyota not being
25 present in front of my client's tractor immediately before

| 10:44:04-10:45:11 | Page 85 |
| --- | --- |

1 the accident on the highway?
2 A. No. Not entirely. I also included the
3 deposition testimony of Mr. Boecken.
4 Q. Okay. Is it then reasonable to give equal
5 weight, then, to the defendants' theory in the case
6 regarding, or the defendants' version of the accident in
7 this case regarding the blue Toyota in rendering your
8 opinions?
9 A. What do you mean weight, given weight?
10 Q. Well, as you understand, Mr. Nelson, there is a
11 version of the accident offered by Mr. Boecken which in
12 some respect is different than that offered by Ms. Perez.
13    Do you understand that?
14 A. Yes, sir, I do.
15 Q. Okay. And specifically I'm referring to the
16 presence of the blue Toyota cutting him off immediately
17 before the accident.
18    Do you understand that?
19 A. Yes, sir.
20 Q. Okay. And my question then is because you have
21 not done an accident reconstruction in this case or
22 performed any of the underlying calculations or
23 inspections, measurements, what have you, that would go
24 into an accident reconstruction isn't it fair to give
25 equal weight, then, in rendering your opinions to the

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 24 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

10:45:13-10:46:39                                    Page 86

1  version of the accident offered by Mr. Boecken and that
2  offered by Ms. Perez?
3  A.  I disagree.
4  Q.  Why would that be?
5  A.  Well, because of the testimony of Mr. Boecken,
6  first of all.  Let me talk about that for a minute.
7      Mr. Boecken says that, first of all, he never
8  sees this blue Toyota until it is up in front, to his
9  left, and cutting over, cutting him off.  And, again, we
10  have the issue if he checks his mirrors every three to
11  five seconds, and had he checked his mirrors every three
12  to five seconds he would have seen the blue Toyota coming
13  up on his left side, number one.  Number two, he says the
14  blue Toyota changes lanes in front of him and cuts him off
15  and gets on the brakes, because he says, I saw the brake
16  lights come on.  And he was asked, well, how far were you
17  from the blue Toyota at that time, and he said it must
18  have been a couple of feet from my front bumper.
19      And at that time Mr. Boecken testifies that he,
20  he gets on his brakes and gets on them hard; he looks in
21  his mirror to see if there is anybody over in the
22  right-hand lane and turns on his turn signal, all in the
23  matter of time where this blue Toyota is slowing by
24  braking and he's two feet in front of the truck.
25      That doesn't make any sense to me.  There is too

10:46:43-10:48:05                                    Page 87

1  much time involved for him to do all these things and not
2  hit this blue Toyota.  And, as a matter of fact, he never
3  touches the blue Toyota by his application of his brakes.
4  Then, when he accomplishes all that he makes a move to the
5  right-hand lane and impacts the side of the Perez vehicle.
6      So all this doesn't make any sense to me in
7  terms of a professional driver, what he's talking about.
8  In fact, along with that, at the same time that he said I
9  got on the brakes so hard I through it in neutral so I
10  wouldn't stall the engine.  That's ludicrous.  So his
11  testimony isn't making any sense to me.
12      Ms. Perez's testimony is that she's driving
13  along and all of a sudden this semi decides to change
14  lanes and hits her in the side of the car, which is really
15  what happened.
16  Q.  You've given me a lot there, Mr. Nelson, and I'm
17  going to go back with you and address some of it.  Okay?
18      With respect to your opinions regarding never
19  seeing the blue Toyota and that he should have if he was
20  checking his mirrors every three to five seconds.
21      Did you do any type of analysis or calculations
22  to confirm that the blue Toyota did not come upon him in
23  less than three seconds?
24  A.  No.
25  Q.  Okay.  With regards to the testimony regarding

10:48:09-10:49:24                                    Page 88

1  the amount of space in between my client's tractor and the
2  back end of the Toyota after being cut off, did you do any
3  type of independent analysis or investigation to address,
4  or confirm that amount of space, that amount of distance?
5  A.  The only analysis I had available to me to
6  confirm that the Toyota was within two feet of the front
7  bumper of the truck was Mr. Boecken's testimony.
8  Q.  Okay.  So the answer would be no to that
9  question, then, that you did another type of independent
10  investigation or analysis with respect to that distance?
11  A.  That's correct.
12  Q.  Okay.  With respect to the opinions regarding, I
13  believe your testimony was that it was ludicrous that he
14  could change it into neutral when applying the brakes and
15  changing lanes from left to right.
16      Did you do any type of independent analysis or
17  investigation with respect to confirming that opinion?
18  A.  No.  It's just my experience in driving trucks
19  in performing litigation services and collision events.
20  Q.  No simulation of this accident, correct?
21  A.  That's correct.  But I didn't need to.
22  Q.  You did not perform a reconstruction of the
23  accident, correct?
24  A.  Correct.
25  Q.  Okay.  I believe there at the end you testified

10:49:33-10:50:34                                    Page 89

1  that this accident was, and correct me if I'm wrong, but I
2  believe your words were it was a simple lane change
3  collision, correct?
4  A.  Yes.
5  Q.  Okay.  With respect to conclusions regarding --
6  go ahead.
7  A.  That being an unsafe lane change.  Let me add
8  that.
9  Q.  And, actually, that's your opinion, right, an
10  unsafe lane change.
11      With respect to the cause of the accident you
12  would agree with me that the jury could review the
13  testimony of Ms. Perez and Mr. Boecken on the road and
14  come to their own conclusions regarding the cause,
15  correct?
16      MR. FISCHEL:  Object to form.
17      THE WITNESS:  Yeah, I don't know how to answer
18  that one for you.
19  BY MR. FINLEY:
20  Q.  Why don't you know how to answer that?
21  A.  Because I'm not on the jury.
22  Q.  Well, I understand that, but from your review of
23  the deposition testimony in this case would you agree that
24  the jury can review that testimony of Ms. Perez and
25  Mr. Boecken and come to their own conclusions regarding

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

| | |
|---|---|
| **10:50:38-10:51:44** Page 90 | **10:53:22-11:05:50** Page 92 |

10:50:38-10:51:44                                    Page 90

1   the cause of the accident?
2       MR. FISCHEL: Same objection.
3       THE WITNESS: Yeah, I can't answer that for you.
4   BY MR. FINLEY:
5   Q.  Is it the same answer, because you're not on the
6   jury?
7   A.  I can't answer that.  That's something for the
8   jury to decide.
9   Q.  Okay.  And I'm just clarifying your answer, what
10  you gave me earlier.
11      You're saying because you're not on the jury.
12  Is that correct?
13  A.  Well, that's a jury decision, not mine.
14  Q.  Okay.  We talked about this earlier, but with
15  respect to any type of literature or research in this case
16  it would be limited to the commercial motor vehicle
17  handbook in Texas that you referred to earlier and the
18  Federal Motor Carrier Safety Regulations, correct?
19  A.  In terms of literature, yes, sir.
20  Q.  Okay.  This was provided earlier, but with
21  respect to -- by you before the deposition -- but with
22  respect to any notes you have, handwritten notes you have
23  regarding your opinions in this case and the investigation
24  you performed, those would be on the notes you provided,
25  correct?

10:51:44-10:53:21                                    Page 91

1   A.  No, sir.  The notes I provided were typed on the
2   computer, not handwritten.
3   Q.  Okay.  I'm sorry.  I misspoke on handwriting.
4   But any notes you have are typed out, correct?
5   A.  Yes.
6       MR. FINLEY: All right.  And I believe we have
7   those.  If the court reporter could have those marked as
8   Exhibit No. 9 and attach to the deposition please.
9       (Exhibit 9 was marked for identification.)
10      BY MR. FINLEY:
11  Q.  And, if we have those pulled up there,
12  Mr. Boecken -- I'm sorry -- Mr. Nelson, in front of you
13  you have notes and you have titled Notes/2019041.  Is that
14  correct?
15  A.  Yes, sir.
16  Q.  All right.  In reviewing this document,
17  Mr. Nelson, the notes that are on here specifically refer
18  to the deposition testimony of Jessica Perez, correct?
19  A.  Yes.
20  Q.  And Alvin Boecken?
21  A.  Yes.
22  Q.  The notes that you have on here do not refer to
23  anything else with regards to your review of this case
24  beyond deposition testimony.  Am I correct?
25  A.  Correct.

10:53:22-11:05:50                                    Page 92

1   Q.  All right.  And these are the only notes you
2   have that you performed, or I'm sorry, prepared on your
3   own with regards to the work you've done in this case.
4   A.  That's right.
5       MR. FINLEY: All right.
6       Let's take a real quick break for a couple
7   minutes.  We're off the record.
8       THE VIDEOGRAPHER: Going off the record at 10:54
9   a.m.
10      (Recess taken from 10:54 a.m. to 11:05 a.m.)
11      (Exhibit 6 was marked for identification.)
12      THE VIDEOGRAPHER: We are back on the record at
13  11:05 a.m.
14      BY MR. FINLEY:
15  Q.  Okay.  Mr. Nelson, we are back on the record
16  now.
17      Are you ready to proceed forward?
18  A.  Yes, sir.
19  Q.  Okay.  The actual contract that you have for the
20  services you're providing in this case we have that marked
21  here as the retainer agreement, I believe as Exhibit No. 6
22  to your deposition.
23      Do you see that in front of you?
24  A.  Yes, sir, I do.
25  Q.  Okay.  Is this just a one page document?

11:05:52-11:07:28                                    Page 93

1   A.  There's two pages.
2   Q.  Two pages to it.  Okay.  And I'm just asking
3   because the screen I have -- there it is, a second page.
4   All right.
5       Do you have any other agreements of any kind
6   related to your work in this case with Mr. Fischel?
7   A.  No, sir, I do not.
8   Q.  Do you have any other agreements of any kind
9   with any other entities or individuals related to the work
10  you're performing in this case?
11  A.  No, sir.
12  Q.  All right.  Mr. Boecken -- I'm sorry --
13  Mr. Nelson, I'd like to go ahead and attach as Exhibit
14  No. 10 to your deposition a copy of your report you wrote
15  in this case.
16      (Exhibit 10 was marked for identification.)
17      BY MR. FINLEY:
18  Q.  And that's the report in front of you,
19  Mr. Nelson.
20      Is that the report you drafted in this case?
21  A.  Yes, sir.
22  Q.  And that's the only report you drafted, correct?
23  A.  It's the only one.
24  Q.  All right.  With regards to the report itself on
25  page one we have a list here of all the items that you

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

| 11:07:33-11:08:48 | Page 94 |
|---|---|

1 reviewed in formulating your opinions. Is that correct?
2 A. Well, let's see. So far on the first page, yes.
3 Q. All right. And if we scroll on, then, to the
4 second page we have a seventh item being the Federal Motor
5 Carrier Safety Regulations.
6    That encompasses all the items that you relied
7 upon and reviewed to prepare your opinions, correct?
8 A. In terms of literature, yes, sir.
9 Q. Okay. What are the other items not listed in
10 this report that you relied upon, then?
11 A. It would be my training, knowledge, and
12 experience in the analysis of commercial motor vehicle
13 collisions.
14 Q. Okay. Anything else besides what's listed in
15 report, then, aside from what you just said regarding your
16 experience?
17 A. No.
18 Q. Okay. Now, on page two here we have got four
19 conclusions. These opinions and conclusions, these four,
20 Mr. Nelson, are they the only four opinions and
21 conclusions you have rendered in this case?
22 A. That's correct.
23 Q. All right. You have not edited or revised this
24 report since it was drafted, correct?
25 A. Yes, that's correct.

| 11:10:04-11:11:51 | Page 96 |
|---|---|

1 A. It is simply -- the regulation is 391.11. It
2 effectively says that the individual -- let me get it in
3 front of me. You know, you would think I'd memorize this
4 book by now. I can't do it yet. All right.
5    One part of the qualification process is that
6 the individual can, by reason of experience, training, or
7 both, safely operate the type of commercial motor vehicle
8 that he drives. Well, making an unsafe lane change is not
9 safely operating the vehicle. Number two --
10 Q. Well, let me stop you there because we're
11 focused on No. 1 regarding maintaining a proper lookout.
12 And my question with regards to obligation to maintain a
13 proper lookout was which regulation or what specifically
14 are you relying upon for that obligation, and you told me
15 391.11. Is that correct?
16 A. Yes. 391.11(b)(3). And, secondly, to maintain
17 a proper lookout is contained within the Texas CDL Manual.
18 It speaks of the regulations that a professional driver
19 needs to put in practice as he is driving down the road.
20 Q. Which specific section of the manual are you
21 referring to?
22 A. Probably under seeing --
23 Q. I'm sorry. Go ahead.
24 A. It's called seeing in the CDL manual.
25 Q. Scene as in like S-C-E-N-E, scene?

| 11:08:49-11:10:01 | Page 95 |
|---|---|

1 Q. All right. You have not come to any additional
2 opinions and conclusions, correct?
3 A. Correct.
4 Q. All right. With respect to the first three
5 opinions and conclusions those three relate to
6 Mr. Boecken's actions concerning the accident. Is that
7 fair to say?
8 A. Yes, sir.
9 Q. Okay. And your three opinions in that section
10 there on page two, for each of them you refer to an
11 obligation that he has with respect to maintaining a
12 proper lookout, managing space, and initiating a lane
13 change.
14    When you identify these things as obligations
15 what are you relying upon in terms of them being
16 obligations?
17 A. Well, he has an obligation to operate the
18 vehicle in a safe manner in accordance with federal
19 regulation and state regulation since Texas adopted the
20 federal regulation, so --
21 Q. Okay. So -- I'm sorry. I cut you off.
22 A. I said they are essentially the same thing.
23 Q. With regards, then, to the first one,
24 maintaining a proper lookout, which specific regulation
25 are you relying upon, then, for the obligation?

| 11:11:56-11:13:00 | Page 97 |
|---|---|

1 A. No, no. S-E-E-I-N-G.
2 Q. Oh, seeing. Okay.
3 A. It's subsection seeing ahead, seeing to the
4 rear, seeing to the sides, the use of mirrors, et cetera.
5 Q. And which specific, is that -- you're just
6 giving me the title of the section.
7    Is that a chapter, a specific number?
8 A. Yes. It's a subsection in --
9 Q. What number is that?
10 A. -- Chapter 2.
11 Q. Okay. With regards to managing space around his
12 vehicle at all times, your second conclusion there, or
13 opinion. What are you relying upon for the obligation to
14 do so?
15 A. That would be also in the reference, the
16 commercial driver's license manual.
17 Q. Is it solely in the manual, or are you referring
18 to a regulation as well?
19 A. No. There's no regulation to manage the space
20 around his vehicle.
21 Q. All right. And then with regards to the -- I'm
22 sorry. I cut you off.
23 A. It's only the custom and practice and industry
24 standard as recommended by the commercial driver's license
25 manual.

11:13:01-11:14:10                                                    Page 98

1  Q.  And so for this industry standard and custom
2  practice, again, you're referring to the manual for that
3  opinion, correct?
4  A.  Yes, sir.
5  Q.  All right.  And what specific chapter or subpart
6  of that manual are you referring to?
7  A.  That would be under managing space, and I don't,
8  I don't know right now where it's at.  I'd have to look it
9  up.
10 Q.  But you believe it's found under a section
11 titled managing space?
12 A.  I know it's in chapter 2 because that's, that is
13 the information on the operation of a commercial vehicle,
14 and those things are listed in subchapters, in chapters.
15 Q.  Okay.  All right.  And then the third opinion
16 there with regards to obligation to initiate a safe lane
17 change, where are you basing -- or what are you basing the
18 obligation on there?
19 A.  That would be the, again, the information
20 contained in the commercial driver's license manual and
21 state law.
22 Q.  Okay.  Specifically the manual, which part of
23 the manual refers to that or discusses that?
24 A.  That would be under chapter 2, whatever
25 subchapter is contained within that.

11:14:14-11:15:37                                                    Page 99

1  Q.  And then what specific state law are you
2  referring to for Texas?
3  A.  Oh, I'd have to look that one up.  I'm sure it's
4  545 something.  I'm not sure what that is.
5  Q.  When you're saying 545 can you give me -- are
6  you referring to a specific body of law?
7  A.  Yeah.  I'm referring to --
8  Q.  Or code?
9  A.  -- a specific code for lane changes in Texas,
10 transportation code.
11 Q.  You're just not sure what code that is?
12 A.  I'm not sure right now.  I'd have to bring it
13 up.
14 Q.  Okay.  Are you referring or relying upon any
15 other code, regulation, or literature otherwise, besides
16 the CDL manual and that, that code, or section you're
17 referring to in the code for initiating a safe lane
18 change?
19 A.  And the regulations.
20 Q.  Which regulation is that?
21 A.  The one I testified to earlier, 391.11.
22 Q.  Okay.  Is that also (b)(3)?
23 A.  Yes.
24 Q.  Now, focusing then on (b)(3), Mr. Nelson, do you
25 have a copy of that in front of you?

11:15:39-11:16:38                                                   Page 100

1  A.  I do.
2  Q.  Okay.  (B)(3) is found under qualification and
3  disqualification of drivers.  Is that right, in subpart
4  (b)?
5  A.  Yes, sir, that's correct.
6  Q.  Okay.  And (b)(3), if you have a copy in front
7  of you, states that -- (b) says, except as provided in
8  subpart G of this part a person that's qualified to drive
9  a motor vehicle if he/she can, subpart (3), by reason of
10 experience, training, or both, safely operate the type of
11 commercial motor vehicle he/she drives.
12     Did I read that correctly?
13 A.  Yes, sir, you did.
14 Q.  Okay.  With regards to that specific section did
15 you see anything in there regarding an obligation to
16 maintain a proper lookout specifically?
17 A.  No.  Not in this section.  That --
18 Q.  Okay.
19 A.  That would be something contained within the CDL
20 manual.
21 Q.  All right.  Within that section do you see
22 anything regarding effectively managing space?
23 A.  No.
24 Q.  Okay.  And then within that section is there
25 anything that speaks to initiating a safe lane change?

11:16:41-11:17:55                                                   Page 101

1  A.  Well, yes.  Because it's an unsafe lane change,
2  therefore, he is not safely operating the commercial
3  vehicle.
4  Q.  So you're taking that -- or you derive that
5  opinion from that section.  Is that correct?  Or that
6  subsection?
7  A.  That's one place, yes.
8  Q.  Okay.  Does it say lane change anything in
9  there?
10 A.  It doesn't speak of lane change.  It's an unsafe
11 maneuver.
12 Q.  Beyond the regulations, specific regulation,
13 and, and CDL manual and the code section we talked about
14 now, have you relied upon any other codes, regulation, or
15 literature for these first three opinions in formulating
16 your opinion?
17 A.  Well, of course, I've relied upon the police
18 report also.
19 Q.  All right.  Beyond that any other literature?
20 A.  No, sir.
21 Q.  Okay.  And with respect to the opinions
22 regarding managing of space, maintaining a proper lookout,
23 and initiating a safe lane change, you have not done any
24 type of calculations on speed, have you?
25 A.  Correct.

---

1 Q. Okay. You have not done any type of testing or
2 experiments to verify these opinions, correct, with regard
3 to how the accident occurred?
4 A. I didn't need to do any testing or experience to
5 render these opinions.
6     MR. FINLEY: Object to nonresponsive to that
7 response.
8     BY MR. FINLEY:
9 Q. Did you do any testing or experiments at all?
10 A. What do you mean by experience?
11 Q. I'm sorry. Experiments.
12 A. Oh, experiments. No. No testing or
13 experiments.
14 Q. Okay.
15 A. It didn't require that.
16     MR. FINLEY: Objection; nonresponsive after no.
17     BY MR. FINLEY:
18 Q. Now, with regards to your last conclusion there
19 in your report, Mr. Nelson, focusing on that. As I read
20 your report, Mr. Nelson, it looks like you have various
21 subparts to that conclusion. Is that correct?
22 A. Well, yes, I suppose.
23 Q. And by that I mean your report goes into detail
24 as you go on past page two regarding the various areas
25 that you believe CAB Transport failed in requirements that

---

1 they have under the regulation. Is that fair to say?
2 A. Yes.
3 Q. All right. One of those, Mr. Boecken, if I'm
4 not, if I read your report correctly, refers to a road
5 test. Is that right?
6 A. I'm Mr. Nelson.
7 Q. Go ahead. I'm sorry?
8 A. I said, I'm Mr. Nelson. I'm not Mr. Boecken.
9 Q. I'm sorry. Did I call you Mr. Boecken?
10 A. Now, see how you are?
11 Q. I'm sorry?
12 A. See how you are?
13 Q. I can't -- I don't understand what you're
14 saying. I'm sorry.
15 A. I said, see how you are?
16 Q. Oh, I apologize if I called you by the wrong
17 name.
18 Mr. Nelson, one of your opinions in this case
19 regards the road test. Is that correct?
20 A. Yes.
21 Q. Okay. And specifically, if I read your report
22 correctly, your opinion is that they failed to render or
23 provide a road test to Mr. Nelson -- I'm sorry --
24 Mr. Boecken. Excuse me.
25 A. You know what, your hero status is fading here.

---

1 Q. I have got a lot of names, sir. I'm doing my
2 best.
3 A. Yes, that's correct.
4 Q. Okay. Now, under the regulations, and that
5 being specifically 391.33, a motor carrier can accept a
6 driver's license as an equivalent of doing the road test.
7 Is that correct?
8 A. Yes, they can. But there's a caveat with that,
9 because if they do that there is no way that the motor
10 carrier can know if this individual can safely operate a
11 commercial vehicle. The only way --
12 Q. And that is -- go ahead.
13 A. The only way to do that is to offer and
14 administer a road test so that you can evaluate the
15 driver's ability, skill, knowledge, training so that he
16 knows how to safely operate the commercial vehicle.
17 Q. And with regards to that last part of your
18 answer, or is that your answer itself, after acknowledging
19 they can't accept the driver's license as an equivalent?
20 That following part of your answer regarding the ability
21 or inability to know if he can safely operate a vehicle,
22 do you have any literature or regulation that you rely
23 upon for that opinion? Or is that simply your opinion?
24 A. Yes. There is -- or let me put it this way.
25 There was a memo distributed by the Department of

---

1 Transportation long ago, I think it's back in the '90s
2 that spoke to that very issue, that if a motor carrier
3 decides to accept an individual's valid commercial
4 driver's license in lieu of a road test, that only means
5 he managed to pass minimal qualifications to get a
6 driver's license. In no way does it mean, or lend itself
7 to the idea that he can safely operate a commercial
8 vehicle. It only means he has a driver's license.
9 Q. What is the -- which means he was -- and he was
10 provided that by a governing state agency, correct?
11 A. That's correct.
12 Q. After he satisfied the requirements of that
13 state to obtain a commercial driver's license, correct?
14 A. That's correct.
15 Q. All right. And the memo you're referring to, do
16 you know the name of that memo?
17 A. It's an On Guard publication or article, DOT
18 issued. And I don't have it handy with me, but I can
19 certainly come up with it.
20 Q. When was it issued by DOT?
21 A. I don't remember what year. Maybe 1997, I'm not
22 sure.
23 Q. And just to be clear on the record, when you say
24 DOT you're referring to the U.S. Department of
25 Transportation?

---

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 29 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

**11:23:16-11:24:19**                 Page 106

1  A.  Yes, sir.
2  Q.  Okay.
3  A.  They warned, in fact the article warned against
4  simply accepting a driver's license in lieu of a road
5  test.
6  Q.  But yet there is a regulation issued by the
7  Federal Motor Carrier Safety Administration that allows a
8  motor carrier to do just that, correct?
9  A.  That's right.  And then after that regulation
10  came into effect they issued the memo, because there were
11  some issues involved with that.
12  Q.  And if they comply with that regulation,
13  accepting the license, they are in compliance -- in lieu
14  of the road test -- they are in compliance with the
15  regulation as written.  Is that correct?
16  A.  That's true, but in this case there's no copy of
17  a driver's license in his file either.
18  Q.  Do you have any evidence to show that he does
19  not have a driver's license when he was starting to work
20  for Jim Ballard d/b/a CAB Transport?
21  A.  The only information I have is what's included
22  in the police report.  The police report indicates that he
23  has a Class A commercial driver's license.  I don't know
24  if it's expired, if he's disqualified, if it's valid, or
25  what the status is because there is no motor vehicle

**11:24:24-11:25:50**                 Page 107

1  report included in the case file for this individual.
2  Q.  Have you reviewed on your own, independently of
3  what's been provided to you, any information on file with
4  the State of Oklahoma regarding the commercial driver's
5  license or driving history of Mr. Boecken?
6  A.  I have not reviewed any document that speaks to
7  that.
8  Q.  Have you reviewed a copy of the driver's license
9  report, driving history report, provided in this case on
10  behalf of our clients, the plaintiff, related to
11  Mr. Boecken?
12  A.  I don't have that.
13  Q.  Okay.  With regards to the opinions you rendered
14  in this case regarding Mr. Boecken's qualifications to
15  operate a motor vehicle, you did not do any independent
16  investigation of such beyond the documents provided to
17  you.  Is that correct?
18  A.  Correct.
19  Q.  Okay.  With regards to the damage that was seen
20  on the plaintiff's vehicle, which you referred to
21  reviewing earlier in this case, you offer an opinion in
22  your report regarding the relative speed of the vehicles
23  at impact.  Is that correct?
24  A.  Yes, generally.
25  Q.  Okay.  And concerning that -- and I'll reference

**11:25:55-11:27:41**                 Page 108

1  here the report for you, or where in the report.  That
2  would be, sir, on page three and that would be the second
3  to last paragraph.
4  A.  Okay.
5  Q.  And in looking at that paragraph, Mr. Nelson,
6  you talk about hard braking being used by Mr. Boecken when
7  contact was made, but yet you were talking about the
8  damage as you see in the photographs indicating no
9  repeated circular pattern overlapping damage indicating
10  one vehicle was traveling faster or slower than the other.
11  Is that correct?
12  A.  Yes.
13  Q.  All right.  In your opinion are you, I take it
14  from reading that, disputing the relative speed of the
15  vehicles at contact?
16  A.  No.
17  Q.  Okay.  What are you saying in that paragraph?
18  A.  Well, I'm saying that, since Mr. Boecken
19  testified that he was braking hard and then moved to the
20  right at the same time Ms. Perez is accelerating to get
21  away from the side of the truck -- so now I have Ms. Perez
22  accelerating; we have Mr. Boecken braking hard, as he
23  says, which tells me he has slammed on the brakes to slow
24  that truck -- when contact is made, in my experience
25  anyway, the damage that is shown on the side of the Perez

**11:27:46-11:29:03**                 Page 109

1  vehicle would indicate that the, the circular damage from
2  the right front wheel of the truck would not stay in one
3  place, but the circular pattern would move along the side
4  of the car if one car was going faster than the other, or
5  one vehicle, I'm sorry, was going faster.  And you don't
6  see that.  I see the circular pattern kind of remaining in
7  one particular area rather than moving alongside of the
8  car.
9  So I just came to the conclusion that both
10  vehicles were traveling about the same speed when impact
11  occurred.
12  Q.  With regards to that portion of your opinion
13  there you allude to a period of time when contact was
14  made, or when the vehicles were engaged itself.
15  Do you have any evidence to show that there was
16  actually a period of time that they were engaged together
17  beyond the testimony of the two drivers in this case?
18  A.  No.
19  Q.  Okay.  Do you have any evidence to show that it
20  may have been -- or let me strike that.
21  Have you done any independent analysis or
22  investigation as to the amount of time that the vehicles
23  were engaged together during this accident?
24  A.  No.  The only thing I see so far is that one
25  vehicle is not going much faster than the other vehicle,

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 30 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

| | |
|---|---|
| **11:29:07-11:30:24** **Page 110** | **11:32:07-11:33:19** **Page 112** |

1  otherwise there would be a change in damage.  In --
2  Q.  Okay.  And again that is -- sorry to cut you
3  off.
4  A.  In my experience anyway.  And I have seen a
5  lot --
6  Q.  And again that -- I'll let you finish your
7  answer.  I'm sorry.
8  A.  I said, and I have seen a lot of these types of,
9  a lot of this type of damage.
10  Q.  Okay.  You're basing it on your experience.
11    Are you basing that opinion on any literature or
12  research?
13  A.  No.  I am not.  Only the pictorial evidence of
14  the physical damage, in my experience, and seeing the same
15  types of damage with the same types of speed differentials
16  relative to one another.  In other words, relative from
17  one vehicle to the other.
18  Q.  Okay.  And you're not basing it on any speed
19  calculations of the vehicles in this case, correct?
20  A.  No.  I'm not.
21  Q.  Or measurements of the damage that you see in
22  the photographs?
23  A.  Correct.
24  Q.  Okay.  With regards to Mr. Boecken's driving
25  experience and qualifications are you rendering your

1  48 years.
2  Q.  Okay.  And with regards to his testimony
3  regarding his driving history over that time have you
4  conducted any type of investigation to, to look into what
5  he said regarding his prior accident history, moving
6  violation history, to dispute what he testified to?
7  A.  I don't have any documentation to that effect.
8  I'm only going by testimony and what he describes as the
9  actions, or the lack thereof, that he takes action during
10  the collision event.
11  Q.  Okay.  That, that summarizes the basis of your
12  opinions regarding his qualification to operate the
13  vehicle?
14  A.  Well, no, also the Federal Motor Carrier Safety
15  Regulations come into play.
16  Q.  Okay.  And which, okay, which regulations are
17  those then?
18  A.  I have them listed in my report, I believe.
19  Q.  Okay.  And we've talked about 391.11(b)(3),
20  correct?
21  A.  391 in general, yes.
22  Q.  Okay.  What other specific regulations, then,
23  are you relying on?
24  A.  391.21, which is the application for employment.
25  There is none.  And, incidentally, those two regulations

| | |
|---|---|
| **11:30:29-11:32:04** **Page 111** | **11:33:25-11:34:42** **Page 113** |

1  opinions in this case solely on documentation that is in
2  his file that was provided to you and documentation that
3  you did not receive?
4  A.  Correct.
5  Q.  Okay.  The opinions regarding his qualifications
6  and ability to safely operate a vehicle are based solely
7  on documents you have and that you don't have, correct?
8  A.  Could you ask me that one more time, please?
9  Q.  Sure.  Your opinions regarding Mr. Boecken's
10  ability to safely operate his vehicle, are those based
11  solely on the documentation that was provided to you and
12  not provided to you?
13  A.  No.  Also on some of his testimony.
14  Q.  And specifically what testimony?
15  A.  Well, the testimony of his actions in this
16  collision event and his testimony that he's never seen the
17  CDL manual, never looked at it.
18  Q.  Are you talking about the Texas CDL manual?
19  A.  Or any CDL manual for that matter.  Because --
20  Q.  Did he -- go ahead.
21  A.  -- those are all the same, with little
22  exception.
23  Q.  And how long, to your understanding, has
24  Mr. Boecken been operating commercial motor vehicles?
25  A.  Almost 50 years, somewhere in that area,

1  are prefaced by a person shall not drive unless he's
2  qualified.  And a person --
3  Q.  If he -- go ahead.  Sorry.
4  A.  And a person shall not drive unless he's
5  submitted an application that is in conformance with the
6  regulation.
7  Q.  Have you seen any testimony, or other evidence,
8  from Ballard, from Jim Ballard from CAB Transport that
9  they did not obtain an application from Mr. Boecken?
10  A.  I don't have a deposition from Mr. Ballard.
11  Q.  Okay.  With regards to investigation and
12  inquiries have you seen any testimony from Mr. Ballard, or
13  other evidence, to confirm they did not submit any
14  investigations or inquiries from primary employers for
15  Mr. Ballard?
16  A.  I don't have anything on record to indicate --
17  Q.  I mean Mr. Boecken.  I misspoke.  I meant for
18  Mr. Boecken in that question.
19  A.  I don't have anything on record to indicate
20  that.
21  Q.  Okay.  That they did not do it?
22  A.  Right.
23  Q.  Okay.  With respect to preemployment drug
24  testing, do you have anything on the record in evidence or
25  testimony that indicates or confirms they did not perform

---

11:34:46-11:36:21                                    Page 114

1  a drug test for Mr. Boecken for, or when he was hired?
2  A.  I don't have any documentation that reflects
3  that.  The only drug test I see happened almost two
4  years -- well, more than two years prior to the date of
5  the collision.
6  Q.  With respect to your report -- and I'm looking
7  specifically at page five, Mr. Nelson -- you say there's
8  little doubt, in your opinion, that CAB Transport was in
9  violation of several federal regulations.
10      The regulations that you're referring to in that
11  sentence, are all of those listed in your report?
12  A.  Yes.
13  Q.  Okay.  And so I can rely upon that to find the
14  specific regulations contained in your report that you
15  refer to in that sentence.
16  A.  Yes.
17  Q.  Okay.  With regards to the specific cause of
18  action the plaintiff's pled in this case, Mr. Nelson, are
19  you aware of those?
20  A.  I'm sorry?
21  Q.  With regards to the specific causes of action or
22  claims that have been pled by Mrs. Perez in this case are
23  you aware of those?
24  A.  No.  I don't have any pleadings.
25  Q.  Okay.  All right.  So you do not know what type

---

11:36:25-11:37:36                                    Page 115

1  of cause of action or Texas law she has pled for in this
2  case against my client?
3  A.  I don't have any pleadings.
4  Q.  Okay.  With regards to the final -- go ahead.
5      Did you say something?
6  A.  No.
7  Q.  Okay.  With regards, then, to the final or near
8  the final end of your report there you make a statement
9  that, in summary, CAB Transport allowed an unqualified,
10  unsafe driver to operate their vehicle and that
11  Mr. Boecken had an obligation to operate the vehicle in a
12  safe manner and -- excuse me -- failed to do so.  You go
13  on to state that, as a result, CAB Transport and
14  Mr. Boecken consciously disregards the safety and welfare
15  of the motoring public.
16      Did Mr. Boecken ever testify to the fact that he
17  was aware of Ms. Perez was on the highway?
18  A.  He never saw the Perez vehicle until impact.
19  Q.  That's right.  So he never confirmed or
20  testified that he was aware she was there, correct?
21  A.  Correct.
22  Q.  All right.  And there has been no testimony that
23  has been provided to date to you from CAB Transport,
24  correct?  Or from Jim Ballard?
25  A.  What from Jim Ballard now?

---

11:37:39-11:38:42                                    Page 116

1  Q.  There's been no testimony provided to you from
2  Jim Ballard in this case, correct?
3  A.  Correct.
4  Q.  All right.  And you're not in position, then, to
5  make an opinion as to regards to either Jim Ballard or
6  Mr. Boecken consciously disregarding the safety and
7  welfare of the public, are you?
8  A.  Well, when you don't qualify a driver and you
9  allow him to operate a commercial vehicle on your behalf
10  and that driver makes an unsafe maneuver and creates
11  injury to someone else, I'd say that's a conscious
12  disregard to the welfare and safety of the motoring
13  public.  I mean, they have --
14  Q.  With regard -- go ahead.
15  A.  They have -- the motor carrier has certain
16  things they have to do to qualify a driver, otherwise he
17  cannot be behind the wheel of a commercial vehicle.
18      And in this case Mr. Boecken should have never
19  been behind the wheel of a commercial vehicle unless he's
20  qualified to do so.  You can't just look the other way and
21  toss the driver a set of keys and say, here you go, you
22  can drive the truck for me.
23  Q.  And you have received no testimony to that
24  effect in this case, have you?
25  A.  That he wasn't qualified?

---

11:38:43-11:39:44                                    Page 117

1  Q.  No.  You've received no testimony from either
2  Alvin Boecken or Jim Ballard that they simply tossed him
3  the keys and did nothing else in this case, did you?
4  A.  No.  Absolutely not.
5  Q.  Okay.  And, and with regards to the accident
6  itself and the actions of Mr. Boecken with regards to
7  attempting a lane change, you believe that it was
8  inadvertent on his part, correct?
9      MR. FISCHEL: I'm going to object to form.
10     THE WITNESS: It was what?  It was what on his
11  part?
12     BY MR. FINLEY:
13  Q.  You believe that his actions were inadvertent.
14  A.  Inadvertent?
15  Q.  Yes.  That he had an error of judgment.
16      Do you believe that?
17     MR. FISCHEL: I'm going to object to form.
18     THE WITNESS: Not only an error of judgment.
19  It's absolute unsafe driving practices.
20     BY MR. FINLEY:
21  Q.  Okay.  And you believe he made a mistake?
22  A.  It's more than a mistake.  He's a professional
23  driver.
24  Q.  With regards to the accident itself he testified
25  he wasn't aware that Ms. Perez was there, correct?

---

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

1  A.  That's correct, and he should have known she was
2  there.
3  Q.  So you have no reason to dispute that, that he
4  was not aware she was there?
5  A.  That's his testimony.  But my opinion is that he
6  should have known she was there.
7  Q.  I understand that.  But you have nothing in the
8  evidence to dispute the fact that he was not aware she was
9  there?
10  A.  That's his testimony.  Never saw the Perez
11  vehicle prior to impact.
12  Q.  Okay.  And you have nothing to support or
13  dispute otherwise?
14  A.  No.  I don't dispute that at all.
15  Q.  Okay.  Let me look through my notes real quick,
16  Mr. Nelson, and I will --
17  A.  My name is Nelson.
18  Q.  I know that.  Look through my notes real quick.
19  And then let's go off the record real briefly; we'll come
20  back on and see if I have anything else to go over with
21  you.
22  A.  Okay.
23      THE VIDEOGRAPHER:  Going off the record at
24  11:40 a.m.
25      (Recess taken from 11:40 a.m. to 11:44 a.m.)

1      THE VIDEOGRAPHER:  We're back on the record at
2  11:44 a.m.
3      BY MR. FINLEY:
4  Q.  All right.  Mr. Nelson, with regards to the
5  opinions you've offered in this case, none of them, as I
6  understand it today, have been tested, correct, in terms
7  of independent testing?
8  A.  Correct.
9  Q.  Okay.  The opinions you're offering in this
10  case, Mr. Nelson, are contained entirely in the report
11  you've offered in this case?
12  A.  So far, yes.
13  Q.  Okay.  You say so far.
14      Do you have any plans as of now or have you made
15  any changes to those opinions?
16  A.  I have neither, no plans nor have I made any
17  change.
18  Q.  You haven't been asked to make any changes to
19  them, correct?
20  A.  Right.
21  Q.  Okay.  Mr. Nelson, are you planning on
22  testifying at the trial of this case if there is one?
23  A.  You betcha.
24  Q.  And by that I mean live at trial.
25  A.  Yes.

1      MR. FINLEY:  All right.  Mr. Nelson, I
2  appreciate your time and patience with my questions.
3  I'll pass the witness at this time.
4      MR. FISCHEL:  I have got really just a handful
5  of questions.
6
7      EXAMINATION
8  BY MR. FISCHEL:
9  Q.  So, Mr. Nelson, if there is more or additional
10  information that is obtained and provided to you would
11  that, if I ask you to review that, would that maybe make
12  you either alter or change your opinions, add opinions,
13  something like that?
14  A.  I may have additional opinions but certainly
15  would not change the opinions I have currently.
16  Q.  Okay.  In regards to the opinions that you have
17  currently is there any kind of individual testing that
18  would be required for you to render those opinions?
19  A.  No.  In fact I --
20      MR. FINLEY:  Objection; form.
21      THE WITNESS:  I testified to Mr. Finley that
22  this case didn't require that type of testing.
23      BY MR. FISCHEL:
24  Q.  Did it require any type of mathematical
25  calculations for you to render your opinions?

1  A.  Not from me, no.
2      MR. FINLEY:  Objection to form.
3      BY MR. FISCHEL:
4  Q.  Did, in rendering your opinions were you -- did
5  you need to review medical records?
6  A.  No.
7  Q.  Did you need to conduct any type of independent
8  experiments in order to render your opinions?
9  A.  No, sir.
10  Q.  Did you need to get into an exemplar truck to
11  render your opinions in this particular case?
12      MR. FINLEY:  Objection; form.
13      THE WITNESS:  I didn't need to.
14      BY MR. FISCHEL:
15  Q.  Have you done -- have you actually operated
16  trucks that are the same or similar to this particular
17  truck, or have you gotten in this type of truck or same or
18  similar truck in the past?
19  A.  Yes.
20      MR. FINLEY:  Form.
21      BY MR. FISCHEL:
22  Q.  Okay.  In regards to your testimony list that we
23  looked at earlier, it looks like there are at least
24  two cases around 2018 where you were identified as an
25  expert in the Western District of Texas.  Is that correct?

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 33 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

| 11:46:35-11:47:53 | Page 122 |
|---|---|

1 A.  Probably.

2 Q.  Okay.  And, in looking at your resumé, you've
3 been doing consulting work since you left the Arizona
4 State Patrol in 1985.  Is that right?

5 A.  Yes, sir.

6 Q.  And in that time that you've done consulting
7 work have you consulted with trucking companies and looked
8 over their entire practice, whether it's hiring practice,
9 the training of drivers, that kind of thing?

10 A.  Yes, sir.

11 Q.  And is that, is that something that you continue
12 to do today and you would if you were asked?

13 A.  I don't usually do that now, but if I'm asked I
14 could certainly go into a trucking company and evaluate
15 their operation and advise them in terms of their
16 compliance with regulations and their safe operation
17 mechanism.

18 Q.  And is it your experience over the last 35 years
19 in dealing with the regulations, the commercial driver's
20 license manual, is that what you base your opinions on
21 that you've rendered in this matter today?

22 A.  Yes.

23 Q.  And is that the, the same or similar sort of
24 approach that other individuals in your field take when
25 rendering opinions, as far as you know?

| 11:47:56-11:48:53 | Page 123 |
|---|---|

1     MR. FINLEY: Objection; form.

2     THE WITNESS: Other experts in my field usually
3 take the same position and perform the same analysis work
4 concerning regulation compliance and vehicle operation.

5     MR. FISCHEL: Okay. Mr. Nelson, thank you very
6 much. I'm going to reserve the rest of mine.

7

8     FURTHER EXAMINATION

9     BY MR. FINLEY:

10 Q.  Briefly, Mr. Nelson, in follow-up. I know that
11 you testified you didn't believe the need, or see the
12 need, in your opinion, to do math calculations, correct?

13 A.  Correct.

14 Q.  All right. You're saying that you did not see
15 the need, your testimony was, to get in an exemplar truck.
16 Is that correct?

17 A.  That's correct. Because I have done it so much
18 in the past that I don't need to do that.

19 Q.  Okay. So the bottom line, though, is that you
20 didn't do either one of those.

21     You did not perform speed calculations in this
22 case?

23 A.  I wasn't asked to reconstruct the accident.

24 Q.  Okay. You did not inspect or measure the truck
25 involved in the accident or an exemplar truck, correct?

| 11:48:57-11:49:42 | Page 124 |
|---|---|

1     A.     In terms of in relation to this case?

2     Q.     Yes, sir.  Your opinions in this case.

3     A.     That's correct.

4     Q.     All right.  You did not inspect the scene of the
5 accident, correct?

6     A.     Well, not specifically.  I may have gone through
7 there at some point in my life, but not specifically for
8 this case.

9     Q.     Sure.  And you did not inspect the vehicle
10 driven by Ms. Perez, correct?

11     A.     That's correct.

12          MR. FINLEY:  All right.  Mr. Nelson, I
13 appreciate your time.

14          I will reserve the rest of our questions for
15 trial.

16          MR. FISCHEL:  Reserve the rest of mine.

17          THE VIDEOGRAPHER:  We will go off the record at
18 11:49 a.m.  This ends the deposition of Kerry Nelson.

19          (The deposition concluded at 11:49 a.m.)

20

21

22          (Signature Waived.)
23 _____
          KERRY V. NELSON

24

25

| | Page 125 |
|---|---|

1 STATE OF ARIZONA    )
                      )  ss.
2 COUNTY OF MARICOPA  )

3

4          BE IT KNOWN that the foregoing deposition was
5 taken before me, KAREN L. LOCKER, RPR, Certified Reporter
6 No. 50821 for the State of Arizona, and by virtue thereof
7 authorized to administer an oath; that the witness before
8 testifying was duly sworn by me to testify to the whole
9 truth; deposition review and signature was not requested;
10 that the questions propounded by counsel and the answers
11 of the witness thereto were taken down by me in shorthand
12 and thereafter transcribed into typewriting under my
13 direction; that the foregoing pages contain a full, true,
14 and accurate transcript of all proceedings and testimony
15 had, all to the best of my skill and ability.

16          I FURTHER CERTIFY that I am not related to nor
17 employed by any of the parties hereto and have no interest
18 in the outcome thereof.

19          DATED at Phoenix, Arizona, this 6th day of May,
20 2020.

21

22

23

24 _____
          KAREN L. LOCKER, RPR
          Certified Court Reporter No. 50821

25

Case 5:19-cv-00375-XR   Document 50-2   Filed 05/11/20   Page 34 of 44
Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

## A

**A&M (1)** 55:16
**ability (7)** 40:13;77:17;
78:23;104:15,20;
111:6,10
**able (12)** 7:18;21:19;
47:6;60:17;61:13;
63:12;64:7;65:13;66:8;
68:16;81:21;82:4
**above (1)** 13:23
**absolute (1)** 117:19
**Absolutely (1)** 117:4
**accelerate (1)** 77:24
**accelerating (2)** 108:20,
22
**accept (3)** 104:5,19;
105:3
**accepting (2)** 106:4,13
**Accident (85)** 22:15;
24:2,16;25:3;34:10,13,
16,20;36:6;48:6;49:8,
14,16;50:1;52:16,21;
53:18;54:2,8,11,12,16;
55:7,12,15,16;56:12;
66:18;67:8,9,14,16,21;
69:14,18;70:4,9,15,16,
24;71:10,23;72:1,12;
73:13,22;74:3,10,17,
24;75:7,10;76:13,25;
77:12,12,20;78:18,25;
80:20;81:3,14;82:22;
84:16,23;85:1,6,11,17,
21,24;86:1;88:20,23;
89:1,11;90:1;95:6;
102:3;109:23;112:5;
117:5,24;123:23,25
**accidents (1)** 22:6
**accomplishes (1)** 87:4
**accordance (3)** 67:3,5;
95:18
**Accreditation (2)** 22:14,
14
**accurate (1)** 26:5
**accurately (2)** 26:9;
64:1
**acknowledging (1)**
104:18
**acronym (1)** 22:18
**ACTAR (7)** 22:14,17,
19;23:21;34:9,15,20
**action (5)** 20:21;112:9;
114:18,21;115:1
**actions (7)** 49:7,13;
95:6;111:15;112:9;
117:6,13
**active (7)** 24:8,12,17,
24;25:5,8;28:4
**actual (3)** 52:9;82:24;
92:19
**actually (8)** 28:24;29:8;
58:19;67:15;81:23;

89:9;109:16;121:15
**add (2)** 89:7;120:12
**addition (2)** 17:12;
32:23
**additional (9)** 32:15,25;
83:13,17,21;84:4;95:1;
120:9,14
**address (5)** 8:1,15;
40:17;87:17;88:3
**administer (1)** 104:14
**administering (1)** 4:22
**Administration (1)**
106:7
**adopt (1)** 84:23
**adopted (1)** 95:19
**Advanced (1)** 55:15
**advise (1)** 122:15
**again (9)** 10:14,15;
65:12;74:4;86:9;98:2,
19;110:2,6
**against (3)** 20:22;
106:3;115:2
**agency (1)** 105:10
**ago (4)** 66:1,2,5;105:1
**agree (8)** 4:20;6:1;
15:18;17:8,15;57:5;
89:12,23
**agreement (6)** 4:24;
5:21;39:21;40:2,11;
92:21
**agreements (2)** 93:5,8
**agrees (2)** 5:2,4
**ahead (21)** 9:15;15:11;
19:4;37:20;40:18;
58:20;66:17;75:13;
76:6,18;81:9;89:6;
93:13;96:23;97:3;
103:7;104:12;111:20;
113:3;115:4;116:14
**Air (2)** 26:15;27:1
**alleged (1)** 53:18
**allegedly (3)** 50:3;75:9;
76:24
**allow (1)** 116:9
**allowed (1)** 115:9
**allows (2)** 81:7;106:7
**allude (1)** 109:13
**alluding (1)** 12:17
**Almost (2)** 111:25;
114:3
**along (11)** 7:2;18:4,7;
28:15;39:18;40:6;
54:11;81:20;87:8,13;
109:3
**alongside (8)** 73:12;
76:4,18;78:24;80:14;
81:10;82:9;109:7
**alter (1)** 120:12
**Alvin (6)** 4:4,18;6:24;
78:23;91:20;117:2
**amount (8)** 73:11,19;
76:12,23;88:1,4,4;
109:22

**analysis (34)** 17:24;
51:18;71:18,24;72:16,
20,22;73:10;76:14,16;
77:1,10,16,22;78:3,6,
23;79:1,6,9,17;80:7,9,
18;81:1,4;87:21;88:3,
5,10,16;94:12;109:21;
123:3
**analyze (1)** 49:9
**analyzing (1)** 17:5
**Andy (3)** 36:7;51:10;
83:23
**annual (1)** 55:6
**answered (1)** 34:10
**anticipation (2)** 37:4;
43:11
**Antonio (2)** 4:6;64:22
**apologize (1)** 103:16
**apparently (1)** 76:8
**application (4)** 87:3;
112:24;113:5,9
**applying (2)** 54:13;
88:14
**appreciate (1)** 120:2
**approach (1)** 122:24
**approaching (1)** 81:8
**approximate (6)** 21:11,
19;22:2,7;47:6;60:17
**approximately (4)**
61:14;63:12;64:14;
66:2
**approximation (4)**
61:17;62:20;63:1,10
**April (2)** 4:7;68:22
**area (9)** 17:24;18:6;
55:2,18;73:5;75:25;
82:11;109:7;111:25
**areas (7)** 17:7;52:14;
53:2,24;56:16;57:1;
102:24
**Arizona (20)** 4:12;7:25;
8:4;9:4,13;10:6,10,20;
11:6;19:17;20:3,16;
21:6,9,18;24:11;25:23;
26:16;27:2;122:3
**around (8)** 14:4;17:22;
75:20,24,25;97:11,20;
121:24
**arrangement (2)** 31:7,
15
**arriving (1)** 66:23
**article (3)** 42:21;
105:17;106:3
**articles (15)** 41:8,10,12,
14,17,19;42:1,3,7,10,
16,18,19,22;50:24
**Asa (5)** 18:19;19:1;
28:14,15;29:6
**Aside (12)** 11:13,17;
14:5;38:7;41:13,19,20;
49:23;50:15;52:1,3;
94:15
**aspect (1)** 18:25

**assertion (1)** 81:12
**assist (1)** 48:25
**associated (1)** 25:21
**Associates (3)** 28:9,21;
41:6
**Association (13)** 24:12,
13,15,18,20;25:3,6,9,
24,24;26:2,16;27:2
**associations (3)** 24:23;
29:15,16
**assume (1)** 7:12
**Assuming (1)** 58:23
**assumption (1)** 62:3
**attach (5)** 9:15;31:10;
33:12;91:8;93:13
**attempt (1)** 69:13
**attempting (1)** 117:7
**attend (5)** 8:25;9:2,9;
27:23,25
**attended (2)** 11:18;
27:21
**attending (2)** 26:19;
27:20
**attention (1)** 75:3
**attorney (13)** 28:19,20;
36:2;39:2,17,22;46:11;
49:3;52:3;83:12,22;
84:2,5
**attorneys (3)** 17:25;
38:21;46:21
**author (3)** 41:21,25;
42:2
**authored (4)** 36:12;
41:8,11;42:4
**authoring (1)** 41:11
**available (3)** 35:15;
36:18;88:5
**avoid (1)** 66:22
**aware (10)** 51:15;
75:20;76:4;114:19,23;
115:17,20;117:25;
118:4,8
**away (4)** 24:2;42:13;
63:7;108:21
**awhile (1)** 66:3
**A-Y-S-O-N (1)** 8:6

## B

**b3 (4)** 99:22,24;100:2,6
**back (25)** 6:20;28:15;
33:21,24;39:18;40:21,
22;43:4;58:10;59:8,14;
61:20;62:23,25;63:17;
64:5;68:7,10;87:17;
88:2;92:12,15;105:1;
118:20;119:1
**background (1)** 12:5
**Ballard (17)** 4:4,18;
6:24;48:7;50:9,13;
106:20;113:8,8,10,12,
15;115:24,25;116:2,5;
117:2

**base (1)** 122:20
**based (8)** 11:23;15:9;
29:16;30:19;31:24;
57:14;111:6,10
**Bashas' (10)** 18:22;
19:1,2,15,17;20:1,12;
30:9,11,16
**basing (5)** 98:17,17;
110:10,11,18
**basis (2)** 72:11;112:11
**Bates (4)** 36:9;50:5,8;
82:24
**became (2)** 18:2;54:4
**become (2)** 29:19;54:1
**began (1)** 77:24
**begins (2)** 4:2;35:13
**behalf (17)** 17:10;
39:22;45:23;47:11;
57:17;61:7;62:19,22;
65:4;69:10;107:10;
116:9
**behind (3)** 66:24;
116:17,19
**Bendix (1)** 27:4
**besides (16)** 12:23;
20:10,12;29:5;33:8;
34:20;38:2;46:12;51:7,
14,19;52:10;73:6;
78:15;94:14;99:15
**best (3)** 61:13;63:10;
104:2
**betcha (1)** 119:23
**better (1)** 74:5
**Bexar (1)** 64:22
**beyond (13)** 28:2;
32:14,25;58:13;82:24;
83:17,22;84:5;91:24;
101:12,19;107:16;
109:17
**bibliography (1)** 41:7
**Big (1)** 13:18
**billed (3)** 31:16,17;
32:12
**binding (1)** 4:22
**biomechanical (2)** 53:7,
9
**birth (1)** 8:18
**bit (4)** 12:9;21:8,12;
66:11
**blank (1)** 40:10
**blind (1)** 82:11
**blocking (1)** 66:20
**blue (14)** 72:3,8;84:24;
85:7,16;86:8,12,14,17,
23;87:2,3,19,22
**body (1)** 99:6
**Boecken (64)** 4:4,18;
6:24;36:3;48:6;50:3,3;
69:21;71:15,22;73:13,
21;74:2,8,15,20;75:21;
76:9;77:7,13,20;78:20,
23;79:7,13;80:1,13,17;
81:2,16,23;82:4;85:3,

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 35 of 44
Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

11;86:1,5,7,19;89:13;
25;91:12,20;93:12;
103:3,8,9,24;107:5,11;
108:6,18,22;111:24;
113:9,17,18;114:1;
115:11,14,16;116:6,18;
117:2,6
**Boecken's (5)** 88:7;
95:6;107:14;110:24;
111:9
**book (12)** 28:14,25;
29:2,3,10;37:18;38:2;
41:4,13,19;42:15;96:4
**books (2)** 41:7,10
**both (19)** 11:14;16:8;
17:25;28:22;29:15;
42:12,12,18;45:13,22;
46:5,17;59:20,21;73:1;
80:10;96:7;100:10;
109:9
**bottom (2)** 59:22;
123:19
**boy (2)** 31:9;74:4
**brake (7)** 26:12,14,15,
18;27:1,4;86:15
**brakes (7)** 27:21;86:15,
20;87:3,9;88:14;
108:23
**braking (5)** 28:1;86:24;
108:6,19,22
**break (14)** 7:16,17,22;
12:10;13:16;40:18;
62:24;65:14;67:24,25;
68:13,14,16;92:6
**breakdown (8)** 61:14,
24;62:5,9,18,21;63:1,
11
**brief (1)** 67:24
**briefly (2)** 118:19;
123:10
**bring (3)** 60:5,8;99:12
**broke (1)** 78:4
**bumper (3)** 77:25;
86:18;88:7
**bunch (1)** 6:15
**business (11)** 8:8,11,
14,14;16:15;17:12;
19:16;29:20;58:13;
62:25;63:19
**businesses (1)** 18:6

## C

**CAB (11)** 4:18;48:7;
79:2;82:6;102:25;
106:20;113:8;114:8;
115:9,13,23
**calculating (1)** 73:25
**calculation (5)** 74:14;
76:14;77:16;78:2,5
**calculations (20)** 43:24;
44:2;55:20;71:5,18;
72:4,8,11,15;73:11,18;

76:25;77:21;85:22;
87:21;101:24;110:19;
120:25;123:12,21
**calendar (8)** 60:15;
64:5,10,11;65:12,16;
67:25;68:15
**California (2)** 19:7;20:3
**call (4)** 15:23;19:10;
44:17;103:9
**called (6)** 9:3;19:2;
44:15;48:21;96:24;
103:16
**came (3)** 80:13;106:10;
109:9
**Camelback (1)** 9:3
**can (61)** 6:20;9:19,19,
24;12:9,10;21:11,22;
22:24;26:24;33:11;
34:23;36:18,20;39:6;
40:5,16,16;42:17;47:2;
51:9;54:18,18,21,25;
55:5;58:24;59:5,7,9;
60:5,7,9;61:13;62:20;
63:1,20,25;66:14;
70:22;73:4;74:5;75:16;
79:23;80:16;81:9;82:9;
89:24;96:6;99:5;100:9;
104:5,8,10,10,14,21;
105:7,18;114:13;
116:22
**capabilities (1)** 77:10
**car (5)** 76:11;87:14;
109:4,4,8
**Carrier (20)** 16:1;
17:11;20:13;29:20,25;
30:3,6;37:17;50:25;
52:3,24;90:18;94:5;
104:5,10;105:2;106:7,
8;112:14;116:15
**Carriers (4)** 24:20;
25:24;26:2;30:8
**Case (110)** 4:6;31:2;
32:4,6,12,16;33:5,9,11;
36:6,14,19;37:9,23;
38:1,8,14,18,23;40:12,
25;43:20,25;44:3,7,14;
45:11,24;47:15,17;
48:21;50:5,21;51:18,
23;52:1,12;56:12;57:3;
58:24;59:23;63:7;64:4,
8,20,25;65:1,3,25;
66:11;67:17;68:23;
69:12,17;70:10;71:3,6;
72:17;79:8,11,14;80:1,
8,10;82:3,16,19;83:2,4,
7,14;84:17,23;85:5,7,
21;89:23;90:15,23;
91:23;92:3,20;93:6,10,
15,20;94:21;103:18;
106:16;107:1,9,14,21;
109:17;110:19;111:1;
114:18,22;115:2;
116:2,18,24;117:3;

119:5,10,11,22;120:22;
121:11;123:22
**caseload (1)** 57:21
**cases (19)** 17:5;44:5;
45:12,16;58:14;59:18;
60:13,20,23;61:4;62:5,
9,13,21;63:20;65:10;
79:9,15;121:24
**casual (3)** 19:7,8,25
**catch (1)** 44:25
**caught (1)** 75:2
**causation (1)** 53:15
**cause (7)** 69:2,4;89:11,
14;90:1;114:17;115:1
**causes (1)** 114:21
**caveat (1)** 104:8
**CDL (9)** 51:1;96:17,24;
99:16;100:19;101:13;
111:17,18,19
**certain (1)** 116:15
**certainly (3)** 105:19;
120:14;122:14
**certification (18)** 22:19;
23:2,5,11,14,16,21,24;
26:12,18;27:20,22;
28:2,3;34:9,12,15,16
**certifications (2)** 26:13,
18;34:19
**certified (2)** 4:9;5:10
**cetera (3)** 79:4,5;97:4
**chance (1)** 35:5
**change (9)** 87:13;
88:14;89:2,7,10;95:13;
96:8;98:17;99:18;
100:25;101:1,8,10,23;
110:1;117:7;119:17;
120:12,15
**changed (1)** 14:25
**changes (7)** 84:8,11,
19;86:14;99:9;119:15,
18
**changing (2)** 80:2;
88:15
**chapter (5)** 97:7,10;
98:5,12,24
**chapters (2)** 29:1;98:14
**charge (1)** 53:19
**check (3)** 39:19;57:11;
80:1
**checked (1)** 86:11
**checking (1)** 87:20
**checks (2)** 81:16;86:10
**chief (1)** 13:1
**circular (4)** 108:9;
109:1,3,6
**circumstances (3)** 7:3,
10;35:19
**claim (2)** 74:2;79:16
**Claims (4)** 50:12;
73:20;74:9;114:22
**clarify (1)** 11:2
**clarifying (1)** 90:9
**Class (1)** 106:23

**classes (3)** 54:10,14,15
**clear (4)** 22:2;27:19;
69:4;105:23
**client (2)** 17:11;115:2
**clients (2)** 28:20;
107:10
**client's (2)** 84:25;88:1
**Coash (3)** 4:9,10,10
**coast (1)** 21:18
**code (8)** 99:8,9,10,11,
15,16,17;101:13
**codes (1)** 101:14
**Cola (4)** 13:10,21,24;
18:4
**Cola's (1)** 13:1
**colleagues (1)** 43:2
**collectively (1)** 36:23
**college (14)** 9:11,14;
10:6,14,17,23;11:1,4,7,
8;12:12,13,14;55:14
**colleges (4)** 11:14,18,
19,19
**collision (16)** 47:21,21,
22;48:4;49:10;52:19;
55:13;56:9,19;66:22;
70:13;88:19;89:3;
111:16;112:10;114:5
**collisions (6)** 15:2,3;
18:9;52:18;55:21;
94:13
**coming (4)** 21:18;
74:12;84:22;86:12
**Commercial (45)** 8:12;
14:11;15:3,8;18:6,8;
21:3,23;38:4,6;42:20;
48:20,21;50:12;52:5,
16,18,20,21;53:3;54:1;
55:11;67:4,10;90:16;
94:12;96:7;97:16,24;
98:13,20;100:11;
101:2;104:11,16;
105:3,7,13;106:23;
107:4;111:24;116:9,
17,19;122:19
**Commission (1)** 22:15
**community (2)** 11:19;
12:13
**companies (6)** 15:23;
17:6;18:6;21:13;30:23;
122:7
**company (21)** 14:10,22,
24;15:22,22,24;16:13,
17;17:3,16;18:2,12;
19:2,25;25:22;29:25;
30:3,6,13;41:14;
122:14
**company's (1)** 47:25
**comparative (2)** 72:19,
21
**comparing (1)** 72:24
**compilations (2)** 37:2;
43:10
**compiled (1)** 59:15

**complete (1)** 41:7
**completely (1)** 6:13
**compliance (7)** 16:1;
48:7;52:23;106:13,14;
122:16;123:4
**compliant (1)** 47:25
**complied (1)** 16:3
**comply (1)** 106:12
**computer (1)** 91:2
**concerning (5)** 15:2;
55:21;95:6;107:25;
123:4
**conclusion (5)** 71:25;
97:12;102:18,21;109:9
**conclusions (12)** 71:9;
84:15,16,22;89:5,14,
25;94:19,19,21;95:2,5
**condition (1)** 67:6
**conditions (1)** 66:25
**conduct (3)** 73:19;79:6;
121:7
**conducted (2)** 82:18;
112:4
**conducting (1)** 51:17
**conference (1)** 55:6
**confirm (19)** 35:24;
80:7,19,23;81:1,24;
87:22;88:4,6;113:13
**confirmed (1)** 115:19
**confirming (1)** 88:17
**confirms (1)** 113:25
**conformance (1)** 113:5
**confusing (1)** 7:11
**conscious (1)** 116:11
**consciously (2)** 115:14;
116:6
**consider (4)** 49:7,13,
15;52:15
**considered (1)** 51:25
**consultant (6)** 15:5;
27:1;45:8;48:20;54:1;
57:7
**Consultants (14)** 13:17;
16:8;17:17,20,22,23;
18:1,11,18,24;19:10;
26:16;30:16;54:5
**consulted (2)** 18:13;
122:7
**consulting (11)** 15:7,19;
16:6,20;17:5,10,12;
18:5;57:16;122:3,6
**contact (4)** 108:7,15,24;
109:13
**contain (1)** 59:17
**contained (16)** 37:4,9,
15;38:13,17,22;43:12,
20,25;52:12;96:17;
98:20,25;100:19;
114:14;119:10
**contains (1)** 38:5
**contend (1)** 74:16
**contends (2)** 74:15;
77:19

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 36 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

**content (1)** 28:25
**contents (1)** 33:6
**context (6)** 16:21;
  17:10,13;18:14,14;
  29:20
**continue (1)** 122:11
**contract (4)** 39:25;40:3,
  4;92:19
**copies (2)** 42:7,10
**copy (15)** 9:24;10:2;
  32:3,9;36:5;39:10,13,
  21;44:4;55:24;93:14;
  99:25;100:6;106:16;
  107:8
**Corona (1)** 4:20
**corrections (2)** 84:12,20
**correctly (5)** 56:13;
  58:1;100:12;103:4,22
**correspondence (1)**
  38:20
**Coulter (1)** 29:7
**Council (2)** 24:21;
  25:25
**Counsel (13)** 4:13,20;
  5:1,2,3;31:1,8;40:12;
  44:15;48:12;49:7;51:3;
  83:17
**County (2)** 64:22;69:3
**couple (2)** 86:18;92:6
**course (12)** 18:7;21:16;
  47:20;52:7;54:12;
  55:15,17,19;63:6;
  74:25;77:3;101:17
**courses (3)** 12:7,11;
  54:10
**Court (15)** 4:5,8;5:5;
  36:19,22;40:6,14;
  43:15;58:22;65:1,25,
  25;67:19;69:3;91:7
**crash (1)** 55:11
**created (1)** 28:16
**creates (1)** 116:10
**creating (2)** 41:16,17
**crush (1)** 72:16
**current (3)** 34:12;60:10,
  11
**currently (8)** 7:24;
  14:10;24:8;25:5;28:4;
  65:10;120:15,17
**curriculum (2)** 10:11,15
**custom (2)** 97:23;98:1
**cut (7)** 37:21;48:23;
  81:18;88:2;95:21;
  97:22;110:2
**cuts (1)** 86:14
**cutting (4)** 71:23;85:16;
  86:9,9
**CV (33)** 9:16,20,24;
  10:3,9,25;11:17;13:7,
  14,22;16:13;18:21;
  20:15;21:2;22:13,25;
  24:6,9;25:16;26:2,6,
  21;28:7;29:13;30:9;

41:3,4;43:5,6;52:25;
  54:19,23,23

**D**

**D&A (13)** 13:17;16:8;
  17:16,19,22,23;18:1,
  10,18,24;19:10;30:16;
  54:4
**d/b/a (3)** 4:18;48:7;
  106:20
**damage (18)** 56:8,19;
  72:19,21,23;73:1,1,8;
  107:19;108:8,9,25;
  109:1;110:1,9,14,15,21
**damaged (1)** 56:20
**damages (1)** 56:9
**dash (1)** 69:5
**data (2)** 37:2;43:10
**date (17)** 4:7;8:18;
  11:22,25;13:9;27:8;
  44:23;45:1;51:7,15;
  59:25;60:2,5,8;68:20;
  114:4;115:23
**dated (1)** 39:16
**dates (1)** 59:8
**Davis (3)** 46:9,12;51:5
**day (1)** 76:15
**Dealing (2)** 27:4;
  122:19
**decide (1)** 90:8
**decided (1)** 66:22
**decides (2)** 87:13;
  105:3
**decision (2)** 30:19;
  90:13
**decisions (1)** 30:22
**defendant (10)** 5:1;
  57:23,25;58:2;61:8,24;
  62:11,22;63:2;80:10
**defendants (7)** 4:17;
  5:2;6:24;36:8;50:6;
  57:18;61:15
**defendants' (3)** 36:6;
  85:5,6
**defendant's (1)** 47:23
**defense (4)** 17:25;
  28:22;63:4;83:24
**definite (1)** 46:25
**degree (4)** 10:19,22;
  11:23,25
**delete (1)** 65:16
**deliver (2)** 19:12,19
**delivering (2)** 19:16;
  20:6
**Department (9)** 20:16,
  17,20;21:6;54:4,10;
  55:18;104:25;105:24
**depend (1)** 57:21
**depending (1)** 62:13
**deposition (59)** 4:3,11,
  22;6:8,11,13,21;7:4;
  9:16;31:11,17,20;32:3,

16,19,21,24;33:4,12,
  13;34:3,4,5;35:3;
  36:10,10,22,24,25;
  39:1,7;40:14,22,23;
  43:12;46:3,7,8;49:23;
  50:15;59:19;60:10;
  63:22;69:8;71:11,24;
  73:14;78:12,15;84:7;
  85:3;89:23;90:21;91:8,
  18,24;92:22;93:14;
  113:10
**depositions (4)** 5:24;
  36:3;63:13;82:25
**derive (1)** 101:4
**derived (1)** 57:8
**describe (2)** 14:6;17:2
**described (1)** 57:1
**describes (1)** 112:8
**description (2)** 16:19;
  56:6
**designation (4)** 36:7;
  55:25;56:6;57:2
**detail (1)** 102:23
**determine (2)** 75:24;
  77:10
**determined (2)** 49:2;
  78:19
**develop (1)** 49:18
**diagrams (2)** 37:7;
  38:12
**different (9)** 6:16;13:2;
  15:16;17:6;18:4;24:7;
  29:1;41:14;85:12
**differentials (1)** 110:15
**direct (1)** 55:12
**direction (1)** 77:18
**directly (2)** 55:5,12
**director (3)** 19:1;29:19,
  22
**disagree (1)** 86:3
**disciplinary (1)** 20:21
**disconnection (1)** 7:10
**discovery (1)** 83:6
**discussed (2)** 5:19;
  18:13
**discusses (1)** 98:6
**discussion (1)** 34:24
**displayed (1)** 9:20
**dispute (5)** 112:6;
  118:3,8,13,14
**disputed (1)** 80:16
**disputing (1)** 108:14
**disqualification (1)**
  100:3
**disqualified (1)** 106:24
**disregard (1)** 116:12
**disregarding (1)** 116:6
**disregards (1)** 115:14
**distance (4)** 66:21;
  67:3;88:4,10
**distancing (1)** 4:21
**distinguishing (1)** 61:6
**distributed (1)** 104:25

**District (4)** 4:5,5;69:2;
  121:25
**Division (1)** 4:6
**document (4)** 56:4;
  91:16;92:25;107:6
**documentation (7)**
  50:20,22;111:1,2,11;
  112:7;114:2
**documents (14)** 36:8;
  37:1;40:7;43:10;49:17,
  18;50:5;51:2;52:9;
  82:24;83:21;84:6;
  107:16;111:7
**depositions (4)** 5:24;
**Don (5)** 18:19;19:1;
  28:14,15;29:6
**done (25)** 5:24;16:20;
  29:2;40:25;43:20,25;
  63:6;71:17,24;73:5;
  76:2;79:10,16,19;
  82:15,21;83:18;85:21;
  92:3;101:23;102:1;
  109:21;121:15;122:6;
  123:17
**DOT (3)** 105:17,20,24
**doubt (1)** 114:8
**down (17)** 12:10;16:13;
  17:7,16;28:16;48:2;
  62:24;66:17;75:3,21;
  76:1,7,19;79:5;81:7;
  82:9;96:19
**drafted (3)** 93:20,22;
  94:24
**drafting (1)** 29:10
**drive (19)** 19:5,11,19;
  20:1;36:18,22;40:7;
  100:8;113:1,4;116:22
**driven (3)** 20:13;77:20;
  81:23
**Driver (19)** 13:18,23;
  15:25;19:7,8,25;30:19;
  47:24;67:2;75:20;
  76:20;87:7;96:18;
  115:10;116:8,10,16,21;
  117:23
**drivers (9)** 19:9;21:13;
  30:10,13,17;38:6;
  100:3;109:17;122:9
**Driver's (23)** 38:4;
  50:12;52:5;67:4,10;
  77:11;97:16,24;98:20;
  104:6,15,19;105:4,6,8,
  13;106:4,17,19,23;
  107:4,8;122:19
**drives (2)** 96:8;100:11
**driving (19)** 12:20,24;
  13:8,13;20:9,12;75:3,
  21;76:12;79:5,8;87:12;
  88:18;96:19;107:5,9;
  110:24;112:3;117:19
**drug (3)** 113:23;114:1,
  3
**duces (1)** 35:6
**dues (1)** 24:8

**duly (1)** 5:9
**during (11)** 13:10;18:3,
  15;23:10;40:14;42:5;
  54:3;56:11;77:1;
  109:23;112:9
**duties (2)** 20:9;28:8,11,
  23;41:5;53:2
**Dynamic (1)** 55:17

**E**

**earlier (20)** 13:14;14:9;
  19:15;30:15;34:9;39:2;
  49:24;52:4;62:2,4,18;
  68:1;82:25;90:10,14,
  17,20;99:21;107:21;
  121:23
**early (1)** 13:10
**easier (1)** 22:18
**East (2)** 4:12;8:3
**edited (3)** 28:18;29:12;
  94:23
**editing (4)** 28:23,25;
  29:2,8
**editorial (3)** 28:8,11;
  41:5
**education (5)** 9:9;10:4,
  25;11:17;12:5
**effect (5)** 23:5;77:4;
  106:10;112:7;116:24
**effectively (2)** 96:2;
  100:22
**eight (1)** 69:5
**either (12)** 21:14;
  42:22;45:17;53:22;
  59:18;70:2,24;106:17;
  116:5;117:1;120:12;
  123:20
**elapsed (4)** 73:20,25;
  74:14;75:8
**E-L-L (1)** 8:3
**else (10)** 12:23;33:8;
  42:14;52:10,22;91:23;
  94:14;116:11;117:3;
  118:20
**email (3)** 40:15,16,17
**emailed (1)** 44:16
**employed (5)** 16:7,10;
  22:23;25:10;54:4
**employee (2)** 16:18;
  19:8;28:15
**employees (1)** 14:16
**employers (1)** 113:14
**employment (3)** 25:17;
  42:5;112:24
**encompasses (1)** 94:6
**end (4)** 46:2;88:2,25;
  115:8
**enforcing (1)** 22:5
**engaged (3)** 109:14,16,
  23
**engine (1)** 87:10
**engineer (2)** 8:21;53:7

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 37 of 44

Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

engineering (4) 10:11, 16;11:13,23
enter (1) 5:20
entire (5) 23:12,13; 35:15;40:6;122:8
entirely (3) 55:7;85:2; 119:10
entities (1) 93:9
entitled (1) 50:12
environment (1) 12:14
equal (2) 85:4,25
equivalent (2) 104:6,19
error (3) 11:5;117:15, 18
especially (1) 7:3
essentially (1) 95:22
estimate (1) 23:9
estimation (1) 63:4
et (3) 79:4,4;97:4
evaluate (2) 104:14; 122:14
evaluating (1) 30:22
even (1) 42:15
event (2) 111:16; 112:10
events (4) 21:3;47:21; 48:5;88:19
everyone (1) 35:20
Evidence (17) 16:11, 12,22,25;25:10,17; 79:25;80:3;81:5; 106:18;109:15,19; 110:13;113:7,13,24; 118:8
exact (1) 44:23
exam (1) 23:18
EXAMINATION (5) 5:13;23:15,21;120:7; 123:8
examine (1) 15:24
examined (1) 5:11
example (1) 15:21
except (1) 100:7
exception (1) 111:22
excuse (3) 83:5; 103:24;115:12
exemplar (7) 79:7,12; 82:2,6;121:10;123:15, 25
exhibit (28) 9:16,17,18; 31:11,13;32:2;33:1,13, 14;34:3,25;35:2;36:24; 39:7,8;40:11,22;55:1, 23;56:1;58:23;59:1; 91:8,9;92:11,21;93:13, 16
exist (2) 42:11;44:1
expand (1) 12:9
expect (3) 31:4;74:23; 75:4
expected (3) 48:14,17; 56:7
experience (19) 14:6,

29:18;52:7;65:17;79:2; 82:5;88:18;94:12,16; 96:6;100:10;102:4,10; 108:24;110:4,10,14,25; 122:18
experiment (1) 82:18
experiments (8) 82:15, 20;102:2,9,11,12,13; 121:8
expert (16) 36:7;51:19, 22;52:15;53:9,22,25; 54:8;55:25;56:6,17; 57:7,17;59:12;65:18; 121:25
experts (1) 123:2
expired (1) 106:24
explain (1) 66:11
Exposition (1) 55:14
extent (2) 43:18,24
E-Z (1) 8:3
Ezell (2) 4:12;8:3

## F

fact (18) 7:4;21:24; 26:14;27:25;35:25; 52:19;64:18;74:20; 76:5;77:24;81:8,8; 87:2,8;106:3;115:16; 118:8;120:19
factors (2) 53:21,24
fading (1) 103:25
failed (3) 102:25; 103:22;115:12
fair (9) 22:24;49:1; 57:13;62:1,3;67:14; 85:24;95:7;103:1
fairly (1) 5:16
familiar (1) 29:19
far (16) 32:6,12,16; 58:10;59:9,14;62:23; 63:17;78:16;84:21; 86:16;94:2;109:24; 119:12,13;122:25
fashion (5) 7:18;14:7; 15:5;19:13;67:13
faster (4) 108:10;109:4, 5,25
Federal (16) 16:1; 37:17;48:1;50:25;52:3, 24;64:25;65:25;67:5; 90:18;94:4;95:18,20; 106:7;112:14;114:9
fee (2) 31:25;32:1
feet (3) 86:18,24;88:6
fender (1) 76:6
ferret (1) 66:14
few (1) 41:12
field (6) 18:12;22:5; 54:1,12;122:24;123:2
file (5) 32:25;33:5,9, 11;35:15,21,25;36:15, 18;37:5,10,15;38:13,

17,23;40:6;43:12,21, 25;49:24;52:13; 106:17;107:1,3;111:2
files (1) 37:23
final (4) 25:2;115:4,7,8
finalized (1) 29:3
find (1) 114:13
fine (1) 33:17
finish (1) 110:6
FINLEY (61) 4:17,17; 5:1,14,16,18;6:1,3; 9:19,22,23;21:25;22:1, 10,12;31:19;33:11,16, 17,23;34:23;35:1;39:9; 54:25;55:4,9;56:2; 58:22;59:2,4;68:3,9; 72:5,6;75:15;76:21,22; 82:12,14;89:19;90:4; 91:6,10;92:5,14;93:17; 102:6,8,16,17;117:12, 20;119:3;120:1,20,21; 121:2,12,20;123:1,9
firm (12) 25:21,25;26:1; 46:10,12,15,20,21,23; 47:8,13;51:6
firms (2) 28:19,20
first (17) 5:9;6:10,11; 17:22,22;23:18;53:25; 54:5;58:12,15;81:4; 86:6,7;94:2;95:4,23; 101:15
Fischel (30) 4:15,15, 25;5:3,22;6:2;36:1; 39:17;44:19;45:6;46:2, 9,12,14;48:18;75:12, 14,16;89:16;90:2;93:6; 117:9,17;120:4,8,23; 121:3,14,21;123:5
Fischel's (1) 31:15
five (13) 23:12,13; 60:19;75:22,23;76:3; 80:12,21;81:17;86:11, 12;87:20;114:7
flash (3) 36:18,21;40:7
flat (2) 31:25;32:1
focused (3) 11:15;16:6; 96:11
focusing (2) 99:24; 102:19
follow (1) 34:8
following (3) 66:20; 67:3;104:20
follows (1) 5:11
follow-up (1) 123:10
force (6) 56:8,10,11,19, 21,21
Forensics (21) 8:12; 14:11;15:8;16:10; 22:23;23:7;24:5,19; 25:17;27:15;28:13,13, 16,18,21;29:11;41:15; 42:6,13,25;53:3
form (11) 50:13;75:12,

16;89:16;117:9,17; 120:20;121:2,12,20; 123:1
forming (1) 79:8
formulate (1) 71:25
formulated (1) 72:23
formulating (7) 49:20; 51:17,18;52:1;71:19; 94:1;101:15
forth (1) 22:9
forward (2) 33:25;92:17
found (2) 98:10;100:2
four (6) 60:19,20;61:1; 94:18,19,20
fourth (2) 26:22,23
frame (4) 15:17;18:15; 77:2;80:23
front (28) 9:25;10:2; 26:21;32:9;39:11,13; 50:9;54:23;59:6;61:12; 68:24;76:5;77:17,25; 78:1;84:25;86:8,14,18, 24;88:6;91:12;92:23; 93:18;96:3;99:25; 100:6;109:2
full (1) 6:4
FURTHER (1) 123:8

## G

gave (6) 8:15;16:19; 62:2,17;64:4;90:10
geared (3) 54:16;55:7, 12
Geez (1) 66:3
general (1) 112:21
generally (7) 17:2,4,7,9, 14;20:3;107:24
generic (1) 53:1
Germany (1) 55:11
gets (4) 81:9;86:15,20, 20
given (8) 6:8,13;7:14; 44:6;63:13,22;85:9; 87:16
giving (2) 6:18;97:6
glad (2) 7:12,17
Glendale (1) 55:7
goes (2) 63:7;102:23
Good (4) 5:15,16; 33:15;67:24
governing (1) 105:10
graduate (2) 9:5,7
green (2) 37:18;38:2
groceries (4) 19:6,12, 19;20:6
grocery (3) 19:16,17; 20:6
ground (1) 6:16
Guard (1) 105:17
guys (1) 53:19

16;89:16;117:9,17; 120:20;121:2,12,20; 123:1

## H

hand (4) 28:24;29:4; 36:13;41:11
Handbook (7) 28:9,18, 24;29:5;38:4;52:5; 90:17
handful (1) 120:4
handling (1) 5:23
handwriting (1) 91:3
handwritten (3) 38:16; 90:22;91:2
handy (2) 37:22;105:18
Hang (4) 31:9;39:12, 23;68:25
happened (3) 49:16; 87:15;114:3
hard (7) 10:2;22:6; 86:20;87:9;108:6,19, 22
hazardous (1) 67:6
he/she (2) 100:9,11
hear (1) 7:5
heard (3) 57:25;58:4; 75:18
heavy (2) 21:9,16
height (1) 77:6
held (6) 22:17,19,25; 34:16,19,24
Henry (3) 46:16,23; 47:12
herein (1) 5:9
hero (1) 103:25
high (2) 8:25;9:3
highway (16) 21:9; 66:20;73:13,21;74:3,9, 15;75:3,21;76:13,15, 19;80:12,20;85:1; 115:17
highways (1) 22:6
hire (2) 30:19,19
hired (8) 31:1;44:14; 46:11,14,17,24;48:12; 114:1
hiring (5) 30:10,12,17; 44:14;122:8
history (10) 44:8;58:7, 25;61:24;68:1;107:5,9; 112:3,5,6
hit (1) 87:2
hits (1) 87:14
hold (7) 15:4;22:13,21; 26:12,18;34:12;56:16
holding (1) 54:7
hood (1) 76:6
hope (1) 31:6
hopefully (1) 65:16
hour (3) 31:16,17,18
hourly (2) 31:20;32:1
hours (5) 32:12,14,22, 24;33:3
human (1) 53:21

**humans (1)** 53:21
**hundreds (2)** 63:14,15

## I

**idea (5)** 42:12,14;43:3;
63:12;105:7
**identification (9)** 9:18;
31:13;33:14;39:8;56:1;
59:1;91:9;92:11;93:16
**identified (10)** 24:6;
29:14;30:9;32:2,14;
39:6;55:23;56:18;
63:20;121:24
**identify (8)** 4:13;10:10,
15;21:2;41:4;54:18,18;
95:14
**images (2)** 38:13;43:19
**immediately (4)** 77:12;
78:25;84:25;85:16
**impact (7)** 56:10,21;
76:11;107:23;109:10;
115:18;118:11
**impacts (1)** 87:5
**impossible (1)** 72:3
**inability (1)** 104:21
**inadvertent (3)** 117:8,
13,14
**Inc (4)** 18:22;19:15;
20:2,12
**incidentally (1)** 112:25
**incidents (1)** 21:3
**inclement (1)** 66:25
**included (4)** 51:5;85:2;
106:21;107:1
**including (3)** 32:16;
38:12;58:12
**income (2)** 57:8,10
**independent (13)**
71:17;73:19;80:15,18,
22,25;88:3,9,16;
107:15;109:21;119:7;
121:7
**independently (1)**
107:2
**indicate (4)** 26:6;109:1;
113:16,19
**indicates (4)** 80:21;
81:6;106:22;113:25
**indicating (2)** 108:8,9
**indiscernible (2)** 41:15;
73:3
**individual (6)** 29:6;
96:2,6;104:10;107:1;
120:17
**individually (1)** 25:20
**individuals (5)** 13:3;
29:4;42:12;93:9;
122:24
**individual's (1)** 105:3
**industry (4)** 43:2;48:20;
97:23;98:1
**information (15)** 49:5;

51:25;52:6;60:16;
65:12;72:2;77:4;78:14;
83:21;84:5;98:13,19;
106:21;107:3;120:10
**initially (1)** 23:14
**initiate (1)** 98:16
**initiating (1)** 95:12;
99:17;100:25;101:23
**injuries (1)** 53:18
**injury (2)** 53:14;116:11
**inquiries (2)** 113:12,14
**inspect (4)** 69:20,23;
81:23;123:24
**inspected (1)** 82:2
**inspection (1)** 69:18
**inspections (3)** 42:20;
70:2;85:23
**instructing (1)** 13:3
**instruction (2)** 11:10;
55:19
**instructor (8)** 12:21;
13:2,9,24;18:2,3,12,16
**insurance (2)** 15:22;
17:11
**insure (1)** 15:22
**Interstate (3)** 21:14,14;
66:17
**interview (1)** 49:20
**into (16)** 5:20;15:24;
17:24;18:11;26:23;
32:15,25;41:17;85:24;
88:14;102:23;106:10;
112:4,15;121:10;
122:14
**introduction (2)** 17:24;
18:11
**investigating (3)** 18:8;
21:3;22:6
**investigation (14)**
52:17;54:2;55:13;
73:19;80:19;81:1;88:3,
10,17;90:23;107:16;
109:22;112:4;113:11
**investigations (4)** 21:7,
21;52:22;113:14
**investigative (1)** 37:8
**Investigators (1)** 25:4
**invoice (7)** 31:11;32:3,
5,8,15;33:1;36:4
**invoices (1)** 40:25
**involved (10)** 21:6,20;
42:21;48:19;66:7,15;
70:4;87:1;106:11;
123:25
**involving (5)** 21:23;
48:21;49:10;52:18;
66:18
**issue (2)** 86:10;105:2
**issued (6)** 67:19;84:9;
105:18,20;106:6,10
**issues (5)** 15:2;42:21;
66:7,14;106:11
**issuing (1)** 83:20

**item (10)** 27:5;34:8;
35:16;37:1;38:11,20,
25;40:24;51:9;94:4
**itemization (1)** 53:1
**items (15)** 35:6,9,21,24;
36:8,15;41:10;51:7,14;
52:11,12;76:8;93:25;
94:6,9

## J

**Jeff (1)** 4:17
**Jerry (1)** 4:9
**Jessica (6)** 4:3,16;
38:22;49:8;73:12;
91:18
**Jim (11)** 4:4,18;6:24;
48:7;106:20;113:8;
115:24,25;116:2,5;
117:2
**job (7)** 18:25;29:1;
74:5;75:19;76:17,17,
20
**Jr (1)** 4:9
**judge (1)** 67:6
**judgment (2)** 117:15,18
**junior (2)** 11:19;12:12
**jury (8)** 6:20;89:12,21,
24;90:6,8,11,13

## K

**Karen (1)** 4:8
**keep (1)** 76:17
**Kerry (4)** 4:3;5:8;6:6;
36:12
**keys (2)** 116:21;117:3
**kind (9)** 10:22;12:12;
34:16;53:10;93:5,8;
109:6;120:17;122:9
**Kindle (1)** 69:3
**knew (2)** 48:18;76:9
**knowing (1)** 75:8
**knowledge (3)** 52:7;
94:11;104:15
**known (2)** 118:1,6
**knows (1)** 104:16

## L

**labeled (5)** 36:9;39:6;
50:5,8;82:24
**lack (1)** 112:9
**Lane (18)** 4:12;8:3;
86:22;87:5;89:2,7,10;
95:12;96:8;98:16;99:9,
17;100:25;101:1,8,10,
23;117:7
**lanes (4)** 80:2;86:14;
87:14;88:15
**last (22)** 24:12,17;25:8;
34:15;44:25;47:8;52:8;
64:4,14,18;65:6;68:15,

18,19;79:16,21;80:12,
12;102:18;104:17;
108:3;122:18
**lasted (1)** 19:22
**later (2)** 51:7,15
**latest (1)** 24:25
**Law (8)** 46:9,12,15;
51:6;98:21;99:1,6;
115:1
**laws (1)** 22:5
**lawsuit (6)** 6:18,25;
30:25;45:8
**lawyer (1)** 29:16
**leading (2)** 47:22;48:5
**leaned (1)** 57:20
**least (4)** 41:5;67:6;
79:24;121:23
**leave (2)** 19:9;40:10
**left (9)** 23:6;28:1;
48:10;54:4;77:17;86:9,
13;88:15;122:3
**legal (1)** 4:9
**lend (1)** 105:6
**less (1)** 87:23
**letter (8)** 36:1;39:1,11,
13,16;44:21;45:1;51:5
**license (19)** 67:4,10;
97:16,24;98:20;104:6,
19;105:4,6,8,13;106:4,
13,17,19,23;107:5,8;
122:20
**licensed (1)** 53:12
**lieu (3)** 105:4;106:4,13
**life (1)** 70:12
**light (1)** 7:3
**lights (1)** 86:16
**limited (7)** 59:19;65:19,
20;66:7;67:7,12;90:16
**line (7)** 13:23;77:14,23;
78:8,16;81:24;123:19
**link (2)** 56:7,18
**list (24)** 44:8,8,10;
48:10;58:25;59:5,8,14,
17,22,25;60:2,8,11;
61:5,6,12,13;63:21,25;
65:9,10;93:25;121:22
**listed (11)** 11:17;16:13;
25:14;26:15;27:5;
52:25;94:9,14;98:14;
112:18;114:11
**lists (1)** 44:5
**literature (12)** 37:12,25;
50:23;52:10;90:15,19;
94:8;99:15;101:15,19;
104:22;110:11
**litigation (15)** 15:2,9;
16:6,25;17:12,24;
18:11,14;30:21;48:19;
52:17;57:8,14,17;
88:19
**little (6)** 21:9;37:18;
66:11;111:21;114:8
**live (1)** 119:24

**load (1)** 19:9
**loading (1)** 42:21
**location (1)** 8:14
**Locker (1)** 4:8
**long (7)** 16:5;23:4,5;
66:2;80:20;105:1;
111:23
**longer (2)** 26:6;59:12
**look (21)** 12:25;39:23;
47:20,23;48:4,22;56:3,
3;61:4;64:11,24;65:11;
67:25;68:1;70:20;98:8;
99:3;112:4;116:20;
118:15,18
**looked (4)** 43:5;111:17;
121:23;122:7
**looking (19)** 10:3,9;
32:8;35:2,14;36:25;
49:14;50:11;61:6,13;
64:10;68:14;73:6;76:2;
79:4;81:5;108:5;114:6;
122:2
**lookout (8)** 76:17;
95:12,24;96:11,13,17;
100:16;101:22
**looks (4)** 75:23;86:20;
102:20;121:23
**lot (8)** 21:9,23;53:19;
87:16;104:1;110:5,8,9
**lots (1)** 17:6
**ludicrous (2)** 87:10;
88:13

## M

**magnitude (2)** 56:8,19
**maintain (3)** 96:12,16;
100:16
**maintaining (4)** 95:11,
24;96:11;101:22
**maintenance (1)** 16:2
**major (4)** 10:12,17;
11:14;21:8
**majors (1)** 11:15
**makes (2)** 87:4;116:10
**making (3)** 84:20;
87:11;96:8
**manage (1)** 97:19
**managed (1)** 105:5
**Management (1)** 50:12
**manager (1)** 30:2
**managing (6)** 95:12;
97:11;98:7,11;100:22;
101:22
**maneuver (2)** 101:11;
116:10
**manner (2)** 95:18;
115:12
**Manual (21)** 51:1;67:4,
10;96:17,20,24;97:16,
17,25;98:2,6,20,22,23;
99:16;100:20;101:13;
111:17,18,19;122:20

**manuals (1)** 37:14
**many (21)** 20:1;22:7,7, 8;29:4;41:21;45:9; 46:24;47:6;60:4,13; 61:1;63:13;64:1;65:21; 76:14;77:1;79:10,19, 19,23
**March (1)** 16:14
**marked (12)** 9:18; 31:13;33:14;36:23; 39:8;56:1;59:1;91:7,9; 92:11,20;93:16
**mason (1)** 8:5
**match (1)** 57:2
**materials (1)** 38:16
**math (1)** 123:12
**mathematical (2)** 72:14; 120:24
**matter (9)** 4:3;42:17; 52:19;69:7;70:25; 86:23;87:2;111:19; 122:21
**matters (4)** 15:9;16:6, 25;52:18
**may (5)** 6:11,20;10:2; 109:20;120:14
**maybe (4)** 45:11;60:19; 105:21;120:11
**mean (18)** 17:4,9; 21:11;25:20;37:16; 50:22;71:12;72:21; 73:15;77:14;82:17; 85:9;102:10,23;105:6; 113:17;116:13;119:24
**means (5)** 15:16;76:18; 105:4,8,9
**meant (2)** 19:8;113:17
**measure (1)** 123:24
**measurement (2)** 78:2, 6
**measurements (6)** 70:3, 6;71:2;77:5;85:23; 110:21
**mechanical (3)** 10:11, 15;11:13
**mechanism (1)** 122:17
**Media (1)** 4:2
**medical (2)** 83:9;121:5
**member (9)** 24:8,13,17, 24;25:5,8,21,21,22
**members (1)** 29:2
**membership (2)** 26:1, 10
**memberships (4)** 25:13, 15,16,25
**memo (4)** 104:25; 105:15,16;106:10
**memorize (1)** 96:3
**memory (1)** 63:8
**mental (2)** 74:23;75:4
**mentioned (4)** 17:17; 19:15;24:23;52:11
**mentioning (1)** 83:22

**methods (1)** 54:13
**middle (1)** 66:16
**mine (2)** 90:13;123:6
**minimal (1)** 105:5
**minimum (1)** 31:18
**minors (1)** 11:15
**minute (3)** 31:9;68:25; 86:6
**minutes (3)** 80:13,21; 92:7
**mirror (9)** 62:1;75:24; 76:3,5;80:2;81:6,21; 82:8;86:21
**mirrors (8)** 79:4;81:2, 16;82:7;86:10,11; 87:20;97:4
**misspoke (2)** 91:3; 113:17
**mistake (2)** 117:21,22
**mixed (1)** 60:21
**models (2)** 37:2;43:9
**moment (2)** 9:21;66:24
**Monday (1)** 68:22
**money (1)** 53:20
**month (3)** 64:13,14,16
**more (10)** 22:16;26:5; 29:9;34:8;52:19;53:20; 111:8;114:4;117:22; 120:9
**morning (2)** 5:15,16
**most (1)** 59:23
**mostly (1)** 58:14
**motion (1)** 43:18
**Motor (31)** 16:1;20:13; 21:3;29:20,25;30:2,6, 8;37:17;38:4;50:25; 52:3,24;56:8;90:16,18; 94:4,12;96:7;100:9,11; 104:5,9;105:2;106:7,8, 25;107:15;111:24; 112:14;116:15
**motorcycle (1)** 22:8
**motoring (2)** 115:15; 116:12
**move (2)** 87:4;109:3
**moved (1)** 108:19
**Moving (3)** 43:4;109:7; 112:5
**Mrs (1)** 114:22
**much (10)** 6:14;14:25; 21:5;32:20;74:14;75:8; 87:1;109:25;123:6,17
**must (1)** 86:17
**MVR (1)** 30:20
**myself (3)** 14:18;28:15; 29:7

---

## N

**name (8)** 4:9;6:4;8:11; 29:7;64:7;103:17; 105:16;118:17
**namely (1)** 15:3

**names (4)** 41:23,24; 42:17;104:1
**National (3)** 24:15,20; 25:25
**nature (4)** 11:20;16:4; 18:7;50:24
**Navy (1)** 17:23
**near (5)** 44:20;45:1,2; 76:10;115:7
**necessarily (1)** 37:16
**necessary (1)** 49:5
**need (15)** 7:16;13:7; 40:17;54:23;76:16; 88:21;102:4;121:5,7, 10,13;123:11,12,15,18
**needed (2)** 19:9;49:9
**needs (1)** 96:19
**neither (1)** 119:16
**Nelson (88)** 4:3;5:8,15; 6:4,6,7;7:24;8:16,20, 25;9:24;11:18;12:7; 14:10;21:19;22:13; 23:10;29:18;31:1,12; 32:3,9;33:12,25;34:7; 35:2,14,19;36:12,17; 37:1;38:25;39:10,14; 40:13,21;41:4;43:7; 44:7,13;47:15;52:14; 53:6;55:22;56:5,16; 57:6;58:25;59:3,5; 61:5;65:17;67:24; 68:10;69:12;73:10; 76:13;77:5;80:1;82:16; 83:20;85:10;87:16; 91:12,17;92:15;93:13, 19;94:20;99:24; 102:19,20;103:6,8,18, 23;108:5;114:7,18; 118:16,17;119:4,10,21; 120:1,9;123:5,10
**neutral (2)** 87:9;88:14
**Nevada (1)** 19:7
**next (7)** 16:12;17:16; 63:7;77:6,13,19,19
**nine (1)** 56:3
**None (7)** 26:19;43:22, 23;76:8;84:7;112:25; 119:5
**nonlitigation (4)** 16:21, 21;18:14;57:9
**nonresponsive (7)** 21:25;22:10;72:5; 76:21;82:12;102:6,16
**nor (1)** 119:16
**Northern (5)** 9:13;10:5, 10,20;11:6
**nose (4)** 76:5;81:6; 82:7,8
**note (5)** 21:2;25:15; 74:20,23;75:4
**notes (17)** 36:13,13; 38:16;43:10;48:2; 52:10;90:22,22,24;

91:1,4,13,17,22;92:1; 118:15,18
**Notes/2019041 (1)** 91:13
**notice (6)** 33:12;34:4; 35:3;36:10;40:23;84:7
**notoriously (1)** 82:10
**November (9)** 36:2; 39:3,16;44:21;45:2,3; 51:5,12;59:23
**nowadays (4)** 15:12,15, 15;42:15
**number (12)** 46:25; 63:20,21;66:19;75:19, 21;76:18;86:13,13; 96:9;97:7,9
**numbers (1)** 62:2

---

## O

**oath (2)** 4:22;6:18
**Object (9)** 21:25;22:10; 72:5;75:12;76:21; 89:16;102:6;117:9,17
**objected (1)** 75:16
**objection (9)** 4:21,25; 82:12;90:2;102:16; 120:20;121:2,12;123:1
**objections (2)** 5:21,23
**obligation (10)** 95:11, 17,25;96:12,14;97:13; 98:16,18;100:15; 115:11
**obligations (2)** 95:14,16
**obtain (5)** 10:19,22; 27:19;105:13;113:9
**obtained (3)** 11:22,25; 120:10
**occasions (7)** 13:2; 17:18;18:4;45:21;46:1, 5,17
**occupants (2)** 56:11,22
**occur (1)** 27:10
**occurred (5)** 66:23; 71:23;72:13;102:3; 109:11
**off (23)** 5:19;22:25; 33:18;34:2,24;37:21; 48:10,23;68:3,4;71:23; 81:19;85:16;86:9,14; 88:2;92:7,8;95:21; 97:22;110:3;118:19,23
**offer (3)** 72:11;104:13; 107:21
**offered (7)** 84:15;85:11, 12;86:1,2;119:5,11
**offering (3)** 83:24;119:9
**office (2)** 31:15;70:17
**officer (2)** 4:22;22:5
**Oklahoma (1)** 107:4
**old (1)** 8:16
**once (3)** 63:6;65:12,22
**one (74)** 6:11,11;9:13,

13;10:5,6,9;11:2,4; 16:2;19:8,10;25:2; 26:19;34:8,20;36:3,3, 4;40:2;42:18,19,22; 44:12;45:11,12,13,16, 22;46:6;50:5;51:19; 55:15,16;59:19;61:23; 62:16;63:7;64:12;65:9; 67:1;69:4;70:2;72:24; 74:4,7;75:19;76:18; 79:7,13;81:15;86:13; 89:18;92:25;93:23,25; 95:23;96:5;99:3,21; 101:7;103:3,18; 108:10;109:2,4,5,7,24; 110:16,17;111:8; 119:22;123:20
**ones (1)** 54:22
**only (46)** 7:20;18:25; 19:22;21:17;23:20; 30:21;32:1,5;38:3; 41:25;42:2;43:6;44:8, 12;50:2;51:9;52:6,6; 57:10;67:10;71:11; 73:14;76:17,18;78:19, 20;79:1;80:9;81:4; 82:5;88:5;92:1;93:22, 23;94:20;97:23; 104:11,13;105:4,8; 106:21;109:24;110:13; 112:8;114:3;117:18
**opened (3)** 62:25; 63:19;66:24
**operate (17)** 13:3; 14:17;16:15;95:17; 96:7;100:10;104:10, 16,21;105:7;107:15; 111:6,10;112:12; 115:10,11;116:9
**operated (5)** 69:20,23; 77:6;79:13;121:15
**operating (3)** 96:9; 101:2;111:24
**operation (6)** 15:25; 75:2;98:13;122:15,16; 123:4
**opining (1)** 67:10
**opinion (25)** 67:2; 71:25;74:12,13;79:25; 81:22;82:3;88:17;89:9; 97:13;98:3,15;101:5, 16;103:22;104:23,23; 107:21;108:13;109:12; 110:11;114:8;116:5; 118:5;123:12
**opinions (58)** 38:1,9; 49:19,21;51:18;52:1; 53:14;57:3;67:13,17; 71:3,6,19;72:11,23; 74:8;79:8;82:3,16,19, 22;85:8,25;87:18; 88:12;90:23;94:1,7,19, 20;95:2,5,9;101:15,21;

Case 5:19-cv-00375-XR    Document 50-2    Filed 05/11/20    Page 40 of 44
Jessica Perez vs. Alvin Boecken
5:19-CV-00375

Kerry V. Nelson
April 22, 2020

102:2,5;103:18;
107:13;111:1,5,9;
112:12;119:5,9,15;
120:12,12,14,15,16,18,
25;121:4,8,11;122:20,
25
**opposed (1)** 49:3
**order (2)** 67:19;121:8
**ordinary (1)** 75:1,8
**original (1)** 26:17
**originally (1)** 84:9
**originated (1)** 28:12
**Otherwise (5)** 7:12;
99:15;110:1;116:16;
118:13
**out (13)** 15:4;17:23;
19:10;22:5;54:8;56:17;
61:9;66:14;75:1,8;
78:4;79:3;91:4
**Outside (1)** 43:1
**over (16)** 14:25;19:10,
11,28:4;36:4;40:24;
41:15;43:13;55:21;
62:14;86:9,21;112:3;
118:20;122:8,18
**overlapping (1)** 108:9
**own (13)** 8:8;14:10;
16:15;36:13;58:13,13,
15;62:25;63:19;89:14,
25;92:3;107:2
**owned (3)** 18:1;18;19:2
**owner (1)** 18:1

## P

**page (16)** 11:12;13:12,
16;26:22;35:12;56:3;
92:25;93:3,25;94:2,4,
18;95:10;102:24;
108:2;114:7
**pages (2)** 93:1,2
**paid (1)** 31:4
**pandemic (1)** 4:21
**paragraph (3)** 108:3,5,
17
**part (9)** 44:25;67:8;
96:5;98:22;100:8;
104:17,20;117:8,11
**particular (11)** 19:25;
30:25;47:14,15;69:7,
12;79:13;80:8;109:7;
121:11,16
**parties (1)** 83:7
**pass (4)** 23:15,18;
105:5;120:3
**passageways (1)** 21:15
**passed (9)** 42:13;
73:21;74:9,15;75:9;
76:15,24;77:1;81:14
**passenger (3)** 22:8;
49:10;66:19
**passing (1)** 76:24
**past (28)** 12:8;13:2;

16:21;20:12;29:14;
30:8;34:20;45:10;
46:14,18;47:3,4;57:19,
20,24;58:1,3,5,9;63:11,
13,25;79:1,19;82:5;
102:24;121:18;123:18
**patience (1)** 120:2
**Patrol (1)** 122:4
**pattern (3)** 108:9;109:3,
6
**Paul (1)** 8:6
**P-A-Y (1)** 8:6
**paying (1)** 24:8
**payment (1)** 31:7
**Payson (3)** 4:12;7:25;
8:4
**peer (4)** 42:23,24;43:2;
50:23
**peering (1)** 79:3
**Pepsi (7)** 13:1,6,9,21,
24;18:3,16
**per (1)** 62:12
**percent (9)** 57:13,20,
22,22,24,25;58:3;63:3,
4
**percentage (10)** 21:5,
20;22:3;57:7,16;61:14;
62:5,9,12,18
**Perez (46)** 4:4,16;36:3;
38:22;39:22;49:8;
69:24;71:13;73:12,20;
74:2,8,21;76:4,9,11,24;
77:10,14;78:8,21;80:3,
4,8,11,17,19;81:9,15,
20;83:10;84:24;85:12;
86:2;87:5;89:13,24;
91:18;108:20,21,25;
114:22;115:17,18;
117:25;118:10
**Perez's (4)** 77:6;78:24;
81:12;87:12
**perform (20)** 49:2;
69:17;72:16,19;73:10,
18;74:13;76:13;77:9,
16,21;78:22;79:1;80:9;
83:13,17;88:22;
113:25;123:3,21
**performed (18)** 15:19;
17:3;20:4;35:16;67:16;
69:13,16;70:2,3,6;71:3,
5;72:7;76:8;81:4;
85:22;90:24;92:2
**performing (3)** 72:14;
88:19;93:10
**period (8)** 20:16;22:21;
23:10;27:16,17;45:19;
109:13,16
**person (4)** 100:8;113:1,
2,4
**personnel (1)** 38:21
**pertaining (1)** 35:15
**perusing (1)** 72:25
**Phoenix (10)** 9:4,14;

10:6,14,17,22;11:1,4,7;
17:17
**phone (1)** 44:17
**photographs (10)**
36:11;38:12;70:14,17,
18,24;72:25;73:6;
108:8;110:22
**phrasing (1)** 7:11
**physical (4)** 43:9;73:1,
8;110:14
**physician (1)** 53:12
**picking (1)** 19:6
**pictorial (2)** 81:5;
110:13
**picture (2)** 43:19;81:5
**place (6)** 4:11;8:13;
9:3;17:22;101:7;109:3
**plaintiff (34)** 4:15;5:3;
17:25;28:22;29:16;
31:1,8;36:4;38:21;
45:23;47:11;48:13;
49:7;51:3;57:20,22,25;
58:1,3,14;60:21,22;
61:7,24;62:10,22;63:2,
3;65:4;69:10;73:12;
80:11;83:24;107:10
**plaintiffs (6)** 40:12;
45:23;46:21;47:12;
57:17;61:15
**plaintiff's (15)** 36:2,11;
39:2,17;44:15;52:2;
55:24;71:9;83:12,16,
22;84:2,5;107:20;
114:18
**plan (1)** 84:19
**planning (2)** 53:17;
119:21
**plans (2)** 119:14,16
**play (1)** 112:15
**pleadings (5)** 83:1,3,8;
114:24;115:3
**please (13)** 4:13,24;
5:6;6:4;7:2,11,17,21;
8:2,2;59:3;91:8;111:8
**pled (3)** 114:18,22;
115:1
**Plus (2)** 76:4;81:8
**point (6)** 15:13;49:17;
67:24;70:12;71:10;
77:18
**police (4)** 36:5;101:17;
106:22,22
**portion (1)** 109:12
**position (12)** 13:1,5,9,
21;77:11,25;78:10,17,
19;82:9;116:4;123:3
**positioned (1)** 73:12
**positions (2)** 14:5;
15:19
**possess (2)** 43:19;44:9
**postgraduate (1)** 12:4
**practice (6)** 57:17;
96:19;97:23;98:2;

122:8,8
**practices (1)** 117:19
**preemployment (1)**
113:23
**preface (1)** 17:21
**prefaced (1)** 113:1
**prep (3)** 32:18;20;33:3
**prepare (2)** 33:4;94:7
**prepared (7)** 36:14;
37:3;38:12,17;43:11;
44:5;92:2
**presence (1)** 85:16
**present (3)** 14:14;
15:16;84:25
**presentations (1)** 29:14
**presented (1)** 29:15
**president (1)** 29:24
**presume (1)** 84:1
**pre-trip (1)** 42:19
**previously (2)** 41:3;
52:2
**primarily (1)** 46:21
**primary (1)** 113:14
**primer (4)** 41:16,18,20;
42:15
**principal (1)** 8:13
**prior (17)** 14:6;15:23;
25:16;44:9;45:21;46:1;
58:7,7;65:3;66:18,23;
76:11;79:9,15;112:5;
114:4;118:11
**probably (13)** 11:5;
13:7;24:19;32:18;47:7;
58:12;63:3,14;65:15;
66:5;79:24;96:22;
122:1
**proceed (4)** 4:19;
33:25;68:11;92:17
**process (1)** 96:5
**Produce (1)** 19:2
**produced (2)** 36:8;50:5
**professional (8)** 8:20;
24:7,16;47:24;75:19;
87:7;96:18;117:22
**proper (8)** 76:17;95:12,
24;96:11,13,17;
100:16;101:22
**provide (8)** 14:24;15:1;
35:8,15;40:5;67:20;
69:17;103:23
**provided (36)** 31:12;
32:4;37:3;39:1,18;
44:7;49:4;51:2;52:2;
56:6;57:10;67:2;68:18;
70:14,17;71:18,21;
78:15;83:1,6,21;84:4;
90:20,24;91:1;100:7;
105:10;107:3,9,16;
111:2,11,12;115:23;
116:1;120:10
**providing (7)** 31:24;
38:14,18,23;43:15;
57:3;92:20

**Public (8)** 20:16,18,21;
21:6;54:10;115:15;
116:7,13
**publication (4)** 28:12;
29:12;38:3;105:17
**publications (4)** 28:8;
37:13;38:7,8
**published (5)** 28:14,19;
29:3;41:14,19
**pull (1)** 54:25
**pulled (5)** 34:3,7;56:4;
59:2;91:11
**purporting (1)** 49:25
**pursuant (1)** 5:23
**put (5)** 32:15,25;41:12;
96:19;104:24
**puts (1)** 77:25
**putting (1)** 40:7

## Q

**qualification (5)** 15:25;
47:24;96:5;100:2;
112:12
**qualifications (5)** 48:6;
105:5;107:14;110:25;
111:5
**qualified (5)** 53:14;
100:8;113:2;116:20,25
**qualify (2)** 116:8,16
**quick (4)** 34:8;92:6;
118:15,18
**Quite (3)** 21:8,11;60:2

## R

**rate (4)** 31:16,20,21;
32:1
**rather (1)** 109:7
**read (7)** 6:20;56:13,15;
100:12;102:19;103:4,
21
**reading (2)** 56:23;
108:14
**ready (5)** 32:18,21;
33:25;68:11;92:17
**real (5)** 63:8;92:6;
118:15,18,19
**realize (1)** 63:6
**really (2)** 87:14;120:4
**rear (1)** 97:4
**reason (10)** 7:16;19:21;
24:20;24:49;9:75:6;
82:8;96:6;100:9;118:3
**reasonable (1)** 85:4
**recall (6)** 24:14;41:24;
42:16;64:3,13;65:6
**receive (4)** 27:22;51:3,
7;111:3
**received (5)** 23:2;49:4;
51:15;116:23;117:1
**receiving (1)** 51:10
**recent (1)** 59:23

**Recess (4)** 33:20;68:6; 92:10;118:25
**recommendations (3)** 38:5;67:4,11
**recommended (2)** 83:12;97:24
**reconstruct (3)** 67:8,9; 123:23
**reconstructing (1)** 18:8
**Reconstruction (30)** 22:15;24:3,16;34:10, 13,17,21;52:17,22; 54:2,8,11,13,17;55:8, 12,13,14,15,17,19,20; 67:9,13,16,21;69:14; 85:21,24;88:22
**record (27)** 4:1,20,24; 5:19;6:5;33:18,21,24; 34:2,24;35:18,23;68:3, 4,7,10;92:7,8,12,15; 105:23;113:16,19,24; 118:19,23;119:1
**records (2)** 83:9;121:5
**refer (11)** 26:24;38:5; 39:5;40:22;55:22; 78:11;79:15;91:17,22; 95:10;114:15
**reference (2)** 97:15; 107:25
**referencing (1)** 42:19
**referred (5)** 13:13; 37:14;52:4;90:17; 107:20
**referring (23)** 13:19; 17:13;37:20;40:3;44:4; 50:4,10;53:4;54:14; 58:9;85:15;96:21; 97:17;98:2,6;99:2,6,7, 14,17;105:15,24; 114:10
**refers (4)** 39:18;71:22; 98:23;103:4
**reflects (2)** 44:5;114:2
**regard (3)** 67:7;102:2; 116:14
**regarding (35)** 34:24, 25;54:11;71:9,25; 72:12,23;77:22;78:3,6; 82:3;85:6,7;87:18,25; 88:12;89:5,14,25; 90:23;94:15;96:11; 100:15,22;101:22; 102:24;104:20;107:4, 14,22;111:5,9;112:3,5, 12
**regards (45)** 16:20; 22:13;38:25;49:8; 53:24;54:6;56:18;57:6; 63:10;69:13,16;71:21; 76:23;78:10;82:16; 87:25;91:23;92:3; 93:24;95:23;96:12; 97:11,21;98:16;

100:14;102:18;103:19; 104:17;107:13,19; 109:12;110:24;112:2; 113:11;114:17,21; 115:4,7;116:5;117:5,6, 24;119:4;120:16; 121:22
**registered (1)** 8:20
**regulation (2)** 16:4; 67:5;95:19,19,20,24; 96:1,13;97:18,19; 99:15,20;101:12,14; 103:1;104:22;106:6,9, 12,15;113:6;123:4
**Regulations (24)** 16:2; 37:13,17,25;48:1;51:1; 52:4,24,25;90:18;94:5; 96:18;99:19;101:12; 104:4;112:15,16,22,25; 114:9,10,14;122:16,19
**relate (1)** 95:5
**related (23)** 16:24; 21:7;34:9,11,12,16; 37:8;41:5;43:19;44:9; 49:25;57:8,13;67:13, 20;70:10;71:3,6;72:8; 74:13;93:6,9;107:10
**relating (1)** 27:21
**relationship (2)** 56:10, 20
**relative (4)** 107:22; 108:14;110:16,16
**relied (8)** 37:14;38:1,8; 50:20;94:6,10;101:14, 17
**rely (4)** 54:7;63:25; 104:22;114:13
**relying (11)** 71:12; 73:15;78:11,14;81:11; 95:15,25;96:14;97:13; 99:14;112:23
**remaining (1)** 109:6
**remember (8)** 14:2; 27:11;46:6;51:9;65:2; 66:1;79:18;105:21
**remind (1)** 6:17
**remote (7)** 7:10;35:20
**remotely (3)** 4:23;6:13; 7:4
**render (7)** 15:1;102:5; 103:22;120:18,25; 121:8,11
**rendered (4)** 84:22; 94:21;107:13;122:21
**rendering (5)** 85:7,25; 110:25;121:4;122:25
**renewal (1)** 23:12
**renewed (4)** 23:11,23; 24:1;28:4
**repeat (1)** 7:11
**repeated (1)** 108:9
**rephrase (1)** 74:5
**report (46)** 30:20;36:5,

7,12;51:10,14;56:15, 18,24;74:7,19;83:20, 23;84:2,6,9,12,15; 93:14,18,20,22,24; 94:10,15,24;101:18; 102:19,20,23;103:4,21; 106:22,22;107:1,9,9, 22;108:1,1;112:18; 114:6,11,14;115:8; 119:10
**reporter (11)** 4:8;5:5, 10;34:25;36:19,23; 40:6,15;43:16;58:23; 91:7
**reports (4)** 37:2,8; 38:11;51:19
**represent (2)** 4:14;6:23
**representing (1)** 4:10
**represents (1)** 26:9
**requested (2)** 35:6,9
**require (3)** 102:15; 120:22,24
**required (1)** 120:18
**requirements (2)** 102:25;105:12
**research (5)** 50:19,22; 60:15;90:15;110:12
**reserve (1)** 123:6
**reside (2)** 7:24,25
**resigned (1)** 20:19
**respect (27)** 5:21; 24:11,15;28:23;30:17; 33:11;81:18,22;82:2, 22;84:16,24;85:12; 87:18;88:10,12,17; 89:5,11;90:15,21,22; 95:4,11;101:21; 113:23;114:6
**respond (1)** 35:8
**response (1)** 102:7
**responsibilities (2)** 18:5;47:25
**responsible (2)** 30:10, 12
**rest (1)** 123:6
**resubmit (1)** 60:6
**result (2)** 72:14;115:13
**resulted (1)** 56:9
**results (1)** 56:20
**resumé (3)** 43:5,6; 122:2
**retained (4)** 48:13; 49:13;62:6,19
**retainer (7)** 39:18,19, 21;40:2,2,11;92:21
**retainment (1)** 44:13
**retention (4)** 35:16; 47:16;49:6;62:18
**retire (1)** 20:17
**return (1)** 7:20
**review (14)** 35:5;37:17, 22;49:18;50:18,23; 51:19;83:9;89:12,22,

24;91:23;120:11;121:5
**Reviewed (21)** 33:5; 37:3,8,14;38:1,8;42:23, 24;43:2;49:25;50:16, 20;74:7;83:1,5,6;94:1, 7;107:2,6,8
**reviewing (4)** 33:8; 74:19;91:16;107:21
**revised (1)** 94:23
**revisions (2)** 84:11,20
**Rig (2)** 13:18;79:2
**right (110)** 7:23;9:16; 10:4,14,19,25;11:22; 13:21,23;14:2,11,16; 16:12;19:18,21;22:24; 26:5;27:3;29:11;31:4; 32:11,16;33:24;35:5,8, 18,20,23;36:17,21; 37:24;38:11;39:16; 40:21;45:5;48:23;51:4; 52:12;53:12;59:11,17; 60:4,17;61:4;62:8,24; 64:3,10,13,20,22; 65:17;66:6,22;67:22; 68:13,20;70:23;74:12; 76:5,7;77:18,25;80:22; 81:3,7,11,18,22;82:10; 88:15;89:9;91:6,16; 92:1,4,5;93:4,12,24; 94:3,23;95:1,4;96:4; 97:21;98:5,8,15;99:12; 100:3,21;101:19; 103:3,5;105:15;106:9; 108:13,20;109:2; 113:22;114:25;115:19, 22;116:4;119:4,20; 120:1;122:4;123:14
**right-hand (2)** 86:22; 87:5
**road (14)** 21:17;66:24; 76:1;79:5;89:13;96:19; 103:4,19,23;104:6,14; 105:4;106:4,14
**roads (1)** 21:17
**Robert (3)** 4:15;5:19; 29:7
**role (1)** 14:23
**roughly (1)** 60:20
**Ruhl (21)** 16:10;22:23; 23:6;24:5,19;25:17; 27:15;28:9,12,13,16, 18,20,21;29:11;41:5, 15;42:5,12,25;43:1
**Rule (2)** 44:10;58:24
**rules (4)** 5:23;6:16; 37:13,25
**run (1)** 30:18

**S**

**safe (9)** 66:21;67:3; 95:18;98:16;99:17; 100:25;101:23;115:12;

122:16
**safely (10)** 96:7,9; 100:10;101:2;104:10, 16,21;105:7;111:6,10
**Safety (25)** 16:1;19:1; 20:16,18,21;21:6; 24:21;25:25;29:19,22, 24;30:2,5;37:17;50:25; 52:3,24;54:10;90:18; 94:5;106:7;112:14; 115:14;116:6,12
**same (22)** 6:1;11:12; 13:12;31:21;62:12,20; 63:24;64:19;87:8;90:2, 5;95:22;108:20; 109:10;110:14,15; 111:21;121:16,17; 122:23;123:3,3
**San (2)** 4:6;64:22
**sat (1)** 28:16
**SATAI (1)** 55:6
**satisfied (1)** 105:12
**saw (8)** 76:10,11; 78:21;80:3,17;86:15; 115:18;118:10
**saying (15)** 13:22,25; 17:21;28:2;48:3;67:7, 18;77:21;83:25;90:11; 99:5;103:14;108:17, 18;123:14
**scene (10)** 66:23; 69:18;70:6,9,15,16,18, 24;96:25,25
**S-C-E-N-E (1)** 96:25
**schedule (1)** 31:25
**scheduling (2)** 16:3,3
**school (10)** 8:25;9:3; 12:11,20,21,24;13:8, 13;26:14;28:3
**Science (1)** 55:17
**scope (3)** 47:15;48:14; 49:2
**screen (3)** 9:25;13:8; 93:3
**scroll (1)** 94:3
**se (1)** 62:13
**seat (1)** 77:11
**second (8)** 27:5;33:7; 39:12;56:5;93:3;94:4; 97:12;108:2
**secondary (2)** 9:9;12:4
**secondly (1)** 96:16
**seconds (8)** 75:22,23; 76:3;81:17;86:11,12; 87:20,23
**section (12)** 10:25; 95:9;96:20;97:6;98:10; 99:16;100:14,17,21,24; 101:5,13
**security (1)** 57:11
**seeing (8)** 87:19;96:22, 24;97:2,3,3,4;110:14
**S-E-E-I-N-G (1)** 97:1

sees (1) 86:8
semi (1) 87:13
Seminar (9) 26:16,20,
   24;27:1,9,20,21,23,25
seminars (4) 26:15;
   27:6;54:16;55:6
send (3) 36:19,21;
   40:14
sense (3) 86:25;87:6,
   11
sent (1) 49:17
sentence (3) 56:5;
   114:11,15
separate (1) 17:18
September (3) 14:13;
   15:16;16:14
sequence (5) 47:21,22;
   48:5,5;49:10
service (1) 14:24
services (8) 15:1,1;
   31:5;57:8,9,14;88:19;
   92:20
set (1) 116:21
setting (2) 6:12;12:12
seven (3) 66:18;80:13,
   21
seventh (1) 94:4
several (3) 54:15,16;
   114:9
shall (2) 113:1,4
sharp (1) 63:8
shop (1) 16:2
show (4) 64:1;106:18;
   109:15,19
showed (1) 38:2
shown (1) 108:25
shows (1) 11:1
shy (1) 12:21
sick (1) 19:9
side (13) 29:10;52:20;
   76:7;81:3,7,20;82:10;
   86:13;87:5,14;108:21,
   25;109:3
sides (1) 97:4
Sievers (3) 36:7;51:20;
   83:23
Sievers' (3) 51:10,14;
   84:6
sight (5) 77:14,22;78:8,
   16;81:24
sight-line (4) 77:9;78:3,
   6,22
signal (1) 86:22
signed (5) 39:18,22;
   40:1,4,11
similar (5) 79:16;82:6;
   121:16,18;122:23
simple (1) 89:2
simply (8) 7:8;72:7;
   73:15;81:11;96:1;
   104:23;106:4;117:2
simulation (1) 88:20
simulations (1) 82:21

singled (1) 61:9
sit (4) 60:18;61:22;
   63:10;79:12
sitting (5) 77:13,18;
   79:2,7;82:5
six (7) 32:22,24;33:3;
   60:19,20;61:2;66:18
skill (1) 104:15
slammed (1) 108:23
slow (1) 108:23
slower (1) 108:10
slowing (1) 86:23
slowly (1) 24:2
snow (1) 66:16
social (2) 4:21;57:11
societies (7) 24:7,7,9,
   22,24;25:13;26:7
society (2) 25:22;26:9
softly (1) 7:9
solely (8) 14:17;15:8;
   16:5,6;97:17;111:1,6,
   11
Solutions (6) 16:11,12,
   22,25;25:10,18
someone (1) 116:11
sometime (3) 27:16;
   54:3;66:1
Sometimes (5) 16:23;
   57:21,22;58:10,10
somewhere (4) 13:11;
   14:4;23:3;111:25
sorry (39) 5:1;11:7,10;
   27:3;28:17;37:20;
   44:24;45:10;48:17,24;
   54:21;58:4;69:17;73:4;
   74:1;75:13,23;76:10;
   78:5;81:18,20;91:3,12;
   92:2;93:12;95:21;
   96:23;97:22;102:11;
   103:7,9,11,14,23;
   109:5;110:2,7;113:3;
   114:20
sort (1) 122:23
SOS (4) 12:20,24;
   13:13,18
sounds (2) 25:15;29:9
Southwestern (1) 25:3
space (9) 88:1,4;95:12;
   97:11,19;98:7,11;
   100:22;101:22
span (1) 63:17
speak (3) 5:10;73:4;
   101:10
speaking (1) 44:10
speaks (3) 96:18;
   100:25;107:6
Specialists (1) 24:16
specific (18) 17:19;
   19:21,23;27:8;95:24;
   96:20;97:5,7;98:5;
   99:1,6,9;100:14;
   101:12;112:22;114:14,
   17,21

specifically (24) 28:10;
   40:23;48:14,16,17;
   49:12;54:14,16;64:4;
   66:6;68:20;70:12;
   71:22;73:24;79:22;
   85:15;91:17;96:13;
   98:22;100:16;103:21;
   104:5;111:14;114:7
speed (12) 71:5,9,25;
   72:4,12;101:24;
   107:22;108:14;109:10;
   110:15,18;123:21
spent (1) 32:23
spoke (2) 7:9;105:2
spoken (1) 51:22
spot (1) 82:11
staff (5) 28:13;29:2,11;
   42:24;43:1
stall (1) 87:10
standard (2) 97:24;98:1
start (3) 17:5,5;59:22
started (2) 5:18;14:20
starting (2) 26:23;
   106:19
state (18) 4:13,24;5:23;
   6:4;8:21;19:6;52:24;
   64:23;65:1,25;95:19;
   98:21;99:1;105:10,13;
   107:4;115:13;122:4
stated (1) 80:12
statement (5) 50:2,4,13,
   16;115:8
statements (4) 37:7;
   49:25;50:17,18
States (4) 4:5;20:1;
   56:7;100:7
Station (1) 55:14
stationed (1) 21:8
status (2) 103:25;
   106:25
statutes (2) 37:13,25
stay (1) 109:2
still (6) 39:22;42:8,11;
   55:18;75:3,16
stop (2) 66:25;96:10
stopped (1) 66:19
store (2) 19:17;20:7
storm (1) 66:16
strike (2) 62:2;109:20
struck (4) 65:18;67:1,6,
   13
studies (1) 43:10
style (1) 68:23
subchapter (1) 98:25
subchapters (1) 98:14
subject (2) 36:6;42:17
submit (1) 113:13
submitted (2) 32:5;
   113:5
subpart (4) 98:5;100:3,
   8,9
subparts (1) 102:21
subpoena (7) 35:6,9,

13;36:25;40:23;43:4,5
subsection (3) 97:3,8;
   101:6
sudden (1) 87:13
summarizes (1) 112:11
summary (1) 115:9
supervisor (1) 30:5
supplement (1) 60:8
supplemented (1) 60:9
support (2) 79:25;
   118:12
supported (1) 72:11
suppose (2) 12:25;
   102:22
Sure (17) 9:22;11:11;
   16:3;29:21;39:13;
   40:18;44:17,22;45:18;
   48:3;64:25;99:3,4,11,
   12;105:22;111:9
suspended (1) 20:24
swear (1) 5:6
swerve (1) 66:22
sworn (2) 5:9;6:18
system (1) 28:1
systems (1) 27:4

### T

table (1) 7:21
talk (2) 86:6;108:6
talked (13) 5:22;14:9;
   30:15;39:2;41:3;49:24;
   56:16;68:1,14;82:25;
   90:14;101:13;112:19
talking (8) 10:4;26:24;
   30:23;39:25;54:22;
   87:7;108:7;111:18
talks (1) 28:7
tangible (1) 37:1
taught (5) 12:7,11,16,
   19,23
teacher (1) 14:6
teaching (1) 13:1
Technical (1) 25:3
tecum (1) 35:6
telling (2) 29:9;49:3
tells (2) 80:11;108:23
ten (1) 12:21
terms (21) 15:25;30:22;
   44:13;47:24,25;50:19;
   52:9;54:7;57:3,12;
   61:15,23;62:18;67:16;
   73:25;87:7;90:19;94:8;
   95:15;119:6;122:15
test (11) 82:19;103:5,
   19,23;104:6,14;105:4;
   106:5,14;114:1,3
tested (1) 119:6
testified (26) 5:11;
   53:25;59:18,25;60:3,
   11,14;62:10,14,21,22;
   63:21;64:1,15;65:6;
   68:15;75:22;76:2;

88:25;99:21;108:19;
   112:6;115:20;117:24;
   120:21;123:11
testifies (1) 86:19
testify (6) 6:19;31:22;
   53:17;56:7;66:8;
   115:16
testifying (3) 46:2;
   59:12;119:22
testimonial (4) 44:8;
   58:24;61:24;68:1
testimony (72) 6:18;
   25:15;31:17,20,21;
   32:19;37:4;43:12;44:6,
   9;58:7;60:10;61:7,15;
   62:8;63:2;64:4;65:4,
   19,20;67:7,12,20;
   68:18;71:11,13,18,21;
   72:10;73:14;78:12,15,
   20,20;80:10,16,19,21,
   23;81:12,15,16;85:3;
   86:5;87:11,12,25;88:7,
   13;89:13,23,24;91:18,
   24;109:17;111:13,14,
   15,16;112:2,8;113:7,
   12,25;115:22;116:1,
   23;117:1;118:5,10;
   121:22;123:15
testing (9) 55:11;102:1,
   4,9,12;113:24;119:7;
   120:17,22
Texas (19) 4:5;38:4;
   45:13;51:1;52:4;55:14,
   16;60:24;61:2;64:20;
   69:3;90:17;95:19;
   96:17;99:2,9;111:18;
   115:1;121:25
theory (1) 85:5
therefore (1) 101:2
thereof (1) 112:9
third (2) 26:23;98:15
Thomas (3) 46:16,23;
   47:12
though (3) 12:16;58:6;
   123:19
thought (2) 58:4;75:18
Three (23) 11:7;21:15,
   17,17;24:22;31:18;
   35:12;36:11;47:3,4,8;
   75:23;76:3;81:17;
   86:10,11;87:20,23;
   95:4,5,9;101:15;108:2
throughout (1) 19:6
thus (3) 32:6,12,16
tied (2) 15:8;25:16
timely (1) 7:18
times (18) 6:11;16:8;
   45:9,23;46:24;47:6,7,
   10;58:1;60:4;63:21;
   64:1;65:21;79:10,19,
   23,24;97:12
title (3) 16:17;29:19;
   97:6

**titled (2)** 91:13;98:11
**today (23)** 6:12,17,19;
7:2,16,18;8:16;34:5;
35:3,19;36:5,10,22;
39:1;40:14;43:13;
57:12;64:19;65:14;
82:25;119:6;122:12,21
**Today's (1)** 4:7
**together (2)** 109:16,23
**told (11)** 11:2;17:10;
48:13,14,16;49:7,13,
15,16;62:4;96:14
**took (1)** 54:11
**topics (1)** 41:15
**toss (1)** 116:21
**tossed (1)** 117:2
**total (2)** 11:10;32:11
**touches (1)** 87:3
**toward (1)** 54:16
**towards (3)** 52:19;55:7;
57:20
**Toyota (16)** 72:3,8;
84:24;85:7,16;86:8,12,
14,17,23;87:2,3,19,22;
88:2,6
**tractor (15)** 76:7;77:6,
13,19;79:3,7,12;81:3,6,
7,23;82:6,10;84:25;
88:1
**tractors (2)** 82:2,7
**tractor-trailer (7)** 13:4;
19:5;21:7,20;69:20;
78:1,24
**tractor-trailers (2)**
28:17;42:20
**trade (1)** 37:13
**traffic (5)** 21:9,15,16;
22:15;75:20
**training (17)** 13:1,19,
24;18:3,15;26:15;27:6;
52:7;54:6,7,9;55:6;
94:11;96:6;100:10;
104:15;122:9
**transcripts (2)** 49:23;
50:16
**transmitted (2)** 56:11,22
**Transport (9)** 4:18;
48:7;102:25;106:20;
113:8;114:8;115:9,13,
23
**transportation (3)**
99:10;105:1,25
**traveling (5)** 66:17;
75:25;76:19;108:10;
109:10
**treaties (1)** 37:12
**treatises (3)** 37:12;
41:8;50:24
**trial (10)** 6:20;31:21,22;
43:11;46:3,7;59:18;
65:7;119:22,24
**truck (43)** 12:20,24;
13:8,13;19:12,19;21:9,

13,15,16;22:7;28:8,17;
30:10,13,17;49:10;
50:12;66:20,20,21,24;
73:13;75:25;76:4,6,10,
10,20;81:21;86:24;
88:7;108:21,24;109:2;
116:22;121:10,17,17,
18;123:15,24,25
**trucking (17)** 15:22,24;
17:6,11;18:2,5,12;
21:13;24:11;25:23;
26:16;27:2;28:8,18;
48:20;122:7,14
**Truckload (3)** 24:20;
25:24;26:2
**trucks (5)** 66:17,18;
67:1;88:18;121:16
**true (1)** 106:16
**truth (2)** 5:10,11
**try (1)** 23:18
**turn (2)** 67:2;86:22
**turns (1)** 86:22
**Two (42)** 9:11;11:1,4,7;
13:2;14:5;17:18;18:4,
22;19:11,13,22;25:23;
29:13;36:2;38:7;41:22,
25;42:16;45:11,12,16;
49:23;50:15;66:17;
70:2;75:21,22;86:13,
24;88:6;93:1,2;94:18;
95:10;96:9;102:24;
109:17;112:25;114:3,
4;121:24
**type (53)** 9:9;10:19;
11:22,25;12:4;14:24;
16:20;17:2;20:21;
23:15;27:20;28:3;
48:18,18;50:23;62:20;
69:18;71:24;72:16,19,
22;74:13;76:14,25;
77:9,22;78:22;79:2,3,6,
16;80:15,18,25;82:15,
18,21;87:21;88:3,9,16;
90:15;96:7;100:10;
101:24;102:1;110:9;
112:4;114:25;120:22,
24;121:7,17
**typed (2)** 91:1,4
**types (4)** 11:18;110:8,
15,15
**typically (1)** 6:15

**U**

**ultimately (1)** 20:17
**under (15)** 6:18;13:17;
27:5;28:7;53:2;55:5;
67:5;83:8;96:22;98:7,
10,24;100:2;103:1;
104:4
**undergraduate (1)** 10:5
**underlying (1)** 85:22
**underneath (1)** 17:7

**understood (1)** 7:13
**Unit (1)** 4:2
**United (1)** 4:4
**University (5)** 9:13;
10:20;11:6;12:12;
55:16
**unless (4)** 33:2;113:1,
4;116:19
**unloading (1)** 42:21
**unqualified (1)** 115:9
**unsafe (8)** 89:7,10;
96:8;101:1,10;115:10;
116:10;117:19
**up (35)** 19:6;34:3,7,8;
46:2;47:22;48:5;55:1;
56:4;57:2;58:12;59:2,
25;60:2,5,8;62:25;
63:19;64:24;66:17,24;
72:3;73:4;76:6;80:13;
81:9,9;82:8;86:8,13;
91:11;98:9;99:3,13;
105:19
**update (1)** 28:14
**upon (22)** 30:19;37:14;
38:1,8;50:20;54:7;
63:25;71:12;73:15;
78:11;87:22;94:7,10;
95:15,25;96:14;97:13;
99:14;101:14,17;
104:23;114:13
**use (3)** 21:14;22:18;
97:4
**used (3)** 19:24;42:14;
108:6
**usually (2)** 122:13;
123:2

**V**

**valid (5)** 23:5,12,13;
105:3;106:24
**validity (1)** 47:23
**vantage (1)** 77:18
**various (4)** 28:19;
54:10;102:20,24
**Vehicle (92)** 8:12;
14:11;15:2,3,8;18:6,8;
21:3;22:9;36:11;38:4;
48:21;49:11;52:16,18,
19,20,21;53:3;54:1;
55:11,21;56:9,9,10,11,
20,21,22;69:23;71:9,
22;72:1,2,8;74:24;
75:2,4,7,20,25;76:4,9,
19;77:6,11,15;78:21,
24;80:3,4,8,13,17;81:9,
10;87:5;90:16;94:12;
95:18;96:7,9;97:12,20;
98:13;100:9,11;101:3;
104:11,16,21;105:8;
106:25;107:15,20;
108:10;109:1,5,25,25;
110:17;111:6,10;

112:13;115:10,11,18;
116:9,17,19;118:11;
123:4
**vehicles (20)** 21:23;
42:20;66:19;70:2,3;
72:12,24;73:1,7;75:24;
76:15,23;77:1;107:22;
108:15;109:10,14,22;
110:19;111:24
**verify (1)** 102:2
**version (4)** 84:23;85:6,
11;86:1
**versus (8)** 22:7,8;57:8,
18;58:2;61:15,24;63:2
**vice (1)** 29:24
**video (3)** 4:11;6:21;
43:18
**VIDEOGRAPHER (16)**
4:1,10,19;5:5;9:21;
33:18,21;35:11;54:25;
55:2;68:4,7;92:8,12;
118:23;119:1
**videos (2)** 70:15,25
**view (1)** 76:6
**violation (2)** 112:6;
114:9
**virus (1)** 4:21
**visible (2)** 56:8,19
**visual (3)** 38:13;43:9;
77:10
**Volume (1)** 4:2

**W**

**wants (1)** 15:22
**warehouse (1)** 20:6
**warned (2)** 106:3,3
**way (14)** 14:19;15:14;
41:13;49:16;54:11;
61:5,23;62:16;104:9,
11,13,24;105:6;116:20
**weather (1)** 66:25
**week (2)** 64:18;68:19
**weight (4)** 85:5,9,9,25
**welfare (3)** 115:14;
116:7,12
**west (1)** 21:18
**Western (3)** 4:5;19:2;
121:25
**What's (8)** 8:11;14:23;
52:2;94:14;106:21;
107:3
**wheel (3)** 109:2;
116:17,19
**whole (1)** 53:19
**windshield (1)** 79:4
**wise (1)** 63:8
**within (6)** 88:6;96:17;
98:25;100:19,21,24
**without (2)** 23:12;64:10
**witness (25)** 4:23;5:6,9;
6:15;31:2,14;33:15;
37:7;50:1;52:15;55:3,

5;56:17;57:7;59:12;
65:18;75:13;89:17;
90:3;117:10,18;120:3,
21;121:13;123:2
**witnesses (1)** 51:22
**words (2)** 89:2;110:16
**work (41)** 10:5;15:7;
16:6,20,24;17:2,19;
19:18;20:4;21:5,20;
31:24;32:6,25;35:16;
36:14;37:9;40:25;
42:14;43:19;48:14,17,
18;49:2;52:8;54:12;
57:6,12;58:7;69:13,16;
73:5;83:13,17;92:3;
93:6,9;106:19;122:3,7;
123:3
**worked (12)** 15:24;
17:23;18:21,22;19:13;
20:15;45:5,9,15,22;
46:2;53:2
**working (10)** 14:16;
17:17,25;20:25;30:8,
15;45:22;46:9,15;
55:19
**World (1)** 55:13
**wrecks (4)** 21:23;22:7,
8,9
**write (3)** 10:10;28:24;
29:1
**writing (2)** 28:24;29:4
**written (5)** 41:14;50:2,
3;83:6;106:15
**wrong (10)** 6:8;12:3;
20:5;25:14;58:22;62:5;
82:1;84:1;89:1;103:16
**wrote (4)** 41:12,17;
48:2;93:14
**Wyoming (2)** 65:24;
66:16

**Y**

**year (18)** 9:7,13,14;
10:5,6,9;11:2;13:25;
27:8;55:17;57:19,24;
58:3,5,13,15;63:25;
105:21
**years (28)** 9:11;11:1,4,
7,8;12:22;13:5;14:25;
18:22;19:13,22;23:12,
13;28:14;41:15;45:15;
47:3,4,8;52:8;55:21;
62:14;66:5;111:25;
112:1;114:4,4;122:18

**Z**

**zebra (1)** 8:3
**Zoom (1)** 6:12

**0**

**03 (1)** 27:17

## 1

**1 (8)** 4:2,2;9:17,18;
  35:16;36:9;55:1;96:11
**10 (2)** 93:14,16
**10:12 (2)** 68:5,6
**10:21 (2)** 68:6,8
**10:54 (2)** 92:8,10
**100 (1)** 57:13
**11 (1)** 43:9
**11/17/45 (1)** 8:19
**11:05 (2)** 92:10,13
**11:40 (2)** 118:24,25
**11:44 (2)** 118:25;119:2
**118 (1)** 36:9
**11th (3)** 39:16;51:5,12
**13 (2)** 32:12,14
**13th (1)** 68:22
**14 (1)** 44:4
**15 (1)** 66:5
**155 (1)** 36:9
**161 (1)** 36:9
**18 (1)** 69:4
**180 (2)** 4:11;8:3
**18-427 (1)** 69:2
**1963 (1)** 9:8
**1964 (1)** 11:1
**1977 (1)** 55:18
**1985 (4)** 13:8;54:3;
  63:18;122:4
**1995 (2)** 13:8;22:25
**1997 (1)** 105:21
**1998 (2)** 23:8;27:16

## 2

**2 (11)** 31:11,13;32:2;
  33:1;37:1,1;50:9,13;
  97:10;98:12,24
**20 (2)** 63:4;79:24
**2003 (5)** 23:1,8,23;
  24:24;27:16
**2011 (3)** 59:8,12;61:20
**2014 (1)** 16:14
**2016 (8)** 14:13;15:16;
  16:14;25:11;58:17,21;
  62:25;63:20
**2017 (1)** 45:17
**2018 (2)** 45:17;121:24
**2019 (8)** 36:2;39:3,17;
  44:21;45:2,17;51:5;
  59:24
**2020 (1)** 4:7
**22nd (1)** 4:7
**25 (1)** 57:25
**26 (2)** 44:10;58:24

## 3

**3 (8)** 33:13,14;34:3,25;
  35:2;37:7;40:22;100:9

**30 (3)** 57:22;58:2;
  79:24
**325 (1)** 31:16
**35 (2)** 52:8;122:18
**375 (1)** 31:17
**391 (1)** 112:21
**391.11 (3)** 96:1,15;
  99:21
**391.11b3 (2)** 96:16;
  112:19
**391.21 (1)** 112:24
**391.33 (1)** 104:5

## 4

**4 (3)** 36:24;50:9,14
**40 (1)** 21:14
**427 (1)** 69:5
**48 (1)** 112:1

## 5

**5 (3)** 38:11;39:7,8
**5:19-CV-00375 (1)** 4:6
**50 (3)** 47:7,10;111:25
**50/50 (3)** 57:22;58:10;
  61:23
**545 (2)** 99:4,5

## 6

**6 (3)** 40:11;92:11,21
**60 (5)** 21:14,16,23;
  47:7,10
**63 (1)** 11:6
**64 (1)** 11:6
**66 (1)** 11:1

## 7

**7 (4)** 38:20,25;55:24;
  56:1
**70 (2)** 57:22;58:1
**70/30 (2)** 58:10;61:23
**75 (4)** 8:17;57:20,24;
  58:5

## 8

**8 (4)** 21:14;40:24;
  58:23;59:1
**8:37 (1)** 4:2
**80 (1)** 63:3
**85541 (1)** 8:4

## 9

**9 (2)** 91:8,9
**9:18 (2)** 33:19,20
**9:23 (2)** 33:20,22
**90 (2)** 13:10;14:4
**90s (2)** 13:10;105:1
**91 (2)** 13:10;14:4

**95 (4)** 27:16;58:3,4,5
**98 (1)** 23:3
**99 (1)** 23:3